1      UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA

3      WESTERN DIVISION

4   THE HONORABLE GEORGE H. KING, UNITED STATES DISTRICT JUDGE

5

6   UNITED STATES OF AMERICA,        )
                                     )
7                    PLAINTIFF,      )
                                     )
8           VS.                      )    NO. CR 07-732(A)-GHK
                                     )
9   IRA ISAACS,                      )
                                     )
10                   DEFENDANT.      )
    _____)

11

12

13

14      REPORTER'S TRANSCRIPT OF PROCEEDINGS

15      LOS ANGELES, CALIFORNIA

16      WEDNESDAY, JANUARY 19, 2011; 2:34 P.M.

17      DAUBERT HEARING; PAGES 1 THROUGH 127 INCLUSIVE

18

19

20

21

22

23                          MARY RIORDAN RICKEY
                            OFFICIAL COURT REPORTER
24                          255 EAST TEMPLE STREET
                            ROOM 181-G
25                          LOS ANGELES, CA  90012
                            MARY.USDC@YAHOO.COM

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR PLAINTIFF:

 4             UNITED STATES DEPARTMENT OF JUSTICE
               CRIMINAL DIVISION
 5             CHILD EXPLOITATION AND OBSCENITY SECTION
               BY:  MICHAEL W. GRANT, TRIAL ATTORNEY
 6                  DAMON A. KING, DEPUTY CHIEF
                    CHANTEL FEBUS, DEPUTY ATTORNEY GENERAL
 7             1400 NEW YORK AVENUE, N.W.
               SIXTH FLOOR
 8             WASHINGTON, D.C.  20005
               202-307-1982
 9

10    FOR DEFENDANT:

11             LAW OFFICES OF ROGER J. DIAMOND
               BY:  ROGER J. DIAMOND
12                  ATTORNEY AT LAW
               2115 MAIN STREET
13             SANTA MONICA, CALIFORNIA  90405
               310-399-9029
14

15    ALSO PRESENT:

16             IRA ISAACS

17

18

19

20

21

22

23

24

25
```

**I N D E X**

**JANUARY 19, 2011**

**WITNESSES**

| WITNESS | DIRECT | CROSS | REDIR | RECROSS | BY THE COURT |
|---------|--------|-------|-------|---------|--------------|
| IRA ISAACS | | 8 | | | 32 |
| (RESUMED) | | 68 | | | |

I N D E X

JANUARY 19, 2011

| GOVERNMENT'S | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| DH-1  SUD'S CLEANERS MAILER | 11 | 12 |
| DH-2  GINA'S PIZZA MAILER | 13 | |
| DH-3  RUSTY'S PIZZA MAILER | 13 | |

1          LOS ANGELES, CALIFORNIA; WEDNESDAY, JANUARY 19, 2011

2                              2:34 P.M.

3                              --oOo--

4          THE CLERK:  CALLING ITEM 1 ON THE COURT'S

5    CALENDAR, CRIMINAL 07-732, UNITED STATES OF AMERICA VERSUS

6    IRA ISAACS.

7          COUNSEL, PLEASE STATE YOUR APPEARANCE FOR THE

8    RECORD.

9          MS. FEBUS:  GOOD AFTERNOON, YOUR HONOR.

10   CHANTEL FEBUS REPRESENTING THE UNITED STATES.

11         MR. GRANT:  GOOD AFTERNOON, YOUR HONOR.

12   MICHAEL GRANT REPRESENTING THE UNITED STATES.

13         THE COURT:  THANK YOU, GOOD AFTERNOON.

14         MR. DIAMOND:  GOOD AFTERNOON, YOUR HONOR.

15   ROGER DIAMOND WITH MR. ISAACS, WHO IS PRESENT.

16         THE COURT:  ALL RIGHT.  GOOD AFTERNOON.

17         THIS MATTER'S ON THE COURT'S CALENDAR FOR A

18   DAUBERT HEARING WITH RESPECT TO THE PROPOSED EXPERT

19   TESTIMONY OF THE DEFENDANT.

20         MR. DIAMOND, MY UNDERSTANDING IS THAT THE

21   DEFENDANT HAS DECIDED TO FOREGO ANY EXPERT TESTIMONY BY

22   ANYONE OTHER THAN THE PROPOSED EXPERT, MR. ISAACS, HIMSELF.

23   IS THAT CORRECT?

24         MR. DIAMOND:  YES, YOUR HONOR.

25         THE COURT:  OKAY.  AND I HAVE RECEIVED YOUR

```
 1   FILING, WHICH WAS TIMELY FILED ON OR ABOUT JANUARY 12, WHICH

 2   PURPORTS TO SET FORTH WHAT THE QUALIFICATIONS ARE OF

 3   MR. ISAACS TO TESTIFY AND, GENERALLY, WHAT HE INTENDS TO

 4   TESTIFY ABOUT IF THE COURT WERE TO PERMIT HIM TO TESTIFY AS

 5   AN EXPERT.

 6           MR. DIAMOND:  YES, YOUR HONOR.

 7           THE COURT:  ALL RIGHT.  AND WHO'S GOING TO ADDRESS

 8   THE COURT AMONG THE COUNSEL FOR THE GOVERNMENT?

 9           MR. GRANT:  I WILL, YOUR HONOR.

10           THE COURT:  ALL RIGHT.  MR. GRANT, THEN, I TAKE

11   IT, OF COURSE, YOU HAVE HAD A CHANCE TO REVIEW THAT

12   JANUARY 12 FILING WITH RESPECT TO MR. ISAACS.

13           MR. GRANT:  YES, YOUR HONOR.

14           THE COURT:  OKAY.  MY FEELING IS THIS, THAT WE GO

15   AHEAD AND PUT MR. ISAACS ON THE STAND, HE'S SWORN, AND

16   MR. GRANT BE GIVEN AN OPPORTUNITY TO CROSS-EXAMINE

17   MR. ISAACS ONLY, OF COURSE, ABOUT THESE PURPORTED

18   QUALIFICATIONS AND SCOPE AND METHODOLOGY AND REASONS FOR

19   REACHING WHATEVER CONCLUSION.

20           WE'RE NOT INTERESTED IN THE CONCLUSION ITSELF,

21   AS SUCH, BECAUSE WE'RE NOT HERE TO DEBATE WHETHER OR NOT

22   IT'S A RIGHT OR WRONG CONCLUSION; BUT WE ARE HERE TO

23   DETERMINE WHETHER HE'S QUALIFIED AS AN EXPERT TO TESTIFY TO

24   WHAT HE PURPORTS TO TESTIFY ABOUT AND WHETHER HE HAS

25   RELIABLE METHODOLOGY FOR THE APPLICATION OF THAT EXPERTISE
```

```
 1    TO THE OPINION AND THEN, TO SOME EXTENT, WHETHER OR NOT IT

 2    WOULD BE EVEN HELPFUL TO THE JURY FOR PURPOSES OF 702.

 3              SO THAT'S WHAT I PROPOSE TO DO.

 4              IS THAT SATISFACTORY WITH YOU, MR. DIAMOND?

 5              MR. DIAMOND:  YES, YOUR HONOR.

 6              THE COURT:  WITH YOU, MR. GRANT?

 7              MR. GRANT:  YES, YOUR HONOR.

 8              THE COURT:  ALL RIGHT.  MR. ISAACS, WOULD YOU

 9    PLEASE WALK AROUND AND BE PREPARED TO TAKE THE STAND AND BE

10    SWORN BY THE CLERK.

11              THE CLERK:  PLEASE WAIT BEHIND OUR COURT REPORTER,

12    AND RAISE YOUR RIGHT HAND TO BE SWORN.

13                            IRA ISAACS,

14         THE DEFENDANT, WAS SWORN, TESTIFIED AS FOLLOWS:

15              THE CLERK:  DO YOU SOLEMNLY SWEAR THAT THE

16    TESTIMONY YOU SHALL GIVE IN THE CAUSE NOW PENDING BEFORE THE

17    COURT SHALL BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT

18    THE TRUTH, SO HELP YOU GOD?

19              THE WITNESS:  YES.

20              THE CLERK:  THANK YOU, SIR.  YOU MAY GO AROUND AND

21    TAKE A SEAT, PLEASE.

22                            (PAUSE.)

23              THE CLERK:  PLEASE ADJUST THE MICROPHONE AND SPEAK

24    DIRECTLY INTO IT.

25              THE WITNESS:  HELLO.  HELLO.  IS THIS GOOD?
```

```
1            THE CLERK:  YES.  STATE YOUR FULL NAME FOR THE
2    RECORD AND SPELL YOUR FIRST AND LAST NAME PLEASE.
3            THE WITNESS:  IRA ISAACS.  I-R-A, I-S-A-A-C-S.
4            THE CLERK:  THANK YOU.
5            THE COURT:  MR. GRANT.
6            MR. GRANT:  THANK YOU, YOUR HONOR.
7                      CROSS-EXAMINATION
8    BY MR. GRANT:
9    Q.   GOOD AFTERNOON, MR. ISAACS.
10   A.   GOOD AFTERNOON.
11   Q.   I WOULD LIKE TO TAKE A FEW MOMENTS JUST TO GO THROUGH
12   YOUR PLEADING AND SOME OF YOUR QUALIFICATIONS THAT YOU'VE
13   PUT FORTH IN THIS DOCUMENT.
14   A.   OKAY.
15   Q.   THERE'S A STATEMENT IN HERE THAT YOU RECEIVED A B.A.
16   DEGREE IN COMMUNICATION ARTS IN 1977.  IS THAT CORRECT?
17   A.   THAT IS CORRECT.
18   Q.   AND, MR. ISAACS, IS THAT THE DEGREE YOU RECEIVED AT
19   SUNY NEW PALTZ IN NEW YORK?
20   A.   YES, IT IS.
21   Q.   AND SINCE YOU ATTENDED COLLEGE IN 1977, HAVE YOU
22   RECEIVED ANY ADDITIONAL FORMAL EDUCATION?
23   A.   WHAT KIND OF EDUCATION, EXCUSE ME?
24   Q.   FORMAL EDUCATION.
25   A.   NO.
```

1    Q.   MR. ISAACS, OTHER THAN YOUR INVOLVEMENT IN THIS CASE,

2    HAVE YOU EVER BEEN QUALIFIED AS AN EXPERT IN THE AREA OF ART

3    OR ART STUDIES?

4    A.   NO, NO.

5    Q.   HAVE YOU BEEN QUALIFIED AS AN EXPERT IN MEDIA OR FILM

6    STUDIES?

7    A.   MEDIA, YES.

8    Q.   IN A COURT OF LAW, SIR?

9    A.   NO.  COURT OF LAW, NO.

10   Q.   HOW ABOUT COMMUNICATION ARTS?  HAVE YOU EVER BEEN

11   QUALIFIED AS AN EXPERT IN COMMUNICATION ARTS IN ANY COURT OF

12   LAW?

13   A.   COURT OF LAW, NO.

14        THE COURT:  CAN I GET CLARIFICATION, MR. ISAACS.

15        IS YOUR DEGREE IN COMMUNICATIONS OR COMMUNICATION

16   ARTS?

17        THE WITNESS:  COMMUNICATION ARTS.

18        THE COURT:  OKAY.

19   BY MR. GRANT:

20   Q.   MR. ISAACS, OTHER THAN YOUR INVOLVEMENT IN THIS CASE,

21   HAVE YOU EVER BEEN QUALIFIED AS AN EXPERT IN ANY SUBJECT IN

22   ANY COURT OF LAW?

23   A.   NO.

24   Q.   NOW, I BELIEVE IN YOUR PLEADING YOU ALSO TALK ABOUT

25   YOUR EXPERIENCE IN THE TRADITIONAL ART WORLD WITH YOUR

1    MARKETING CAMPAIGN?

2    A.    YES, I DID.

3    Q.    AND, MR. ISAACS, IS THAT YOUR ADVERTISING COMPANY,

4    ISAACS' ADVERTISING?

5    A.    YES.

6    Q.    AND IN THAT ADVERTISING AGENCY, YOU PRODUCE MARKETING

7    LIKE ADVERTISING PAMPHLETS FOR COMPANIES.  CORRECT?

8    A.    I WOULDN'T CALL THEM PAMPHLETS, BUT YES.

9    Q.    OKAY.  IS IT A --

10   A.    BASICALLY, THEY'RE DIRECT MAIL ADVERTISING THAT

11   SOMEBODY WILL COME TO ME AND SAY, "I HAVE TEN STORES.  I

12   WANT TO BRING PEOPLE IN.  COULD YOU MARKET."

13          WE USE THE MEDIUM -- SOME PEOPLE USE T.V. OR

14   RADIO.  WE USE DIRECT MAIL, WHICH IT IS PAPER AND YOU MAIL

15   IT AND SO IN THAT SENSE, IT IS.  BUT IN A CONTENT SENSE,

16   IT'S VERY DIFFERENT THAN WHAT YOU MIGHT THINK WHAT A COUPON

17   WOULD BE.

18   Q.    BUT YOU DO ACTUALLY CREATE COUPONS FOR COMPANIES SUCH

19   AS DRY CLEANERS --

20   A.    ABSOLUTELY.

21   Q.    -- AND PIZZA PARLORS?

22   A.    YES.  RESTAURANTS, YES.

23   Q.    AND YOUR CLIENTS INCLUDE COMPANIES SUCH AS SUD'S COIN

24   LAUNDRY CENTER AND GINA'S PIZZA?

25   A.    GINA'S PIZZA -- YEAH, YEAH, YEAH.  GINA'S PIZZA IN

```
 1    SANTA BARBARA, YES, AND SUD'S I THINK THEY'RE IN THE
 2    MIDWEST.
 3              MR. GRANT:  YOUR HONOR, WITH YOUR PERMISSION, I'D
 4    LIKE TO SHOW THE WITNESS AN EXHIBIT.
 5              THE COURT:  ALL RIGHT.  DO YOU WANT TO MARK THAT
 6    AS EXHIBIT 1 FOR PURPOSES OF DAUBERT HEARING?
 7              MR. GRANT:  YES, SIR.
 8              THE COURT:  HAVE YOU SHOWN A COPY OF IT TO
 9    MR. DIAMOND?
10              MR. GRANT:  I'LL PROVIDE MR. DIAMOND A COPY NOW,
11    SIR.
12              THE COURT:  DO YOU HAVE AN EXTRA COPY FOR THE
13    COURT?
14              MR. GRANT:  YES, SIR, I DO.
15              PERMISSION TO APPROACH?
16              THE COURT:  YES.
17              MR. GRANT:  HANDING THE CLERK OF THE COURT A
18    WORKING COPY FOR THE JUDGE OF EXHIBIT A.
19              THE COURT:  EXHIBIT 1.  WE'LL USE NUMBERS.  OKAY.
20    SO WE'LL JUST GO AHEAD AND SAY DAUBERT HEARING EXHIBIT 1,
21    DH EXHIBIT 1.
22              MR. GRANT:  YES, YOUR HONOR.
23              PERMISSION TO APPROACH THE WITNESS?
24              THE COURT:  YES, YOU MAY.
25      (GOVERNMENT'S EXHIBIT DH-1, MARKED FOR IDENTIFICATION.)
```

1    BY MR. GRANT:

2    Q.   MR. ISAACS, I'M HANDING YOU WHAT'S BEEN MARKED AS DH-1.

3    DO YOU RECOGNIZE THAT DOCUMENT?

4    A.   YES.

5    Q.   WHAT IS THAT, MR. ISAACS?

6    A.   THESE ARE COPIES, COLOR COPIES OF DIRECT MAIL PIECES

7    THAT I'VE DONE FOR, IN THIS CASE, A DRY CLEANER, SUD'S.  I

8    THINK IT WAS IN THE MIDWEST.

9    Q.   IS THAT A FAIR AND ACCURATE COPY OF WHAT YOU PRODUCED

10   FOR SUD'S?

11   A.   YES.  IT'S A FAIR AND ACCURATE COLOR COPY, YES.

12            MR. GRANT:  YOUR HONOR, WITH YOUR PERMISSION, I'D

13   LIKE TO ADMIT EXHIBIT DH-1 INTO EVIDENCE.

14            THE COURT:  ANY OBJECTION, MR. DIAMOND?

15            MR. DIAMOND:  NO, YOUR HONOR.

16            THE COURT:  ALL RIGHT.  IT WILL BE RECEIVED.

17            *(GOVERNMENT'S EXHIBIT DH-1 RECEIVED.)*

18            THE WITNESS:  DO I KEEP THIS?

19            THE COURT:  YOU CAN JUST LEAVE IT UP THERE FOR

20   NOW, MR. ISAACS.

21            THE WITNESS:  THANK YOU.

22            MR. GRANT:  YOUR HONOR, I HAVE WHAT'S BEEN

23   PREVIOUSLY MARKED AS DH-2.  I'M PROVIDING A COPY TO

24   MR. DIAMOND.

25            THE COURT:  ALL RIGHT.

```
 1              MR. GRANT:  I HAVE A WORKING COPY FOR THE COURT.
 2         PERMISSION TO APPROACH, YOUR HONOR?
 3              THE COURT:  YES.
 4              MR. GRANT:  HANDING THE CLERK A WORKING COPY OF
 5    DH-2.
 6              THE COURT:  IF YOU HAVE SEVERAL OF THESE, WHY
 7    DON'T WE DO IT ALL AT THE SAME TIME OR SEE IF HE RECOGNIZES
 8    THEM, RATHER THAN JUST DOING IT PIECEMEAL.
 9              DO YOU HAVE ANY OTHERS?
10              MR. GRANT:  YOUR HONOR, I JUST HAVE ONE MORE.
11              THE COURT:  OKAY.  WHY DON'T YOU DO IT RIGHT NOW,
12    AND WE'LL MARK THAT AS DH EXHIBIT 3.
13              MR. GRANT:  YES, SIR.
14              (GOVERNMENT'S EXHIBITS DH-2 AND DH-3
15                  MARKED FOR IDENTIFICATION.)
16              THE COURT:  AND MAKE SURE THAT COUNSEL HAS AN
17    OPPORTUNITY TO REVIEW IT, PLEASE.
18              MR. GRANT:  I'M PROVIDING A COPY OF DH-3 TO
19    MR. DIAMOND AND HANDING THE CLERK A COPY OF DH-3 FOR THE
20    COURT.
21              THE COURT:  THANK YOU.
22              MR. GRANT:  PERMISSION TO APPROACH, YOUR HONOR?
23              THE COURT:  YES.
24    BY MR. GRANT:
25    Q.   MR. ISAACS, I'M HANDING YOU DH-2 AND DH-3.  WOULD YOU
```

```
1    TAKE A LOOK AT THESE EXHIBITS, PLEASE.

2    A.    SURE.  OKAY.

3    Q.    MR. ISAACS, DO YOU RECOGNIZE THOSE EXHIBITS?

4    A.    YES.

5    Q.    AND WHAT ARE THOSE EXHIBITS?

6    A.    THESE ARE, AGAIN, DIRECT MAILERS.  THIS TIME IT'S FOR A

7    RESTAURANT CHAIN, GINA'S IN SANTA BARBARA.  IT'S LIKE A

8    SUPERHERO PIZZA WE MADE.

9    Q.    OKAY.  HOW ABOUT NO. 3.

10   A.    NUMBER 3 IS THE INSIDE OF THIS -- NO, NO, NO.  THREE

11   IS -- EXCUSE ME.  LET ME --

12              IF I REMEMBER CORRECTLY, WE'VE DONE SEVERAL PIECES

13   FOR GINA'S.  THIS WAS A DIFFERENT FORMAT FOR GINA'S.  IT

14   DIDN'T HAVE THIS COVER.  THIS WAS A SINGLE PIECE OF, YOU

15   KNOW, HARD PAPER.  THEY'RE BOTH GINA'S, BUT THEY'RE FROM

16   DIFFERENT PIECES THAT I PRODUCED FOR GINA'S.

17              THE COURT:  EXCUSE ME.  WHEN YOU SAY "THIS," ARE

18   YOU REFERRING TO EXHIBIT 2?

19              THE WITNESS:  I'M REFERRING TO -- THIS IS ONE

20   PIECE THAT STANDS ALONE.

21              THE COURT:  DON'T SAY "THIS."

22              THE WITNESS:  OH, I'M SORRY.

23              THE COURT:  REFER TO EXHIBIT 2 OR EXHIBIT 3 SO WE

24   HAVE A GOOD RECORD.

25              THE WITNESS:  EXHIBIT IT LOOKS LIKE 3 AND
```

```
 1    EXHIBIT 2 -- EXHIBIT 3 IS ONE SEPARATE PIECE, AND EXHIBIT 2
 2    IS THE SAME COMPANY BUT A TOTALLY DIFFERENT PIECE THAT WAS
 3    DONE AT A DIFFERENT TIME.
 4              THE COURT:  IS EXHIBIT 3 ALSO FOR GINA'S?
 5              THE WITNESS:  YES.
 6              THE COURT:  BUT IT SAYS --
 7              THE WITNESS:  NO.  EXCUSE ME.  RUSTY'S.  I'M
 8    SORRY, I'M SORRY.  I'M GETTING A LITTLE CONFUSED.  IT WAS
 9    QUITE A WHILE AGO.  I'M GLAD YOU POINTED THAT OUT.  I'M A
10    LITTLE NERVOUS.
11              THE COURT:  DON'T BE NERVOUS, BUT WAIT.  LET ME
12    ASK THE QUESTION.
13              THE WITNESS:  OKAY.
14              THE COURT:  EXHIBIT 2 RELATES TO SOME ADVERTISING
15    WORK THAT YOU DID FOR GINA'S PIZZA?
16              THE WITNESS:  YES, IN NEWPORT BEACH.  THAT IS
17    TRUE.
18              THE COURT:  AND THEN EXHIBIT 3 RELATES TO SOME
19    ADVERTISING WORK YOU DID FOR A RUSTY'S PIZZA PARLOR?
20              THE WITNESS:  YES, IN SANTA BARBARA.  THAT IS
21    EXACTLY RIGHT.
22              THE COURT:  ALL RIGHT.  VERY GOOD.
23              THE WITNESS:  THANK YOU.
24              THE COURT:  MR. GRANT.
25              MR. GRANT:  YES, SIR.
```

```
 1    BY MR. GRANT:

 2    Q.   MR. ISAACS, THE THREE EXHIBITS THAT I JUST PRESENTED TO

 3    YOU, ARE THOSE FAIR REPRESENTATIONS OF THE WORK THAT ISAAC'S

 4    ADVERTISING DOES?

 5    A.   WELL, IN THE SENSE OF IT IS -- YEAH, IT'S PROBABLY A

 6    FAIR -- YOU KNOW, WE DO DIFFERENT KINDS OF THINGS.  AND THAT

 7    IS PROBABLY A FAIR REPRESENTATION EVEN THOUGH I'VE BEEN IN

 8    BUSINESS FOR 25 YEARS.  THERE'S SO MUCH, AND I DON'T KNOW IF

 9    YOU CAN BOIL IT DOWN TO THESE TWO.

10         I HAPPENED TO BRING SOME EXHIBITS THAT ARE SIMILAR

11    TO THESE THAT WOULD -- I THINK WOULD REPRESENT A FAIRER

12    REPRESENTATION OF THE CREATIVE THING.  BUT I GUESS SO.  I

13    GUESS SO.  I DON'T SEE WHY NOT.

14    Q.   AND, MR. ISAACS, IN YOUR PLEADING ON THE SECOND PAGE

15    WHEN YOU TALK ABOUT THE TRADITIONAL ART WORLD AND YOUR

16    INVOLVEMENT IN PRODUCING MARKETING CAMPAIGNS --

17    A.   RIGHT.

18    Q.   -- IT'S FOR THIS BUSINESS.  CORRECT?

19    A.   YES.  AND ALSO I'M A PAINTER AND ARTIST AS WELL.

20    Q.   OKAY.  MR. ISAACS, THE ADVERTISING WORK THAT YOU DO FOR

21    ISAACS' ADVERTISING, IT'S NOT TIED TO THE FILMS THAT YOU DO

22    IN YOUR CAPACITY UNDER "STOLEN CAR FILMS," IS IT?

23    A.   WELL, IN A VERY ABSTRACT WAY IT IS BUT NOT IN A DIRECT

24    WAY.  IF YOU WANT ME TO EXPLAIN, I CAN.

25    Q.   WELL, I GUESS WHAT I'M GETTING AT IS YOU DON'T
```

1    INCORPORATE THE PORNOGRAPHY FILMS THAT YOU MAKE INTO YOUR

2    ADVERTISING CAMPAIGNS FOR GINA'S PIZZA, FOR EXAMPLE?

3    A.   I WOULDN'T CHARACTERIZE MY WORK AS PORNOGRAPHY FILMS.

4    BUT NO, THERE'S NO DIRECT RELATIONSHIP BETWEEN WHAT I DID

5    FOR GINA'S PIZZA AND THE FILMS THAT I'VE DONE.

6    Q.   OKAY.

7              THE COURT:  BUT IS THAT TRUE FOR ALL OF YOUR

8    ADVERTISING CUSTOMERS THROUGHOUT YOUR YEARS AS ISAAC'S

9    ADVERTISING?

10             THE WITNESS:  NO.  WHAT I THINK -- NO.

11             THAT'S WHY I SAID ABSTRACTLY.  I DID THIS FOR

12   QUITE A LONG TIME, AND AT THE TIME IT WAS PRETTY -- VERY,

13   VERY NEW AND EXCITING STUFF, LIKE TAKING -- AND THESE ARE

14   ALL HAND PAINTINGS, BY THE WAY.

15             THE COURT:  NO, NO.  I JUST WANT YOU TO ANSWER MY

16   QUESTION AND THAT IS IS THERE ANY INCORPORATING OF ANY OF

17   THE TYPE OF WORK THAT YOU HAVE DONE THROUGH "STOLEN CARS" --

18             THE WITNESS:  RIGHT.

19             THE COURT:  -- INTO ANY OF THE WORK THAT YOU DO

20   FOR ANY OF YOUR CLIENTS AT ISAACS' ADVERTISING?

21             THE WITNESS:  OKAY.  I THINK ALL THE BOX COVERS

22   AND ALL THE MARKETING COMES DIRECTLY FROM THESE IDEAS.

23             THE COURT:  SO IS THERE ANY INCORPORATION OF ANY

24   OF THE IMAGERY --

25             THE WITNESS:  IN THE FILMS?

```
 1              THE COURT:  -- IN THE FILMS TO THE ADVERTISING?

 2              THE WITNESS:  NO, NO.

 3              THE COURT:  THANK YOU.

 4              MR. GRANT.

 5              MR. GRANT:  THANK YOU, YOUR HONOR.

 6   BY MR. GRANT:

 7   Q.   NOW, YOU ALSO DISCUSS IN YOUR PLEADING ABOUT YOUR

 8   EXPERIENCE IN MAKING THE FILMS LIKE THE FILMS CHARGED IN

 9   THIS CASE.  CORRECT?

10   A.   WELL, ONE OF THE FILMS I DID MAKE.

11   Q.   AND THAT IS --

12   A.   HOLLYWOOD SCAT AMATEURS 7, I ACTUALLY MADE.

13              THE COURT REPORTER:  EXCUSE ME?

14              THE WITNESS:  THE FILM IS HOLLYWOOD SCAT AMATEURS

15   NO. 7, A CHARGED FILM, I MADE, I DIRECTED AND PRODUCED.

16              THE COURT:  WHAT ABOUT THE OTHER TWO CHARGED

17   FILMS?  WHAT ROLE, IF ANY, DID YOU HAVE IN THEM?

18              THE WITNESS:  WELL, I DISTRIBUTED THEM.  I DIDN'T

19   MAKE THEM.

20              THE COURT:  YOU WEREN'T THE PRODUCER?

21              THE WITNESS:  NO, I WAS NOT A PRODUCER OR NOTHING.

22   I JUST WAS THE DISTRIBUTOR.

23              THE COURT:  I SEE.  OKAY.  THANK YOU.

24              ALL RIGHT.  MR. GRANT.

25   ///
```

```
 1   BY MR. GRANT:

 2   Q.   AND, MR. ISAACS, I BELIEVE IN YOUR PLEADING YOU STATE

 3   THAT THE FACT THAT YOU WERE THE CREATOR AND DIRECTOR OF THIS

 4   FILM THAT YOU CHARACTERIZE AS "H.S.A. NO. 7" --

 5   A.   RIGHT.

 6   Q.   -- THAT THAT GIVES YOU A SPECIAL INSIGHT?

 7   A.   YES, I DO.

 8   Q.   JUST TO BE CLEAR ABOUT YOUR ROLE AS THE PRODUCER AND

 9   THE CREATOR, YOU CREATE THESE MOVIES AND YOU PLACE THEM ON A

10   WEBSITE FOR SALE.  IS THAT CORRECT?

11   A.   SOMETIMES, YES.

12        I HAVEN'T PUT EVERYTHING I'VE EVER PRODUCED ON THE

13   WEBSITE.

14   Q.   WELL, LET'S JUST USE -- AND WE'LL CALL IT "H.S.A. 7,"

15   AS AN EXAMPLE.

16   A.   YES.

17   Q.   OKAY.  YOU MAKE THAT VIDEO, AND THEN YOU PLACE IT ON A

18   WEBSITE FOR SALE.

19   A.   YES.

20   Q.   AND YOU ACTUALLY SOLD THAT VIDEO.

21   A.   YES.

22   Q.   AND THE WAY THAT WORKS IS THAT ONCE IT'S ON THE

23   WEBSITE, A PURCHASER CAN COME TO THE WEBSITE, REVIEW THE

24   DIFFERENT VIDEOS, AND THEN BUY THAT VIDEO FROM YOU EITHER

25   OVER THE INTERNET OR VIA MAIL?
```

1    A.    WHAT'S THE LAST ONE?

2    Q.    OR THROUGH THE MAIL.

3    A.    OH, YES.

4    Q.    ALL RIGHT.  AND YOU CHARGED FOR THESE VIDEOS?

5    A.    YES.

6    Q.    HOW MUCH WERE YOU CHARGING FOR "H.S.A. 7," FOR EXAMPLE?

7    A.    YOU KNOW, IT DEPENDS.  ANYWHERE AS LITTLE AS $10 AND AS

8    MUCH AS $30.

9    Q.    NOW, MR. ISAACS, ONCE YOU SELL THAT VIDEO AND YOU SEND

10   IT TO THE PURCHASER, YOU HAVE NO CLUE WHAT THAT PERSON DOES

11   WITH THAT FILM.  IS THAT CORRECT?

12   A.    I'LL ASSUME HE WATCHES THE FILM, BUT OTHER THAN THAT,

13   I, YOU KNOW....

14   Q.    RIGHT.  THESE FILMS, IT'S A FAIR CHARACTERIZATION THAT

15   THEY'RE SEXUALLY ORIENTED.  CORRECT?

16   A.    WHAT DO YOU MEAN BY THAT?  WHAT DOES THAT MEAN

17   "SEXUALLY ORIENTED"?

18   Q.    WELL, THEY CONTAIN --

19   A.    DOES IT HAVE SEX IN IT?

20   Q.    THEY CONTAIN SEX ACTS?

21   A.    YES.

22   Q.    OKAY.  AND THE FILMS WE'RE TALKING ABOUT SPECIFICALLY

23   ARE FILMS THAT INVOLVE SEX ACTS INCORPORATING SOME FORM OF

24   FECES, URINATION?

25   A.    YES.

1    Q.   OKAY.  AND YOU ADVERTISE THESE FILMS LIKE --

2    A.   WELL, WELL, CAN I -- CAN I BACK UP AND ANSWER THAT A

3    LITTLE BIT BETTER?

4    Q.   OKAY.

5    A.   EVEN THOUGH THERE'S SEX, THAT'S NOT THE POINT OF THESE

6    FILMS.  SO IF IT DIDN'T HAVE -- MANY OF MY FILMS DON'T HAVE

7    ANY SEX.  THE ONE THE GOVERNMENT HAPPENED TO PICK DID, BUT

8    THAT IS NOT THE FOCAL POINT OF THESE MOVIES IS THE SEX.

9    IT'S INCIDENTAL.

10    Q.   HOW MANY OF THESE VIDEOS HAVE YOU MADE, FOR EXAMPLE, IN

11    THE HOLLYWOOD H.S.A. CATEGORY, HOW MANY OF THOSE VIDEOS HAVE

12    YOU MADE?

13    A.   THIRTY-NINE.

14    Q.   ALL RIGHT.  ALL OF THOSE HAD SOME FORM OF SEXUAL ACT IN

15    THEM?

16    A.   NO.

17    Q.   NO?

18    A.   NO.  MOST DON'T.

19    Q.   PARDON ME?

20    A.   OKAY.  I DON'T KNOW HOW YOU DEFINE SEX, BUT FOR

21    EXAMPLE, IF SOMEBODY KISSES SOMEBODY, WOULD THAT BE SEX?

22    Q.   NO.  BUT I GUESS WHAT I'M GETTING AT --

23    A.   THERE ARE --

24          THE COURT:  WAIT.  DON'T TALK OVER EACH OTHER.

25          THE WITNESS:  OH, I'M SORRY.

```
 1          THE COURT:  SLOW DOWN.  WE HAVE TO GET A GOOD

 2    RECORD.  LET HIM ASK A QUESTION BEFORE YOU ANSWER, AND HE

 3    WILL LET YOU ANSWER BEFORE HE ASKS THE NEXT QUESTION.

 4          THE WITNESS:  OKAY.  THANK YOU.

 5          THE COURT:  ALL RIGHT.  VERY GOOD.

 6          GO AHEAD.  ASK YOUR NEXT QUESTION.

 7          MR. GRANT:  THANK YOU, YOUR HONOR.

 8    BY MR. GRANT:

 9    Q.   I GUESS WHAT I'M GETTING AT, MR. ISAACS, IS THAT

10    THERE'S SOME FORM OF SEXUAL ACT.

11    A.   NO.

12    Q.   NO.  OKAY.

13          HOW MANY FILMS OUT OF THE 39 OR SO FILMS DO NOT

14    INCLUDE SEXUAL ACTS?

15    A.   CAN I ASK YOU A QUESTION?

16          AM I ALLOWED?  HOW DO YOU DEFINE A SEXUAL ACT?

17    Q.   I'LL DEFINE THAT FOR YOU.

18    A.   OKAY.

19    Q.   INTERCOURSE, ORAL SEX, ANY DERIVATIVE OF THAT.

20    A.   OKAY.  I COULD ANSWER IT, BUT I'M NOT SURE WHAT

21    "DERIVATIVE" MEANS.  BUT MOST DON'T.  HOW MANY EXACTLY?  I

22    CAN'T TELL YOU.  BUT I WOULD SAY, YOU KNOW, THE EARLIER ONES

23    TEND TO HAVE MORE SEX, BUT THE LATER ONES DIDN'T.

24          THE LATER ONES WERE JUST, YOU KNOW, THE RAWNESS OF

25    IT; AND I REALIZED I DIDN'T NEED SEX FOR THOSE THINGS.  SEX
```

23

1    WAS KIND OF LIKE A MARKETING PLOY IN A SENSE.

2    Q.   ALL RIGHT.

3    A.   I WAS EXPERIMENTING A LOT.  SO I REALLY WAS ON VERY NEW

4    CREATIVE GROUND, AND I CAN'T BE, AS AN ARTIST -- BE AFRAID

5    TO MAKE MISTAKES.  SO THE LATER ONES I PRODUCED, GENERALLY,

6    HAD NO SEX AT ALL.

7    Q.   ALL RIGHT.  LET'S FOCUS ON THE CHARGED FILMS.

8    A.   OKAY.

9    Q.   "H.S.A. 7," DOES THAT INVOLVE SEX ACTS?

10   A.   YES.

11   Q.   AND THOSE ACTS INCLUDE ORAL SEX WHILE INVOLVING FECES?

12   A.   NO.

13          THE FECES IN THAT PARTICULAR MOVIE IS NOT REAL.

14   Q.   OKAY.

15   A.   SO IT'S REALLY NOT INVOLVING FECES AT ALL.

16   Q.   HOW ABOUT THE "MAKO" VIDEO?

17   A.   WHAT ABOUT IT?

18   Q.   THAT FILM INVOLVED FECES, URINE, AND SEX ACTS.

19   CORRECT?

20   A.   I THINK SO, YES.

21   Q.   AND THE VIDEO "HORSEPLAY"?

22   A.   YES.

23   Q.   THAT INCLUDES A SEX ACT WHERE A WOMAN IS PERFORMING

24   ORAL SEX ON A NUMBER OF HORSES.  CORRECT?

25   A.   TWO HORSES.

1    Q.   RIGHT.

2    A.   THAT'S THE NUMBER.

3    Q.   OKAY.  AND ALSO HAVING INTERCOURSE WITH A HORSE?

4    A.   YES.

5    Q.   AND WOULD YOU AGREE WITH ME THAT THOSE ARE SEX ACTS?

6    A.   YEAH, THOSE ARE SEX ACTS.

7    Q.   AND, MR. ISAACS, YOU ADVERTISE AND SELL THESE FILMS

8    THAT WE JUST DISCUSSED ON SITES SUCH AS SCATMOVIES.COM?

9    A.   YES.

10   Q.   AND SCATCINEMAX.COM?

11   A.   YES.

12   Q.   MR. ISAACS, YOU DON'T ADVERTISE THESE FILMS ON SITES

13   SUCH AS THE ART DEALERS ASSOCIATION OF AMERICA OR THE ART

14   DEALERS ASSOCIATION OF CALIFORNIA, DO YOU?

15   A.   NO, BUT THERE IS A REASON.

16   Q.   NOW, YOU ALSO DISCUSS IN YOUR PLEADING SOMETHING ABOUT

17   A GALLERY INSTALLATION THAT YOU'RE WORKING ON.

18   A.   YES.

19   Q.   NOW, THAT'S A PROJECT THAT YOU STARTED AFTER YOU WERE

20   INDICTED IN THIS CASE.  CORRECT?

21   A.   NO.

22   Q.   THAT'S NOT TRUE?

23   A.   NO, IT'S NOT TRUE.

24   Q.   ALL RIGHT.  WELL, PRIOR TO THIS CASE, HAD YOU TAKEN ANY

25   OF YOUR OTHER 39 VIDEOS AND TRIED TO OPEN A GALLERY AS WHAT

```
 1    YOU DESCRIBED HERE IN YOUR PLEADING?

 2    A.    NO.

 3    Q.    ALL RIGHT.  IS THE GALLERY UP AND RUNNING?

 4    A.    OKAY.  FIRST OF ALL, IT'S NOT MY GALLERY.  THAT WOULD

 5    BE A SELF-SERVING GALLERY.  THAT WOULD BE LIKE -- YOU KNOW,

 6    IT'S LIKE A PURPLE -- YOU KNOW, IT'S LIKE A VANITY PRESS.

 7    SO IT WOULDN'T BE MINE.  I WOULD NEVER DO THAT.

 8            SO WHAT I'M TALKING ABOUT ARE OTHER PEOPLE WHO ARE

 9    INTERESTED IN POSSIBLY SHOWING THIS INSTALLATION PIECE IN

10    THEIR GALLERY.

11    Q.    OKAY.  YOU DO DESCRIBE AN EXHIBIT IN YOUR PLEADING

12    ABOUT HOW YOU WERE GOING TO GO ABOUT PUTTING THAT TOGETHER.

13    CORRECT?

14    A.    YEAH, I DID.

15    Q.    OKAY.  AND HAVE YOU ACTUALLY COMPLETED THAT AND SHOWN

16    THAT TO AN AUDIENCE?

17    A.    NO BECAUSE IT'S NOT EXHIBITED YET.

18    Q.    OKAY.

19    A.    IT'S STILL -- IT'S STILL, YOU KNOW, WORKING IN MY MIND.

20            THE COURT:  SO YOU HAVEN'T EVEN APPROACHED ANY --

21            THE WITNESS:  NO, I ACTUALLY --

22            THE COURT:  YOU'VE GOT TO LET ME FINISH.

23            THE WITNESS:  I'M SORRY.

24            THE COURT:  SO YOU HAVE NOT APPROACHED ANY GALLERY

25    OWNER TO HAVE THIS INSTALLATION PUT IN HIS OR HER GALLERY?
```

```
 1              THE WITNESS:  I SPOKE TO A COUPLE, BUT THEIR MAJOR

 2    FEAR IS BECAUSE IT'S AN OBSCENITY -- FEDERAL OBSCENITY CASE,

 3    AT THIS POINT, THEY'RE AFRAID THEY'RE GOING TO GET ARRESTED.

 4    SO WE HAVEN'T WORKED OUT HOW THAT WOULD WORK.

 5              THE COURT:  ALL RIGHT.  AND NO GALLERY TO DATE HAS

 6    DISPLAYED THIS INSTALLATION.

 7              THE WITNESS:  CORRECT.

 8              THE COURT:  AND HAVE YOU CREATED EVEN THIS

 9    INSTALLATION HERE PHYSICALLY?

10              THE WITNESS:  WELL, YOU KNOW, INSTALLATION ART IS

11    NOT SOMETHING YOU DO LIKE A PAINTING, YOU CREATE AND, YOU

12    KNOW, YOU LEAVE IT IN YOUR APARTMENT, AND YOU BRING IT

13    SOMEPLACE AND SHOW IT.  YOU KNOW, IT'S A MASSIVE THING AND

14    YOU HAVE TO SET THE ROOM UP.

15              SO EVEN IF I CREATE IT, THERE WOULD BE NO WAY FOR

16    ME TO, YOU KNOW, BRING IT TO THEM.  SO WHAT I DID CREATE IS

17    A DRAWING.  AND I DON'T KNOW IF I COULD -- I HAVE THAT HERE.

18    I COULD SHOW THAT, BUT A DRAWING OF HOW IT WOULD BE, HOW IT

19    WOULD WORK.

20              THE COURT:  OKAY.  SO YOU HAVE AN IDEA, YOU HAVE A

21    RENDITION.

22              THE WITNESS:  YES.

23              THE COURT:  BUT YOU CANNOT SET IT UP BECAUSE YOU

24    DO NOT HAVE ANYBODY WHO HAS AUTHORIZED YOU TO USE THEIR

25    GALLERY FOR THAT PURPOSE?
```

1              THE WITNESS:  AT THIS POINT, YES.

2              THE COURT:  OKAY.

3              MR. GRANT.

4              MR. GRANT:  YES, YOUR HONOR.

5     BY MR. GRANT:

6     Q.   NOW, MR. ISAACS, IN THE PAST YOU'VE TESTIFIED -- AND I

7     BELIEVE YOU EVEN SPOKE TO PEOPLE ABOUT HOW YOU DEFINE ART --

8     AND I BELIEVE YOU STATED THAT "ART IS WHAT ARTISTS DO."

9     A.   YEAH, YOU CAN SAY THAT.  YOU COULD SAY ART, AT THE VERY

10    LOWEST LEVEL, IS WHAT AN ARTIST DOES.  THAT IS TRUE.

11    Q.   OKAY.  SO I GUESS MY QUESTION TO YOU WOULD BE:

12              IF AN ARTIST PRODUCES SOMETHING, IS IT THEN

13    NECESSARILY ART?

14    A.   OKAY.  LET ME SAY IT THIS WAY:  ALL ARTISTS PRODUCE

15    ART, BUT THEY MIGHT NOT BE PRODUCING GOOD ART, TASTEFUL ART,

16    BAD ART, OR EVEN SERIOUS ART.

17              THE BAR FOR BEING ART IS A VERY LOW BAR BECAUSE I

18    DON'T THINK WE NEED TO START JUDGING PEOPLE EVEN IF WE DON'T

19    LIKE IT.  SO ART IS WHAT ARTISTS DO.  BUT THAT DOESN'T MEAN

20    IT'S A SERIOUS PIECE OF ART OR EVEN A GOOD PIECE OF ART OR

21    SOMETHING THAT ANYBODY WOULD EVEN WANT TO LOOK AT.

22              THE COURT:  I'M SORRY.  I DIDN'T MEAN TO INTERRUPT

23    YOU.

24              THE WITNESS:  IT'S OKAY.

25              THE COURT:  WHEN YOU SAY "SERIOUS ART," YOU MEAN

```
 1   ART THAT HAS SERIOUS ARTISTIC VALUE?

 2             THE WITNESS:  YES.

 3             THE COURT:  WELL, YOU GO AHEAD.

 4             MR. GRANT:  YES, SIR.

 5             THE COURT:  I DON'T WANT TO INTERRUPT.  I JUST

 6   WANTED TO CLARIFY THAT.

 7   BY MR. GRANT:

 8   Q.   SO, MR. ISAACS, IS THERE ANYTHING THAT AN ARTIST

 9   PRODUCES OR CREATES THAT YOU WOULD CONSIDER AS NOT

10   QUALIFYING AS ART?

11   A.   AGAIN, DEPENDING ON HOW YOU -- IF YOU DEFINE ART THE

12   WAY I DEFINE IT, IF THE ARTIST SAYS, "IT'S NOT ART," IT'S

13   NOT ART.

14             THE COURT:  I'M SORRY.  I DIDN'T HEAR THAT LAST

15   PART.

16             THE WITNESS:  OKAY.  I DEFINE ART VERY, VERY

17   LOOSELY.  IT'S BASICALLY, IF AN ARTIST CREATES SOMETHING --

18   WHETHER IT'S GOOD, BAD, WHATEVER -- HE HAS A RIGHT TO SAY

19   "THIS IS MY ART."  BUT THAT DOESN'T MEAN IT'S GOOD ART OR

20   ADDS VALUE TO THE ART.  IT DOESN'T MEAN IT'S TASTEFUL OR

21   ANYTHING.

22             SO ART IS VERY -- A VERY LOW BAR TO MAKE IT ART.

23   SO IF AN ARTIST SAYS, "WELL, YOU KNOW, AS AN ARTIST, I THINK

24   WHAT I CREATED IS NOT ART," THEN I WOULD RESPECT THAT.

25   ///
```

```
 1   BY MR. GRANT:

 2   Q.   YOU SAID THAT THAT'S HOW YOU DEFINE ART.

 3              WHERE DO YOU GET THAT DEFINITION FROM?

 4   A.   A PART OF THAT DEFINITION IS FROM MARCEL DUCHAMP AND

 5   MANY PEOPLE IN THE POST MODERNISTIC MOVEMENT, AND IT'S A

 6   VERY ACCEPTED THEORY OF WHAT PEOPLE THINK ART IS.  IT'S

 7   MOSTLY MARCEL DUCHAMP.

 8   Q.   MR. ISAACS, LET'S FOCUS ON PORNOGRAPHY FOR A MOMENT.

 9   A.   OKAY.

10   Q.   CAN YOU COME UP WITH ANY TYPE OF PORNOGRAPHY THAT YOU

11   WOULD CONSIDER AS NOT QUALIFYING AS A PIECE OF ART?

12   A.   PIECE OF ART?

13   Q.   OR ART.

14   A.   NO, BUT IF YOU ASK ME -- IF YOU ASK ME HAVE I SEEN

15   PORNOGRAPHY THAT DOES NOT HAVE SERIOUS ARTISTIC VALUE, I

16   WOULD SAY MOST PORNOGRAPHY I'VE SEEN DOES NOT HAVE SERIOUS

17   ARTISTIC VALUE.  BUT IF YOU ASK ME, "IS IT ART," YEAH, WHY

18   NOT?  SOMEBODY CREATED IT; THEY TOOK SOME TIME TO DO THIS.

19              LOOK, THINK OF IT THIS WAY:  IF I LOOK AT THAT

20   CLOCK BEHIND YOU AND THAT -- AND THAT -- I'D LOOK AT THE

21   SECONDHAND, BUT I CAN'T SEE THAT FAR.  BUT IF THE

22   SECONDHAND'S TICKING, THAT'S NOT ART.

23              BUT IF I FILM THAT AND I INTENTIONALLY FILM THAT

24   FOR A POINT AND I FILM THAT, NOW IT BECOMES ART.  BUT IT

25   MIGHT NOT BE GOOD ART.  IT MIGHT BE LOW ART, OR IT MIGHT BE
```

1  TERRIBLE ART.  IT MIGHT NOT HAVE ANY VALUE.

2        BUT THE FACT THAT, AS AN ARTIST OR AS A HUMAN

3  BEING, I'VE DECIDED TO CAPTURE SOMETHING LIKE THAT WOULD

4  MAKE IT ART.  BUT IF IT'S JUST TICKING AWAY, IT'S NOT ART.

5  Q.  ALL RIGHT.  MR. ISAACS, LET'S FOCUS ON SERIOUS ARTISTIC

6  VALUE.

7        HOW DO YOU DEFINE SERIOUS ARTISTIC VALUE?

8  A.  WELL, I THINK FOR SOMETHING TO HAVE SERIOUS ARTISTIC

9  VALUE, IT'S IMPORTANT THAT IT ENGAGES THE VIEWER IN A

10  PROFOUND WAY.  AND IF IT MAKES THEM THINK ABOUT THEIR

11  DAY-TO-DAY OR MAKES THEM THINK ABOUT CERTAIN ISSUES OF THE

12  DAY, POLITICAL ISSUES, AND IT AFFECTS THEM IN A WAY THAT

13  ELEVATES DISCUSSION AND THINGS LIKE THAT, IT TENDS TO BE

14  SERIOUS ART.

15        ART THAT ENGAGES PEOPLE TO THINK ABOUT THINGS, I

16  THINK, IS SERIOUS ART OR HAS SERIOUS ARTISTIC VALUE, AND IT

17  COULD BE GOOD.  IF YOU TASTE IT, IT MIGHT BE -- YOU MIGHT

18  SAY, YOU KNOW, MY TASTE IS NOT THIS.  I THINK IT'S TERRIBLE.

19        SO SERIOUS ART, SERIOUS ARTISTIC VALUE COULD BE

20  TASTELESS.  TASTE AND PRODUCTION VALUE HAS NOTHING TO DO

21  WITH IT.  IT'S WHAT THE VIEWERS ULTIMATELY GET OUT OF THIS.

22  AND IF IT ENGAGES PEOPLE TO THINK ABOUT THINGS AND EVEN IF

23  IT'S NEGATIVE THINGS -- EVEN IF THEY SAY "I HATE THIS.  THIS

24  IS NEGATIVE.  THIS IS NOT ART.  THIS IS TERRIBLE," THAT IS

25  THE PURPOSE, I THINK, THAT GIVES IT SERIOUS ARTISTIC VALUE

1    BECAUSE IT GIVES A DIALOGUE OF WHAT ART IS.

2    Q.    MR. ISAACS, HAVE YOU EVER PUBLISHED ANY ARTICLE

3    REGARDING THE SERIOUS ARTISTIC VALUE IN ANY JOURNAL?

4    A.    ME, PERSONALLY?

5    Q.    YES.

6    A.    NO.

7    Q.    HAVE YOU EVER LECTURED ON THE SERIOUS ARTISTIC VALUE AT

8    ANY UNIVERSITIES, COLLEGES?

9    A.    NO.

10          CAN I RESPOND TO THAT THOUGH?

11          I DON'T KNOW IF I --

12   Q.    WELL, LET ME JUST ASK YOU HOW WOULD YOU DETERMINE, IF

13   YOU WERE LOOKING AT SOMETHING THAT YOU DEEMED AS ART --

14   A.    YES.

15   Q.    -- HOW WOULD YOU ACTUALLY LOOK AT THAT AND DETERMINE IF

16   THAT PIECE HAD SERIOUS ARTISTIC VALUE?

17   A.    WELL, I THINK THERE'S A LOT OF THINGS YOU WOULD LOOK AT

18   AS AN EXPERT, YOU KNOW.  AS A PARTICULAR VIEW, IT'S WHAT I

19   GET OUT OF IT.  BUT AS AN EXPERT YOU LOOK AT, YOU KNOW,

20   WHAT'S OUT THERE, WHAT BOOKS ARE TALKING ABOUT IT, WHAT PEER

21   REVIEW OF THE ART MIGHT BE.

22          SO YOU KIND OF -- WHAT MUSEUMS, THINGS LIKE THAT.

23   SO YOU LOOK AT BASICALLY -- THE METHODOLOGY I WOULD USE IS

24   KIND OF LIKE -- IT'S NOT SCIENCE IN THE SENSE LIKE MATH IS

25   SCIENCE, BUT IT'S MORE LIKE PHILOSOPHY OR LIKE

1    PSYCHOANALYSIS.

2              BUT TAKE PHILOSOPHY, FOR EXAMPLE, IF I WAS GOING

3    TO TALK ABOUT THAT AND I WANTED TO CONCENTRATE ON

4    EXISTENTIALISM, I'D PROBABLY WANT TO READ KAFKA AND

5    NIETZSCHE AND CAMUS AND THINK OF THESE PEOPLE, WHAT THEY

6    HAVE TO SAY, LOOK AT OTHER ARTICLES, PEER REVIEWS OF THINGS

7    AND MAKE -- FROM ALL THAT EMPIRICAL INFORMATION, MAKE SOME

8    KIND OF INTELLIGENT DECISION.

9              BUT LIKE PSYCHOANALYSIS OR PHILOSOPHY, IT'S NOT A

10   HARD SCIENCE.  SO I CAN'T SAY, YOU KNOW, I HAVE A SCALE OF

11   NUMBERS, AND I ADD THEM UP, AND IT BECOMES SERIOUS ART.

12                          **EXAMINATION**

13   BY THE COURT:

14   Q.   I THINK THAT'S MORE OF A DESCRIPTION THAN AN ANSWER.

15   I'M NOT SURE I QUITE APPRECIATE WHAT YOUR ANSWER IS.   I

16   MEAN, I CAN UNDERSTAND WHAT YOU'RE SAYING THAT IT'S NOT,

17   LIKE, MATHEMATICS OR ONE OF THE HARD SCIENCES, OF COURSE.

18              BUT WHEN YOU SAY YOU LOOK AT PEER REVIEW ARTICLES,

19   MUSEUMS -- WHATEVER -- WHAT IS IT THAT YOU'RE GETTING FROM

20   THIS THAT DRIVES YOUR METHODOLOGY?

21              I MEAN, YOU'RE JUST SAYING, "THESE ARE THINGS I

22   DO."

23              BUT WHAT IS IT ABOUT THOSE THINGS THAT YOU DO THAT

24   GIVES YOU SOME LEVEL OF METHODOLOGY OR PRINCIPLE THAT CAN BE

25   APPLIED RELIABLY TO DIFFERENT CIRCUMSTANCES?

33

1    A.    OKAY.  LET ME SEE IF I CAN THOROUGHLY UNDERSTAND THAT

2    QUESTION.

3              I THINK ART, WHEN YOU HAVE TO APPLY METHODOLOGY,

4    YOU HAVE TO APPLY IT LIKE -- NOT LIKE A HARD SCIENCE BECAUSE

5    YOU JUST CANNOT DO THAT.

6    Q.    I UNDERSTAND.  I'M NOT SUGGESTING THAT.

7    A.    SO WHAT I TRY TO DO IS, FOR EXAMPLE, IF I'M GOING TO

8    TALK ABOUT POSTMODERNISM, I'M GOING TO -- YOU KNOW, I

9    RESEARCH IT; I LOOK AT NOT ONLY WHAT THINGS ARE WRITTEN

10   ABOUT IT, LET'S SAY, DUCHAMP OR PIERO MANZONI.  I READ ABOUT

11   WHAT THE PEER REVIEWS OF ART CRITICS WOULD SAY ABOUT IT AND

12   LOOK AT THE HISTORY OF THESE THINGS AND WAY SMARTER PEOPLE

13   THAN ME WHO TALK ABOUT THIS PERIOD OF POSTMODERNISM.

14             AND I BRING ALL THOSE THINGS TOGETHER AND MY OWN

15   EXPERTISE AS AN ARTIST, AND I THINK I COULD SHED LIGHT ON

16   THE VALIDITY OF THESE THINGS BY SHOWING OTHER THINGS.

17   Q.    WELL, BUT MY CONCERN IS THIS -- YOU SAY WHAT IS IT THAT

18   YOU'RE GETTING FROM YOUR READING OF THESE SO-CALLED

19   POST-MODERN ARTISTS' WORKS OR PUBLICATIONS -- OR WHATEVER IT

20   IS -- THAT ALLOWS YOU TO APPLY THEM TO DIFFERENT

21   CIRCUMSTANCES AND SAY NOW I'M GOING TO APPLY THE

22   CIRCUMSTANCES OF "H.S.A. NO. 7" AND, AS APPLIED, I CAN HAVE

23   THIS OPINION THAT THIS HAS SERIOUS ARTISTIC VALUE.

24             SO FAR, YOU'RE TELLING ME PROCESS WITH NO

25   METHODOLOGY.  I NEED TO KNOW WHAT IS THE METHODOLOGY BY

```
1    WHICH OR THE PRINCIPLE THAT YOU USE, THAT YOU HAVE GLEANED

2    FROM ALL OF YOUR READINGS, WHATEVER READINGS YOU HAVE

3    DONE --

4    A.   ARE YOU ASKING WHAT I GET OUT OF IT AND HOW DO I APPLY

5    IT TO MY OWN --

6    Q.   SAY THAT AGAIN.

7    A.   ARE YOU ASKING ME WHAT I GET OUT OF THOSE READINGS AND

8    HOW I APPLY IT TO MY FILM-MAKING?

9    Q.   WHAT IS IT ABOUT THE READINGS, WHAT PRINCIPLES OR

10   FACTORS THAT YOU HAVE OBTAINED FROM YOUR READINGS THAT YOU

11   THINK WOULD BE THE KEY FACTORS FOR YOU, AS A PURPORTED

12   EXPERT, TO BE ABLE TO USE TO COME TO ANY CONCLUSION ABOUT

13   ANY PARTICULAR PIECE OF WORK AS TO ITS SERIOUS ARTISTIC

14   VALUE?

15         YOU KNOW, I GUESS WHAT I'M SAYING IS, IN A MORE

16   CONCRETE WAY, IF I WANT TO MEASURE WHAT YOUR TEMPERATURE IS,

17   THEY HAVE THERMOMETERS.  OKAY.  BECAUSE THERE'S CERTAIN --

18   BUT I'M NOT SAYING IT HAS TO BE THAT EXACT, BUT I STILL HAVE

19   TO HAVE SOMETHING MORE THAN JUST YOU SAYING, "I READ THIS.

20   THAT'S MY CONCLUSION."

21         WE'RE MISSING THE MIDDLE STEP OF, WELL, YOU READ

22   IT.

23         WHAT ABOUT WHAT YOU READ THAT CAUSES YOU TO HAVE

24   WHAT RELIABLE METHODOLOGY THAT THEN I CAN SEE IF THOSE CAN

25   RELATE TO THE KIND OF CONCLUSIONS YOU CAN DRAW FROM THEM.
```

1    A.   I THINK, AS AN ARTIST AND A FILMMAKER AND ALSO AS A

2    TRADITIONAL ARTIST DOING PAINTINGS AND THINGS LIKE THAT,

3    YOU'RE INFLUENCED BY MANY, MANY PEOPLE.

4            SO WHEN I READ ABOUT, LET'S SAY, MARCEL DUCHAMP

5    AND I READ ABOUT "FOUNTAIN," WHICH IS, IN MY OPINION, ONE OF

6    THE FIRST SHOCK ART PIECES.

7            ARE YOU FAMILIAR WITH THAT?  BECAUSE I HAVE A

8    PICTURE HERE.

9    Q.   I READ ABOUT IT IN YOUR STATEMENT.

10   A.   OKAY.  IT'S A VERY, VERY TOUGH QUESTION.  BUT WHAT I

11   USE IS TRYING TO BE ON THE EDGE.  I TRY TO SEE WHAT OTHER

12   ARTISTS ARE DOING AND HOW I CAN TAKE IT AND HOW DO I BE ON

13   THE EDGE, HOW DO I DO SOMETHING NEW AND DIFFERENT.

14           AND CHRIS OFILI AND KIKI SMITH, THEY'VE ALL USED

15   THESE -- ALL THESE SCATOLOGICAL KIND OF THEMES IN THEIR ART,

16   AND IT'S BEEN VERY SUCCESSFUL.  IN FACT, THE TATE MUSEUM

17   OFFERS THIS THING CALLED "THE TURNER AWARD," AND THE LAST

18   COUPLE OF YEARS AGO, A WOMAN -- A MANNEQUIN ON A TOILET WINS

19   THE AWARD.

20           I THINK ART AND WHAT I GET OUT OF IT IS DOES IT

21   TRY TO CHALLENGE EXISTING KIND OF IDEAS.  HOW DO WE GO FROM

22   THE BAROQUE PERIOD TO THE CLASSICAL PERIOD TO THE EARLY

23   ROMANTIC AND SO ON AND SO FORTH.  HOW DO WE GO THERE?  WE

24   DON'T GO THERE ONE WAY.  BACH DIDN'T DIE IN 1750 AND

25   CLASSICAL STARTED.

1          SO I TRY TO TAKE FROM THESE THINGS WHAT OTHER

2   PEOPLE ARE DOING, PUT A NEW TILT ON IT, AND TRY TO ADVANCE

3   THE ARTISTIC IDEAS, AND PART OF IT IS DECONSTRUCTING --

4          I'M NOT REALLY SURE.  I KNOW THAT YOU'RE ASKING A

5   VERY, VERY GOOD QUESTION.  I'M REALLY NOT GETTING WHAT KIND

6   OF MECHANISM I WOULD USE, LIKE A THERMOMETER.  HOW I WOULD

7   USE IT BESIDES AN OPINION AND SHOWING LIKE CASE LAW,

8   DIFFERENT -- LIKE EACH ONE, LIKE I SHOW MARCEL DUCHAMP, IF I

9   SHOW PIERO MANZONI.

10          THIS IS KIND OF LIKE ARTIST CASE LAW.  IT SHOWS

11  WHAT PEOPLE ARE DOING, AND I'M TRYING TO GO IN THE SAME VEIN

12  AND MAYBE EVEN ONE STEP FURTHER.

13  Q.   WELL, WHAT YOU'RE REALLY DOING IS YOU'RE ESSENTIALLY

14  USING THOSE THINGS IN THE EXHIBIT -- THE FOUNTAIN AND THE

15  OTHER THINGS THAT YOU REFER TO -- AS SOME SORT OF A

16  COMPARISON.

17  A.   YOU KNOW, I REALLY CAN'T COMPARE MYSELF TO MARCEL

18  DUCHAMP OR ANY OF THESE PEOPLE.  THEY WERE GREAT ARTISTS.

19  Q.   BUT YOU ARE, IN EFFECT, SAYING THAT'S WHAT THEY'RE

20  DOING, AND I AM DOING SOMETHING -- BUILDING FROM THAT, AND

21  THEREFORE, IF THAT'S ART, THIS HAS ARTISTIC VALUE.

22  A.   I WOULD SAY THE FIRST THING IS TRUE.  I AM TRYING TO

23  BUILD, AND THEY DO INFLUENCE ME, THESE PEOPLE.  BUT I'M NOT

24  SURE IF I'M MAKING THE NEXUS BETWEEN BECAUSE THEY DO ART,

25  MINE IS ART.

```
 1   Q.   WELL, THEN, HOW DO YOU CONCLUDE -- BECAUSE YOU'RE HERE

 2   TESTIFYING AS AN EXPERT, THEN HOW DO YOU CONCLUDE WHAT YOU

 3   WANT TO CONCLUDE, WHICH IS, I TAKE IT, THAT YOU'RE PROPOSING

 4   THAT WHAT YOU DID IN THESE THREE COUNTS HAS TO DO WITH

 5   ARTISTIC VALUE?

 6   A.   RIGHT.

 7   Q.   THAT'S WHAT I'M GETTING AT IS THAT -- I'M NOT DISPUTING

 8   OR ARGUING WITH YOUR CONCLUSION, IF YOU'RE PERMITTED TO

 9   TESTIFY.  WHETHER ANYBODY AGREES WITH YOUR CONCLUSION IS NOT

10   GENERALLY THE BAROMETER BY WHICH WE MEASURE WHETHER YOU GET

11   TO BE AN EXPERT WITNESS OR NOT.

12   A.   RIGHT.

13   Q.   THAT'S FOR THE JURY TO DECIDE.  BUT BEFORE YOU CAN COME

14   TO THAT CONCLUSION, HOWEVER YOU COME TO THE CONCLUSION,

15   WHATEVER THE CONCLUSION IS -- THERE COULD BE AN EXPERT

16   WITNESS THAT THEY MIGHT CALL THAT SAYS "I ABSOLUTELY

17   DISAGREE WITH MR. ISAACS AS TO THE CONCLUSION," BUT THAT

18   DOESN'T MEAN THAT EITHER OF YOU CAN'T TESTIFY.  MAYBE BOTH

19   OF YOU CAN TESTIFY.

20        BUT BEFORE ANYBODY CAN TESTIFY, I HAVE TO

21   UNDERSTAND WHAT IS THE MEANS BY WHICH YOU GET TO THAT

22   CONCLUSION.

23   A.   OKAY.

24   Q.   IT CAN'T BE JUST BECAUSE "THAT'S MY OPINION."

25   A.   RIGHT.
```

1    Q.    IF THAT'S JUST MY OPINION THAT IS UNTETHERED TO A

2    CERTAIN METHODOLOGY THAT CAN BE TEST -- THAT CAN BE AT LEAST

3    EXAMINED --

4         I DON'T MEAN TESTED IN THE SENSE OF

5    EPIDEMIOLOGY, BUT THAT CAN BE EXAMINED, THEN I THINK WE HAVE

6    A PROBLEM.

7    A.    OKAY.

8    Q.    SO THAT'S WHAT MY QUESTION IS TO YOU.  I'M STILL TRYING

9    TO UNDERSTAND WHAT YOUR ANSWER IS AS TO HOW DO YOU GO FROM

10   LOOKING AT DUCHAMP OR ANY OF THOSE THINGS THAT YOU SAY YOU

11   WANT TO LOOK AT OR ANY OF THE OTHER INSTANCES WHERE FECES

12   HAD BEEN USED IN A DIFFERENT WAY --

13        HOW DO YOU GO, THEN, AND SAY OKAY, I CAN, HAVING

14   TAKEN THAT RECORD -- IF YOU WANT TO CALL IT THAT -- OF

15   WHAT'S EXISTING OUT THERE, BY APPLYING WHATEVER METHODOLOGY,

16   MY CONCLUSION IS THAT YOUR FILMS ARE WITH SERIOUS ARTISTIC

17   VALUE.

18   A.    OKAY.  I THINK THEY ARE COMPARABLE.

19        I THINK I DO LOOK TO THESE PEOPLE TO BE INFLUENCED

20   AND THERE ARE CERTAIN PEOPLE I LOOK AT AND OTHER PEOPLE I

21   DON'T.  THE FACT THAT MARCEL DUCHAMP HAS ENDURED, HIS WORK,

22   IS SOMETHING I LOOK TO AND TRY TO DO A NEW VERSION OF IT OR

23   ANY OF THESE OTHER PEOPLE.

24        SO I TRY TO BE IN THE COMPARABLE SYSTEM OF

25   POSTMODERNISM.  I'M TRYING TO DO THINGS IN A WAY THAT IS IN

1    LINE WITH THAT AND TO HOPEFULLY BRING THINGS A LITTLE BIT

2    FORWARD.

3          SO THE BAROMETER IS WHAT OTHER PEOPLE HAVE DONE

4    THAT HAS BEEN CONSIDERED BY ART CRITICS, MUSEUMS, AND THE

5    LIKE OF SERIOUS ARTISTIC VALUE AND EMULATE THAT IN A WAY AND

6    TO BRING -- YOU KNOW, IN FACT, LIKE MY FILMS.

7          FOR EXAMPLE, ALL MY DIRECTOR'S CREDIT IS JOSEPH K.

8    FROM THE CHARACTER FROM THE TRIAL BECAUSE, I BELIEVE, WHEN I

9    FIRST MADE A FILM, I USED THAT CHARACTER BECAUSE KAFKA'S

10   "BEFORE THE LAW" STORY, YOU KNOW, OF GOING TO THE DOORS AND

11   EVENTUALLY BEING CLOSED WAS ALWAYS ONE OF THE BIGGEST THINGS

12   IN MY LIFE, TO NOT HAVE THE DOOR BEING CLOSED ON ME.

13   Q.   WELL, I DON'T MEAN TO INTERRUPT YOU, BUT I THINK WE ARE

14   GOING QUITE COLLATERALLY AT THIS POINT.

15         YOU STILL HAVE NOT ADDRESSED MY CONCERN.  WHAT

16   YOU'RE SAYING TO ME IS "I WAS INFLUENCED BY THESE PEOPLE."

17   OKAY.  THAT'S NOT THE ISSUE.

18         THE QUESTION IS NOT WHETHER YOU COULD BE

19   INFLUENCED BY THESE PEOPLE.  YOU'RE TESTIFYING AS AN EXPERT,

20   REGARDLESS OF WHETHER YOU'RE ALSO THE DEFENDANT.

21   A.   RIGHT.

22   Q.   YOU'RE PROFFERING YOURSELF AS AN EXPERT.  SO I WANT TO

23   KNOW WHAT METHODOLOGY PERMITS YOU OR ANY OTHER EXPERT TO GO

24   FROM WHAT YOU HAVE READ TO MAKING ANY KIND OF CALL ON THE

25   THREE FILMS.

```
 1          LET ME PUT IT ANOTHER WAY.

 2          BECAUSE CERTAIN OF THESE EXHIBITS THAT YOU HAVE

 3  TALKED ABOUT IN YOUR STATEMENT ALSO HAVE SOME USE OF

 4  FECES -- FOR INSTANCE, "TRAIL" OR WHATEVER -- DOES THAT MEAN

 5  ANY USE OF FECES IN VISUAL DEPICTION WOULD NECESSARILY BE OF

 6  SERIOUS ARTISTIC VALUE?

 7  A.   NO.

 8  Q.   WOULD THERE BE SOME INSTANCES WHERE THE USE OF FECES IN

 9  VISUAL DEPICTIONS, FOR EXAMPLE, WOULD LACK SERIOUS ARTISTIC

10  VALUE?

11  A.   YES.

12  Q.   NOW, THIS IS MY QUESTION:

13          WHAT IS THE METHODOLOGY BY WHICH YOU GO ABOUT

14  DISTINGUISHING THOSE USES OF FECES THAT WOULD HAVE SERIOUS

15  ARTISTIC VALUE VERSUS THOSE USES OF FECES THAT WOULD NOT?

16  A.   OKAY.  I THINK I UNDERSTAND IT BETTER NOW.

17  Q.   OKAY.

18  A.   I THINK A LARGE PART OF IT IS YOU HAVE THE OPPORTUNITY

19  TO SHOW YOUR WORK, AND I HAVE SHOWN MY WORK ON THE INTERNET.

20  IT'S BEEN DISCUSSED; PEOPLE HAVE BLOGGED ABOUT IT; PEOPLE

21  HAVE TALKED ABOUT IT.  I'VE BEEN -- AND I'M NOT JUST TALKING

22  ON THE NEWS OR A NEWS STORY, BUT A LOT OF PEOPLE HAVE

23  REACTED TO THIS, AND THEY'VE REACTED POSITIVE; THEY'VE

24  REACTED NEGATIVE.

25          SO THE POINT THAT I HAVE THE CONVERSATION -- THE
```

```
 1   POINT THAT I GO WITH AND GO ON AND, LIKE I SAID, PAT BOONE

 2   IS WRITING AN ARTICLE ABOUT ME --

 3          YOU KNOW, HOW I CONNECT WITH PAT BOONE IN MY LIFE

 4   IS THE MOST AMAZING THING, SHOWS THAT I GOT PEOPLE TO THINK

 5   ABOUT THE NATURE OF ART, WHAT IS ART, WHAT IS ANIMAL

 6   CRUELTY, WHAT IS -- YOU KNOW, WHAT'S TABOO.  AND EVEN THE

 7   NAZI SITES WRITE ABOUT ME.

 8          SO I THINK THE FACT THAT I'VE GOTTEN A LOT OF

 9   PEOPLE TO TALK ABOUT IT IS THE IMPORTANT THING.  VERY MUCH

10   LIKE RAUSCHENBERG'S "WHITE" PAINTING.

11          NOW, RAUSCHENBERG'S "WHITE" PAINTING IS -- MOST

12   PEOPLE'S REACTION TO IT IS THIS IS NOTHING; MY KID CAN DO

13   IT; IT'S NOT ART.  BUT IT'S A GREAT PIECE; IT'S IN A MUSEUM

14   BECAUSE IT GETS THE AUDIENCE TO REACT AND TALK ABOUT ART AND

15   BLAH, BLAH, BLAH.

16          THE "WHITE" PAINTING IN THE APARTMENT IS JUST A

17   WHITE PAINTING WITH NO SERIOUS ART, BUT THE AUDIENCE

18   ELEVATED THE STUFF TO SERIOUS ARTISTIC VALUE.

19   Q.   OKAY.  SO, THEN, APPLYING WHAT YOU JUST SAID, WHAT

20   WOULD BE AN INSTANCE WHERE THE USE OF FECES WOULD HAVE NO

21   SERIOUS ARTISTIC VALUE?

22   A.   WELL, YOU KNOW, EVERY PIECE IS DIFFERENT, AND YOU KNOW,

23   SOMETIMES ART COULD BE A MASTERPIECE BUT WE DON'T REALIZE IT

24   YET.

25   Q.   NO, I'M NOT TALKING ABOUT GENERALLY.
```

```
 1   A.   OH, I SEE.

 2   Q.   I'M ASKING YOU, AS A PROPOSED EXPERT, TO TELL ME,

 3   USING THOSE CRITERIA THAT YOU SAID, WHAT WOULD BE AN

 4   INSTANCE WHERE THE USE OF FECES WOULD, IN YOUR MIND, BE NO

 5   SERIOUS ARTISTIC VALUE.  BECAUSE YOU SAID NOT EVERY USE OF

 6   IT --

 7   A.   NO, NO, AND I AGREE.  LET'S SAY IF YOU TOOK A FILM WITH

 8   JUST A WOMAN IN THE BATHROOM JUST GOING TO THE TOILET WITH

 9   NOTHING ELSE HAPPENING, I THINK -- AND IT WOULD HAVE FECES,

10   BUT I DON'T THINK IT WOULD NECESSARILY RISE TO THAT.

11   Q.   SO WAIT.  ARE YOU SAYING THAT THAT HAS NO SERIOUS

12   ARTISTIC VALUE?

13   A.   I THINK IF YOU JUST TOOK A FILM, THAT, IN MY OPINION,

14   YEAH -- I WOULD THINK JUST THAT ALONE, I'D SAY IT WOULD NOT.

15   Q.   WHAT IF THAT WERE ALSO PUT ON THE INTERNET?  WHAT IF

16   EVERYBODY STARTS COMMENTING ON IT?  DOES THAT THEN BECOME

17   SERIOUS?

18   A.   YEAH, THAT'S A VERY, VERY GOOD QUESTION WHAT BECOMES --

19   YOU KNOW, CAN SOMETHING THAT DOESN'T HAVE SERIOUS VALUE NOW

20   ALREADY BECOME SERIOUS VALUE.

21           AND, YOU KNOW, HONESTLY, I THINK ART CAN CHANGE.

22   I THINK IF YOU LOOK AT VAN GOGH IN HIS TIME, FOR EXAMPLE, HE

23   WASN'T REALLY CONSIDERED -- NOW HE'S A MASTER ARTIST.

24           SO, YEAH, I THINK IT CAN CHANGE.  SO I THINK IF

25   THAT PIECE DID GO ON THE INTERNET AND IT GOT REACTION VIDEOS
```

1   AND IT BECAME THE BIGGEST TALK AND EVERYBODY WAS DISCUSSING

2   IT AND THINGS LIKE THAT, I THINK IT WOULD BE ELEVATED TO

3   SERIOUS ART.  IT WOULD BECOME THAT.

4   Q.   DOES IT HAVE TO BE A LOT OF TALK?  IS THERE A QUANTUM

5   OF TALK THAT'S REQUIRED BEFORE IT BECOMES SERIOUS IN YOUR

6   MIND?

7   A.   I THINK IT HAS TO, YOU KNOW -- IF YOU WANT TO TALK --

8   IF YOU WANT TO LOOK AT IT IN ANY MEANINGFUL WAY, I THINK ONE

9   OR TWO PEOPLE OR A HANDFUL OF PEOPLE IS NOT GOOD ENOUGH.

10  Q.   HOW MANY?  IS THERE A NUMBER?

11  A.   YOU KNOW, I CAN'T SAY HOW MANY, BUT I KNOW MY PIECES,

12  THERE ARE THOUSANDS OF PEOPLE TALKING ABOUT THEM FROM

13  SERIOUS ART CRITICS LIKE GRACE MOON TO PAT BOONE TO PEOPLE

14  BLOGGING A LOT OF DIFFERENT THINGS.

15         SO I DON'T KNOW WHAT THE NUMBER IS, BUT I THINK A

16  NUMBER ENOUGH THAT -- IF YOU'RE ON TELEVISION OR IF YOU'RE

17  ON RADIO, I THINK THERE'S PROBABLY A BIG ENOUGH NUMBER THAT

18  YOU'RE REACHING AND THAT ARE TUNING IN THAT -- THAT NUMBER.

19  BUT I CAN'T COME UP WITH AN EXACT NUMBER OF HOW MANY.

20  Q.   SO MY UNDERSTANDING IS THAT YOUR METHODOLOGY IS NOT

21  APRIORI, BUT YOUR METHODOLOGY IS POST HOC.

22         SO IF YOU DO SOMETHING AND THERE HAPPENS TO BE A

23  REACTION, THEN YOU SAY, "THAT MEANS IT'S SERIOUS," AND IF IT

24  TURNS OUT THAT YOU PUT IT ON THE INTERNET, PEOPLE COULDN'T

25  CARE LESS, MAYBE TWO OR THREE PEOPLE BLOGGED ABOUT IT, THEN

```
1    YOU SAY, "IT'S NOT."

2              IS THAT YOUR METHODOLOGY?

3    A.   NO.  I'M SAYING IF YOU TAKE JUST THE QUESTION WE TALKED

4    ABOUT OF FILMING, YOU KNOW, A WOMAN ON A TOILET, THAT IF

5    YOU'RE TALKING ABOUT THAT --

6    Q.   RIGHT.

7    A.   -- THAT WOULD STILL BE MY ANSWER.

8              BUT I THINK YOU NEED A LOT MORE THAN JUST THAT.  I

9    THINK YOU NEED -- AGAIN, PEER REVIEW WOULD BE NICE -- TO SEE

10   WHAT OTHER PEOPLE, CRITICS THINK AND PEOPLE WHO ARE IN THE

11   ART WORLD, WHAT THEY THINK, THE CRITICS BASICALLY.  I THINK

12   IT COULD BE SERIOUS ART AND NOBODY EVER ON THE INTERNET --

13   ONLY ONE PERSON.

14             IT'S VERY HARD FOR ME TO PUT IN A BOX EXACTLY, YOU

15   KNOW, WHAT THE PARTICULAR PIECE IS, IF IT CHANGES.  BUT I

16   THINK, IN THEORY, SOMETHING COULD GO FROM NOT SO SERIOUS,

17   AND I THINK PEOPLE CAN MAKE IT SERIOUS IF IT ENGAGES PEOPLE.

18             SOMETIMES AN ARTIST DOESN'T NECESSARILY KNOW WHAT

19   HE'S CREATING.  SOMETIMES HE CREATES AND THINGS TAKE ITS OWN

20   LIFE.  BUT GENERALLY SPEAKING, I THINK IF YOU WERE GOING TO

21   DO IT IN AN ACADEMIC TYPE OF WAY, I THINK STUDYING WHAT

22   CRITICS SAY, WHAT THE LITERATURE OUT THERE IS ABOUT, WHAT

23   YOUR EXPERIENCE AS AN ARTIST CAN BRING TO IT AND WHAT THE

24   VIEWERS, YOU KNOW, TAKE AWAY FROM IT, I THINK IS A GOOD

25   BAROMETER OF WHETHER IT'S SERIOUS.  HOW SERIOUS?  YOU KNOW,
```

1   DOES IT HIT THE BAR?  I THINK IT DOES.

2            BUT, YOU KNOW, IT'S A TOUGH ONE TO BE EMPIRICAL --

3   TOTALLY EMPIRICAL ABOUT IT BECAUSE I DON'T KNOW IF THERE'S A

4   REAL RIGHT ANSWER.

5   Q.   SO YOUR VIEW IS IT DOESN'T MATTER WHAT PEOPLE SAY SO

6   LONG AS THEY SAY SOMETHING ABOUT IT?

7   A.   THAT'S A PART OF THE VIEW, YEAH.  THAT'S A BIG ONE,

8   YES.  THAT'S TRUE.

9   Q.   SO JUST BECAUSE PEOPLE COMMENT, NO MATTER WHAT THE

10  COMMENT IS, THAT'S YOUR METHOD OF DETERMINING THAT IT'S

11  SERIOUS?

12  A.   WELL, I THINK THAT'S FOR THE VIEWER.

13           I THINK THE CRITIC, IT'S A DIFFERENT THING.  NOW,

14  THE CRITIC IS LOOKING AT IT THROUGH A CRITICAL EYE.  YOU

15  KNOW, THEY HAVE A BACKGROUND, THAT'S THEIR -- HOPEFULLY,

16  THEIR JOB, AND THEY'RE GOOD AT IT.

17           SO AS THE VIEWER, THAT'S WHAT THAT DOES.  BUT THE

18  CRITIC -- SO FOR EXAMPLE, THE VIEWERS MIGHT LOVE THE STUFF

19  AND THINK IT'S THE GREATEST THING SINCE APPLE PIE, AND IT

20  MIGHT BE THE TASTE MOST VIEWERS LIKE, BUT THAT DOESN'T MAKE

21  IT SERIOUS ART.

22  Q.   WHICH EXPERT ARE YOU TESTIFYING ABOUT -- PURPORTING TO

23  TESTIFY ABOUT?  WHAT EXPERTISE?  AS A CRITIC?  AS A VIEWER?

24  WHAT'S THE SOURCE OF YOUR EXPERTISE?

25  A.   AS A FILMMAKER.  AS A -- AS A FILMMAKER....

1   Q.   SO YOU THINK THAT THESE FILMS, AS A FILMMAKER, HAVE

2   SERIOUS ARTISTIC VALUE TO WHOM?

3   A.   TO SOME PEOPLE WHO VIEW IT, AND I THINK CRITICS HAVE

4   WROTE ABOUT IT, AND SOME CRITICS FEEL IT DOES; OTHER CRITICS

5   DON'T.  SO IT DEPENDS.

6         THE VIEWER TAKES OUT OF IT -- I THINK THE FACT

7   THAT PEOPLE TALK ABOUT IT IS DIFFERENT THAN TASTE.  I THINK

8   SOMETIMES WE THINK ABOUT TASTE, HOW GOOD IS SOMETHING WE

9   LIKE OR HOW PRETTY IT IS --

10  Q.   I'M NOT TALKING ABOUT TASTE.  I'M TALKING ABOUT WHETHER

11  OR NOT -- WELL, LET ME PUT IT THIS WAY:

12        ARE YOU PURPORTING TO TESTIFY AS AN EXPERT ABOUT

13  WHAT A REASONABLE PERSON WOULD FIND TO BE WITH OR WITHOUT

14  SERIOUS ARTISTIC VALUE?

15  A.   A REASONABLE PERSON WOULD FIND -- I'M SORRY.  SAY THAT

16  AGAIN.

17  Q.   ARE YOU PURPORTING TO TESTIFY AS AN EXPERT ON WHAT A

18  REASONABLE PERSON WOULD FIND TO BE WITH OR WITHOUT SERIOUS

19  ARTISTIC VALUE IN THOSE THREE CHARGED FILMS?

20  A.   YES.  I THINK -- I THINK A REASONABLE PERSON, KNOWING

21  THE INFORMATION, WOULD FIND THAT THE --

22  Q.   WHAT IS THE BASIS OF YOU PURPORTING TO SAY, "I CAN

23  TESTIFY AS AN EXPERT ON THAT SUBJECT"?

24  A.   BECAUSE I BRING TO, SAY, THE JURY EXAMPLES OF OTHER

25  POST-MODERN ART IN THE SAME GENRE AND FEELING THAT IS

1    CONSIDERED BY MANY -- AND I THINK WILL BE CONSIDERED BY

2    THEM -- AS SERIOUS ARTISTIC VALUE.  AND WHEN YOU PUT THE

3    CHARGED PIECES AGAINST THESE FOUR OR FIVE EXHIBITS, I THINK

4    IT WILL BECOME CLEAR WHAT THEY DO HAVE IN COMMON AND THEY DO

5    HAVE WHAT THEY NEED.

6    Q.   OTHER THAN THE COMPARISON, WHAT DO YOU BRING TO THE

7    TABLE, SO TO SPEAK, WHAT ASSISTANCE WILL YOU BE TO THE JURY?

8    A.   WELL, I THINK OF MY MOVIES, BEING THE DIRECTOR OR

9    PRODUCER, I CAN ALMOST TALK LIKE IT'S EPISTEMOLOGY -- WHAT

10   I'M TRYING TO DO, WHY I FEEL THIS IS SERIOUS ART, WHY IT'S

11   JUST NOT ME PUTTING A CAMERA AND JUST SHOOTING IT THIS WAY.

12   Q.   FROM YOUR SUBJECTIVE STANDPOINT?

13   A.   YES, FROM MY -- YES, BECAUSE I'M THE FILM DIRECTOR.

14   Q.   SO YOU BELIEVE THAT YOUR SUBJECTIVE STANDPOINT IS WHAT

15   YOU CAN HELP THE JURY WITH IN TERMS OF THIS COMPARISON?

16   A.   I DON'T THINK THAT'S THE MAIN THING I CAN HELP.

17   Q.   WHAT IS THE MAIN THING?

18   A.   I THINK THE MAIN THING IS LIKE I CAN SHOW 'EM -- OKAY.

19        CAN I GIVE YOU AN ANALOGY BECAUSE I'M A BIG

20   CLASSICAL MUSIC FAN.

21   Q.   OH, NO.  I'D RATHER NOT.  IF YOU WOULD JUST ANSWER MY

22   QUESTION.

23   A.   OKAY.  THE MAIN THING IS TO BRING THE JURY TO

24   UNDERSTAND WHAT'S HAPPENING IN A LEGITIMATE FORM OF ART

25   POSTMODERNISM THAT THEY MIGHT NOT NECESSARILY BE FAMILIAR

```
 1   WITH.
 2             I'M GIVING SOME EXAMPLES OF THAT.  THERE ARE MANY,
 3   MANY EXAMPLES I COULD HAVE PUT IN, BUT I'M GIVING SOME
 4   EXAMPLES.
 5   Q.   OKAY.  LET ME BACK UP THEN, AND SAY WHAT IS YOUR
 6   TRAINING AND BACKGROUND IN WHAT YOU CALL "POSTMODERNISM"?
 7   A.   WELL, MY TRAINING AND BACKGROUND, I GUESS, IS AS A
 8   POST-MODERN FILMMAKER FOR OVER TEN YEARS.  I'VE STUDIED
 9   POSTMODERNISM, BUT NO, I HAVEN'T --
10   Q.   WHEN YOU SAY YOU STUDIED, WHAT DO YOU MEAN?
11   A.   YOU KNOW, PERSONALLY, I READ BOOKS.
12   Q.   DO YOU TAKE CLASSES?
13   A.   NO, I DON'T GO -- I DON'T.
14   Q.   HAVE YOU READ BOOKS?
15   A.   YEAH, NO.  I'VE STUDIED AND I --
16   Q.   WHAT DID YOU READ?
17   A.   EXCUSE ME?
18   Q.   WHAT DID YOU READ OR --
19   A.   WHAT BOOK DID I READ?  OKAY.  FOR EXAMPLE, LEO --
20   Q.   WE HAVE TO DO THIS ONE AT A TIME.
21   A.   SORRY.
22   Q.   WHAT BOOK OR BOOKS DID YOU READ ABOUT POSTMODERNISM?
23   A.   WELL, I'VE READ LEO TOLSTOY, AND I THINK A LOT OF IT,
24   YOU KNOW, "WHAT IS ART," TALKING ABOUT ESSENCE OF ART, WHAT
25   MAKES ART, THINGS LIKE THAT.
```

1    Q.   OKAY.  WHAT ELSE?

2    A.   I READ ABOUT, AGAIN, MARCEL DUCHAMP; STUDIED HIM

3    EXTENSIVELY.

4    Q.   WHEN YOU SAY THAT, WHAT DO YOU MEAN "STUDIED HIM

5    EXTENSIVELY"?

6    A.   WELL, YOU KNOW, MARCEL DUCHAMP HAS A LOT OF OTHER

7    WORKS, A LOT OF THE READY-MADE.

8         THE COURT REPORTER:  I'M SORRY.  PLEASE SLOW DOWN.

9         THE WITNESS:  HE HAS WHAT'S CALLED READY-MADES,

10   WHERE HE BUYS LIKE A BICYCLE WHEEL OR SOMETHING AND PUTS IT

11   IN A MUSEUM AND BECAUSE -- THE WHOLE IDEA IS, AS AN ARTIST,

12   YOU CREATE SOMETHING TO GET A REACTION; IT'S NOT ALWAYS

13   ABOUT WHAT YOU SEE ON THE SURFACE.

14   BY THE COURT:

15   Q.   SO YOU HAVE LOOKED AT OTHER CREATIONS BY THIS

16   INDIVIDUAL, DUCHAMP?

17   A.   I LOOKED AT THAT AND OTHER PEOPLE WRITING ABOUT HIM AND

18   THEIR OPINION OF HIS WORK.

19   Q.   ARE THOSE PEER-REVIEWED JOURNAL WRITINGS?

20   A.   WELL, MOSTLY, TO BE HONEST WITH YOU, YOU KNOW, THE

21   INTERNET.  I GO ON THE INTERNET, AND I RESEARCH IT, AND I

22   CAN GIVE LIKE AN EXAMPLE.  I CAN GO IN HERE AND SHOW YOU,

23   FOR EXAMPLE, A PROFESSOR TALKS ABOUT POSTMODERNISM AND SO

24   FORTH.

25        LET'S SEE IF I CAN GET THIS STUFF OUT.

1    Q.    LET ME ASK YOU THIS.

2    A.    SURE.

3    Q.    WHEN DID YOU START STUDYING POSTMODERNISM?  YOU DID IT

4    THROUGH THE INTERNET.  SO WHEN DID YOU START DOING THAT?

5    A.    I WOULD SAY, YOU KNOW, POSTMODERNISM REALLY HAS BEEN

6    SINCE ABOUT THE '90S, EVEN THOUGH IT REALLY STARTED IN 1917.

7    SHOCK ART, THINGS LIKE THAT HAS BEEN MORE FROM SINCE THE

8    '90S.  SINCE THE BRITISH -- LIKE WITH OPHELIA, AND THINGS

9    LIKE THAT.

10   Q.    IT WOULD BE HELPFUL IF YOU JUST LISTEN TO MY QUESTION

11   AND ANSWER IT BECAUSE, YOU KNOW, WE HAVE LIMITED TIME.  I

12   APPRECIATE YOUR TRYING TO DO THE BEST YOU CAN.  I DO.

13              BUT MY QUESTION TO YOU IS:  WHEN DID YOU START,

14   FIRST START TO STUDY POSTMODERNISM?

15   A.    PROBABLY IN THE MID TO LATE '90S.

16   Q.    AND YOU DID SO BY, AS YOU SAID, YOU READ TOLSTOY?

17   A.    YES, I READ "WHAT IS ART."

18   Q.    ABOUT HIS ART?

19   A.    WELL, HE HAS A BOOK CALLED "WHAT IS ART."

20   Q.    AND YOU READ OR YOU LOOKED AT NOT PUBLICATIONS BUT

21   ARTICLES ON THE INTERNET --

22   A.    YES.

23   Q.    -- ABOUT POST-MODERN ART.

24   A.    THAT AND, YOU KNOW, JUST TALKING ABOUT ART IN GENERAL

25   AND WHAT, YOU KNOW, ART MIGHT BE OR MIGHT NOT BE AND

1    CRITICISM AND THINGS LIKE THAT.

2    Q.    WHAT ELSE?

3    A.    GO TO MUSEUMS, GO TO GALLERIES, HAVE FRIENDS AND WE

4    HAVE DISCUSSIONS; WE MIGHT SIT DOWN AND WE MIGHT DISCUSS

5    THINGS.  KIND OF LIKE WHEN YOU GO TO A MOVIE, THE FRIENDS

6    THAT GO DISCUSS THE MOVIE.  SOME OF MY FRIENDS WOULD DISCUSS

7    SOME VERY CLASSICAL MUSIC, AND THERE IS SOME POST-MODERN

8    MUSIC WHERE -- THERE'S A POST-MODERN MUSIC PIECE WHERE THE

9    CONDUCTOR GETS UP AND THERE'S THREE MINUTES OF SILENCE.

10   THERE'S NOTHING PLAYED.

11          SO I'VE STUDIED, YOU KNOW, A LOT OF DIFFERENT

12   THINGS.  POSTMODERNISM ISN'T ONLY FILMMAKING OR A SCULPTURE,

13   IT'S IN EVERYTHING.  BUT I TRY TO STUDY EVERYTHING TO KEEP

14   IT -- BUT AS AN ARTIST, I'D WANT TO BE INFORMED OF WHAT'S

15   HAPPENING AS MUCH AS I CAN.

16   Q.    I UNDERSTAND, BUT I DON'T WANT YOU TO BE GENERAL AND

17   SAY "I STUDIED A LOT OF THINGS."  THAT'S NOT VERY HELPFUL TO

18   ME.  I WANT YOU TO TELL ME WHAT EXACTLY YOU HAVE DONE THAT

19   WOULD QUALIFY YOU TO EVEN BE AN EXPERT TO GIVE ANY OPINION,

20   REGARDLESS OF YOUR METHODOLOGY.

21   A.    OKAY.

22   Q.    SO YOU'VE READ TOLSTOY; YOU'VE STUDIED DUCHAMP AND ART;

23   AND YOU'VE READ INTERNET DISCUSSIONS ABOUT POST-MODERN ART;

24   YOU HAVE BEEN TO GALLERIES THAT, IN YOUR MIND, DISPLAY

25   POST-MODERN ART?

1    A.   YES, SOME, YES.

2    Q.   AND YOU'VE HAD DISCUSSIONS WITH YOUR FRIENDS MUCH LIKE

3    HOW PEOPLE WOULD WATCH A MOVIE AND TALK ABOUT IT.

4    A.   YES, SOMETIMES, YES.

5    Q.   WHAT ELSE?  ANYTHING ELSE?

6    A.   LET ME THINK FOR A SECOND.

7         I THINK, YOU KNOW, AS FAR AS EXTERNAL THINGS, THAT

8    THAT'S PROBABLY IT.  BUT YOU KNOW, THERE'S A LOT OF THINGS

9    GOING ON IN SOMEONE'S HEAD THAT I THINK ARE IMPORTANT AS

10   WELL -- WHAT HE TAKES OUT OF THOSE EXTERNAL THINGS AND SHEDS

11   SOME LIGHT MAYBE IN A DIFFERENT WAY.

12        SOMETIMES, LIKE THE HISTORY WE'VE SEEN WHERE YOU

13   COULD HAVE -- I'M NOT SAYING I'M A GREAT ARTIST BECAUSE I'M

14   NOT.  BUT YOU COULD HAVE GREAT ARTISTS THAT HAVE NO

15   EDUCATION.  YOU KNOW, MY BEST EXAMPLE IS J.S. BACH.

16   J.S. BACH DIDN'T GO TO SCHOOL OR LECTURE OR DO ANY OF THOSE

17   THINGS.  IN HIS LIFETIME, HE WASN'T THAT FAMOUS.  HE WAS AN

18   OKAY ORGAN PLAYER AT A LOCAL CLUB, AND THEN FOR A WHILE

19   J.S. BACH WAS LOST UNTIL MENDELSSOHN CAME ALONG IN THE

20   1800'S AND REVIVED HIM.

21        SO I THINK NOT HAVING, LET'S SAY, A FORMAL

22   UNIVERSITY OUTLOOK DOESN'T NECESSARILY, I THINK -- BY DOING,

23   BY FILMMAKING, IT GIVES ME --

24   Q.   I'M NOT MAKING ANY JUDGMENTS ABOUT WHETHER YOU HAVE TO

25   ONE WAY OR THE OTHER.  I MAY BE A LITTLE BIT -- DON'T BE

```
 1   SELF-CONSCIOUS BECAUSE I'M NOT MAKING THAT STATEMENT.  SO
 2   THERE'S NOTHING TO REBUT.
 3   A.   I APOLOGIZE.
 4   Q.   OKAY.  I THINK AT BOTTOM I'M TRYING TO UNDERSTAND,
 5   GIVEN YOUR QUALIFICATIONS, WHAT PRINCIPLES, FACTORS,
 6   METHODOLOGY -- HOWEVER YOU WOULD DESCRIBE IT -- THAT WOULD
 7   ALLOW YOU AS AN EXPERT --
 8           YOU'RE PURPORTING TO BE AN EXPERT.
 9           -- TO BE ABLE TO LOOK AT ANY NUMBER OF THINGS AND
10   BE ABLE TO FORM AN OPINION AS TO ITS ARTISTIC VALUE OR LACK
11   THEREOF.
12           AND SO FAR, WHAT YOU'VE TOLD ME IS IF THIS OBJECT
13   OR DEPICTION OR WHATEVER IT IS -- FILM -- BECOMES THE
14   SUBJECT OF A LOT OF DISCUSSION, THEN IT'S SERIOUS; AND IF IT
15   IS NOT THE SUBJECT OF A LOT OF SERIOUS DISCUSSION, THEN IT'S
16   NOT SERIOUS.
17           I MEAN, IS THAT A FAIR STATEMENT?
18   A.   IT'S KIND OF.  I'M SAYING COULD BE, YOU KNOW.  WHAT I'M
19   SAYING TO YOU IS I THINK THE FACT THAT IT'S BEING DISCUSSED
20   AND IT'S BEING DEBATED IN A BIG WAY, I THINK, ELEVATES IT TO
21   SERIOUS ART EVEN IF IT WASN'T BEFORE.
22   Q.   SO THEN WHY DO WE NEED YOU TO TESTIFY AS AN EXPERT WHEN
23   ALL WE HAVE TO DO IS TO DETERMINE WHETHER OR NOT THERE'S
24   BEEN A LOT OF TALK?
25   A.   BECAUSE I'M HERE -- WELL, IF YOU COULD GET SOMEBODY TO
```

```
 1   DO ALL OF THOSE DETERMINATIONS, YOU WOULDN'T NEED ME, BUT
 2   I'M HERE TO DO THAT.
 3   Q.   WELL, NO.  IF THERE'S EVIDENCE --
 4   A.   THAT'S MY ROLE.
 5   Q.   -- ON THE INTERNET OF A LOT OF TALK, GOOD OR BAD,
 6   DOESN'T MATTER.
 7   A.   RIGHT.
 8   Q.   A LOT OF TALK ABOUT SOMETHING.
 9   A.   YEAH.
10   Q.   WHY DO WE NEED YOU THEN?
11   A.   BECAUSE I'M THE ONE WHO WOULD SHOW WHAT THE TALK IS.
12   Q.   WHY DO WE NEED YOU TO SHOW US THE TALK?
13   A.   YOU WOULD NEED -- YOU CAN GET -- ANOTHER ART EXPERT, I
14   THINK, WOULD CONCUR WITH ME AND MIGHT DO THE SAME THING.
15   Q.   WHY WOULD YOU NEED AN EXPERT OF ANY KIND?  WHY CAN'T
16   MR. DIAMOND, A VERY COMPETENT LAWYER, JUST INTRODUCE
17   EVIDENCE OF ALL OF THESE THINGS ON THE INTERNET?
18        IF THAT'S WHAT IT IS -- IF WHAT YOU'RE SAYING IS,
19   "JUST GO AND LOOK.  SEE HOW MUCH DISCUSSION THERE IS.
20   BECAUSE IF THERE'S LITTLE BIT OF DISCUSSIONS, IT'S NO GOOD;
21   BUT IF YOU'VE GOT A LOT OF DISCUSSION, YOU KNOW, THEN FOR
22   SURE IT BECOMES SERIOUS," THEN I DON'T UNDERSTAND WHY WE
23   NEED YOU.  I MEAN, AS AN EXPERT, OF COURSE.
24   A.   RIGHT.  RIGHT.  YOU NEED ME AS A DEFENDANT.
25                     (LAUGHTER.)
```

```
1              THE WITNESS:  BECAUSE I'M READY TO GO IF YOU DON'T

2    NEED ME.  I'M READY TO GO NOW.

3    BY THE COURT:

4    Q.   THAT'S VERY GOOD, MR. ISAACS.

5    A.   I'M HERE -- WHAT THE JURY NEEDS --

6              LOOK, TO BE HONEST, THESE MOVIES ARE VERY

7    EMOTIONAL.  THEY'RE VERY EMOTIONAL.  AND THE FIRST REACTION

8    PEOPLE ARE GOING TO HAVE ON THESE MOVIES IS IN THEIR GUT

9    THAT THESE MOVIES ARE OBSCENE.  THAT'S WHAT THEY'RE GOING TO

10   GET OUT OF THAT WHEN THEY SEE THAT.

11             WHAT AN EXPERT DOES, WHETHER IT'S ME OR SOMEBODY

12   ELSE, IS TO EXPLAIN THAT EMOTION ISN'T THE WAY TO JUDGE ART.

13   NOW, THEY MIGHT COME TO A CONCLUSION AFTER TALKING THAT IT

14   ISN'T SERIOUS ART, BUT I NEED TO GET THE EMOTION AND TALK

15   ABOUT ART.  TALKING ABOUT PEOPLE DEBATING IT AND I'M --

16   PEOPLE DEBATING ON THE INTERNET.  I'M NOT TALKING ABOUT

17   PEOPLE SAYING, "WELL, DID YOU SEE -- "

18   Q.   WHOA, WHOA, WHOA.

19   A.   I'M SORRY.

20   Q.   YOU REALLY HAVE TO SLOW DOWN.

21   A.   IT'S THE NEW YORKER IN ME.

22   Q.   OKAY.  YOU HAVE TO SLOW DOWN.

23   A.   I'M NOT TALKING ABOUT PEOPLE ON THE INTERNET DEBATING

24   IT, SAYING --

25   Q.   SLOW DOWN.
```

```
 1    A.   -- YOU KNOW, LIKE, SOME MEANINGLESS THING.  IT'S

 2    MEANINGFUL DEBATE ABOUT WHAT ART IS, WHETHER IT SHOULD BE

 3    THIS AND THAT.

 4           AND I DON'T KNOW IF THE QUANTITY -- THE ONLY

 5    REASON THAT I ASK THAT IS BECAUSE YOU ASKED ME AND I NEVER

 6    THOUGHT ABOUT DOES QUANTITY MATTER.  I DON'T THINK IT REALLY

 7    DOES.

 8           I THINK SERIOUS ART STANDS FREE-STANDING, ALONE,

 9    NO MATTER WHAT THE CRITICS SAY, NO MATTER WHAT THIS GUY

10    SAYS, NO MATTER WHAT I SAY.

11           THE PROBLEM IS YOU DON'T KNOW NECESSARILY AT THE

12    TIME THAT YOU'RE TALKING ABOUT IT; ALL THE FACTS ARE NOT IN.

13           SOMETIMES, FOR EXAMPLE, A LOT OF YESTERDAY'S --

14    TODAY'S MASTERPIECES WERE YESTERDAY'S OBSCENITIES.  AND I

15    CAN GIVE YOU, YOU KNOW, MANY OF THOSE AND I'M SURE YOU KNOW

16    WHAT THOSE ARE.

17           SO I CAN'T SAY ANY PARTICULAR THING.  ALL I KNOW

18    IS I'D LIKE TO BRING THE JURY -- TO SHOW THEM SOME EXAMPLES

19    OF THINGS THAT ARE SIMILAR, TO LOOK AT IT NOT SO EMOTIONALLY

20    BECAUSE I THINK WHAT THE PROSECUTION WANTS TO DO IS JUST TO

21    GET THEIR EMOTION GOING AND THEN -- FORGETTING ABOUT

22    EVERYTHING ELSE.

23    Q.   SO YOU'RE ESSENTIALLY TELLING ME THAT YOUR EXPERT

24    TESTIMONY IS THERE TO DE-EMOTIONALIZE THE TOPIC.

25    A.   YEAH, I'D LIKE TO, YEAH, AND TALK ABOUT IT, YOU KNOW,
```

57

```
 1   LIKE IN A RATIONAL WAY.
 2   Q.   DO YOU HAVE EXPERTISE IN, FOR INSTANCE, ART HISTORY?
 3   A.   WHAT WOULD CONSTITUTE EXPERTISE?  A DOCTORATE?  A
 4   DEGREE?
 5   Q.   IN ANYTHING.  DO YOU HAVE ANY TRAINING?
 6   A.   YEAH, IN COLLEGE I TRAINED.  I DON'T THINK A B.A. IS
 7   THAT GREAT OF A DEAL.  SO I DON'T REALLY WANT TO SAY THAT.
 8   Q.   JUST A MINUTE.  DO YOU HAVE A DEGREE IN ART HISTORY?
 9   A.   NO.
10   Q.   HAVE YOU EVER STUDIED ART HISTORY?
11   A.   YES.
12   Q.   ON YOUR OWN?
13   A.   NO, IN SCHOOL.
14   Q.   OKAY.  YOU'VE TAKEN CLASSES?
15   A.   YEAH.
16   Q.   OKAY.  AND DO YOU HAVE A DEGREE OR ANY STUDIES IN
17   PSYCHOLOGY?
18   A.   NOT A DEGREE.
19   Q.   HAVE YOU STUDIED PSYCHOLOGY?
20   A.   YES, I HAVE, YES.  ACTUALLY, I STUDIED A LOT OF -- YES,
21   I HAVE.  ON MY OWN, READING, YES.  BUT NO, I DON'T HAVE A
22   DEGREE IN PSYCHOLOGY.
23   Q.   YOU'RE NOT PURPORTING TO BE AN EXPERT IN PSYCHOLOGY,
24   ARE YOU?
25   A.   NO.  NO.  BUT I DON'T THINK -- I THINK MOST PEOPLE
```

1    WOULD AGREE THAT THESE MOVIES ARE GOING TO BRING A BIG

2    EMOTIONAL RESPONSE TO PEOPLE.  THAT WAS THE -- YOU KNOW, THE

3    SHOCK ART TENDS TO DO THAT.

4    Q.   IS EVERYTHING SHOCKING ART?

5    A.   IS EVERYTHING SHOCKING ART?

6    Q.   YEAH.

7    A.   NO.  EVERYTHING IS NOT SHOCKING ART.

8    Q.   HOW DO YOU TELL, WHEN THERE'S A SHOCKING DEPICTION OF

9    SOMETHING, WHETHER IT IS OR IS NOT ART?

10         I DON'T MEAN ART.  WHEN I SAY "ART," I MEAN OF

11   SERIOUS ARTISTIC VALUE.

12   A.   RIGHT.  I UNDERSTAND.  IS IT OKAY IF I GET A GLASS OF

13   WATER?

14   Q.   OF COURSE.

15   A.   I'M VERY DRY.  THESE ARE ALL SUCH GOOD QUESTIONS.

16         IS IT POSSIBLE TO GET THAT REPEATED?

17   Q.   HOW DO YOU TELL WHEN THERE IS A SHOCKING DEPICTION OF

18   SOMETHING WHETHER IT IS OF SERIOUS ARTISTIC VALUE?

19   A.   I DON'T THINK BECAUSE IT'S SHOCKING, IT MAKES IT

20   SERIOUS ARTISTIC VALUE.

21   Q.   SO HOW DO YOU TELL?

22   A.   WELL, I GUESS IT GOES BACK, AGAIN, TO WHAT'S THE, YOU

23   KNOW -- IS THE POINT OF ART, THE END-USER, THE VIEWER, WHAT

24   HE GETS OUT OF IT, OR IS IT THE CRITIC WHO GETS TO WRITE

25   ABOUT IT OR THE MUSEUM THAT GETS TO DISPLAY IT?

```
 1              I THINK THEY ALL HAVE VALID THINGS, BUT SOME CAN
 2    SHOCK YOU.  I CAN WATCH, YOU KNOW, THE MOST SHOCKING VIDEOS
 3    ON TV, AND THAT DOESN'T MEAN THEY HAVE ARTISTIC VALUE.
 4    Q.   SEE, YOU'RE GIVING ME YOUR OPINION, AND YOU'RE GOING
 5    AHEAD OF THE GAME.  BEFORE YOU GET TO TESTIFY AND GIVE YOUR
 6    OPINION, YOU HAVE TO TELL ME WHAT METHODOLOGY ARE YOU USING.
 7              THAT'S WHY I'M SAYING IS EVERY SHOCKING DEPICTION
 8    OF SERIOUS ARTISTIC VALUE, AND YOUR ANSWER IS "NO."
 9    A.   RIGHT.
10    Q.   OKAY.  SO NOW WHAT I'M SAYING IS WHAT METHODOLOGY DO
11    YOU COME TO DECIDING WHETHER SOMETHING SHOCKING IS OR IS NOT
12    OF SERIOUS ARTISTIC VALUE?
13    A.   I WOULD LOOK AT -- IF I SAW A PIECE AND I WOULD HAVE TO
14    EVALUATE IT --
15              THE COURT REPORTER:  I'M SORRY.  YOUR HONOR, CAN I
16    ASK THE WITNESS TO MOVE THE MIC A LITTLE BIT CLOSER?
17              THE COURT:  MOVE CLOSER TO THE MICROPHONE AND SLOW
18    DOWN, BUT NOT TOO CLOSE BECAUSE IT WILL DISTORT IT.
19              THE WITNESS:  OKAY.  AND NOT TOO SLOW BECAUSE
20    WE'LL NEVER LEAVE.
21              I THINK WHEN YOU LOOK AT A PIECE AND YOU SAY
22    OKAY, THIS IS SHOCKING, WHETHER IT HAS SERIOUS ARTISTIC
23    VALUE -- I THINK WHAT I WOULD DO AND THE METHODOLOGY I WOULD
24    USE, I WOULD SAY OKAY, IS THERE WRITING ABOUT IT.  AND THIS
25    ISN'T LIKE ACADEMIC IN A SERIOUS WAY.
```

```
 1              I THINK TO THE VIEWER, IT REALLY DOESN'T MATTER IF
 2    THERE IS SERIOUS ARTISTIC VALUE.  THEY'RE MORE INTERESTED IN
 3    ENTERTAINMENT.  DOES IT ENTERTAIN ME?  DOES IT PLEASE ME?  I
 4    THINK ALL THAT SERIOUS ARTISTIC VALUE ARE FOR BIGGER
 5    THINKERS AND CRITICS AND PEOPLE LIKE THAT.  I THINK THE
 6    VIEWER DOESN'T CARE ABOUT THAT.
 7              SO BEYOND THAT, BEYOND BEING THE VIEWER, DO I LOOK
 8    AT SOMETHING -- I WOULD PROBABLY, RATHER THAN JUST STAMP IT
 9    "IS IT SERIOUS," I MIGHT WANT TO LOOK AT PEER REVIEW.  HAVE
10    PEOPLE WRITTEN ARTICLES, HAVE CRITICS WRITTEN ARTICLES, WHAT
11    ABOUT THIS THING IS IT TRYING TO TALK ABOUT?
12              SO IF I JUMP OUT OF THE CLOSET AND I SHOCK YOU, I
13    DON'T THINK THAT'S SERIOUS ARTISTIC ART.  BUT IF I DO
14    SOMETHING THAT MAKES YOU DO PROFOUND THINKING ABOUT
15    SOMETHING IN A PROFOUND WAY OR IN A WAY YOU'VE NEVER THOUGHT
16    ABOUT THE SUBJECT BEFORE, I THINK THEN YOU START GETTING
17    INTO THE SERIOUS ARTISTIC BECAUSE YOU'RE MAKING A STATEMENT
18    THAT'S AN IMPORTANT STATEMENT.
19              SO IF THERE'S NO IMPORTANT STATEMENT TO IT, THEN I
20    PROBABLY WOULD SAY IT'S NOT SERIOUS ARTISTIC VALUE.  AND
21    PROBABLY THE EVIDENCE WOULD BE THERE'S PROBABLY NOT MUCH
22    PEER REVIEW OR PEOPLE WRITING ABOUT IT.  PEOPLE TEND NOT TO
23    WRITE ABOUT THE DOOR KNOB BEING BROKE.
24              BUT ON THE OTHER HAND, I THINK IF IT DOES HAVE IT,
25    SOMETIMES IT GETS THROUGH ALL THE MUCK AND MIRE, AND PEOPLE
```

1   DO TALK ABOUT IT.  AND I THINK THE THREE CHARGED FILMS

2   HAPPEN TO DO THAT BECAUSE OF THE VENUE AND A WHOLE LOT OF

3   OTHER VARIABLES -- IT DOES DO THAT.  PEOPLE HAVE TALKED

4   ABOUT IT.

5           SO TO ANSWER YOUR QUESTION, I THINK I WOULD

6   LOOK -- THE METHODOLOGY I WOULD LOOK AT, THINGS THAT ARE OUT

7   THERE, THINGS THAT ARE COMPARABLE, WHAT IT'S TRYING TO SAY,

8   AND HAVE A DIALOGUE IN MY HEAD OF WHAT IT'S TRYING TO SAY.

9   AND IF IT'S TRYING TO SAY SOMETHING IMPORTANT, IT THEN

10  BECOMES WHAT COULD BE SERIOUS ARTISTIC VALUE.

11  BY THE COURT:

12  Q.  SO THEN YOU'RE CONCLUDING IF IT'S A SERIOUS DIALOGUE

13  VERSUS NO SERIOUS DIALOGUE AND THEN YOU COME BACK AND YOU

14  SAY IF I ALREADY CONCLUDED THAT THIS PROVOKES SERIOUS

15  DIALOGUE, THEN I WILL HAVE TO SAY THAT THIS IS OF SERIOUS

16  VALUE.

17  A.  THAT WOULD BE MY OPINION.

18          I HAVE NO OBJECTIVE WAY.  I COULDN'T, YOU KNOW --

19  I GUESS IF YOU GET AN AWARD, LIKE DUCHAMP GOT AN AWARD OF

20  ONE OF THE GREATEST ART PIECES, YOU KNOW, I GUESS THAT MAKES

21  IT BECAUSE A WHOLE BUNCH OF PEOPLE SAY IT.  THEN SO BE IT.

22          I PERSONALLY DON'T FEEL THAT YOU NEED THE JUDGES

23  AND THE CRITICS AND THE WHOLE THING.  I THINK ART IS ABOVE

24  ALL THAT.  I DON'T THINK WE NEED TO JUDGE ART, BUT WE'RE

25  HERE AND WE HAVE TO.

```
 1              HERE WE'RE TALKING ABOUT WHAT'S SERIOUS, AND WE'RE
 2    IN A POSITION THAT WE HAVE TO.  AND IT'S A LITTLE BIT
 3    AWKWARD FOR ME BECAUSE I'M NOT USED TO HAVING TO DEFEND
 4    SOMETHING, WHETHER IT'S SERIOUS OR NOT SERIOUS OR DEFEND ART
 5    IN ANY KIND OF WAY.  SO I THINK THE METHODOLOGY --
 6    Q.   HAVE YOU EVER BEEN CALLED UPON TO GIVE AN OPINION ABOUT
 7    WHETHER SOMETHING IS SERIOUS ART OR NOT, OR OF SERIOUS
 8    ARTISTIC VALUE?
 9    A.   YOU MEAN LIKE -- LIKE IN WHAT KIND OF SETTING?  I'VE
10    DONE LECTURES ON MARKETING AND ART, THINGS LIKE THAT, AND
11    TALKING ABOUT HOW ART CAN BE INTEGRATED.  BUT NO, I'VE NEVER
12    BEEN CALLED ON TO DO THAT BECAUSE I'M A FILMMAKER.  I'M NOT
13    A LECTURER OR A TEACHER.  I DON'T TRY TO DO THOSE.
14              YOU KNOW, MAYBE AFTER ALL THIS, MAYBE THEY WILL BE
15    CALLING ON ME.  BUT RIGHT NOW, I DON'T LOOK FOR THAT.  MY
16    JOB ISN'T TO BE AN EXPERT WITNESS.
17    Q.   YOU SAY SOMEBODY TAKES A PICTURE OF YOU JUMPING OUT OF
18    A CLOSET AND SURPRISING SOMEBODY.  THAT'S SHOCKING, BUT THAT
19    HAS NO SERIOUS ARTISTIC VALUE.
20    A.   IT MAY NOT HAVE SERIOUS ARTISTIC VALUE.
21    Q.   WELL, DOES IT OR DOESN'T IT?
22    A.   AGAIN, I WOULD HAVE TO LOOK AT THE PIECE, I WOULD HAVE
23    TO GO THINK WHAT'S HAPPENING HERE.
24    Q.   WELL, WHAT ABOUT THE PIECE THAT YOU'RE LOOKING AT TO
25    MAKE YOUR DETERMINATION AS TO WHETHER THAT KIND OF SHOCK HAS
```

1   NO SERIOUS ARTISTIC VALUE BUT YOUR KIND OF SHOCK DOES?

2   A.   WELL, I THINK, AGAIN, I PROBABLY WOULDN'T THINK MY

3   STUFF HAD SERIOUS ARTISTIC VALUE IF NOBODY IN ALL THE PRESS

4   AND THE MEDIA AND ALL THE OPINIONS BY CRITICS HAVEN'T TALKED

5   ABOUT IT.  HOW WHEN I LOOK AT BLOGS WHEN PEOPLE ARE

6   COMMENTING ON ARTICLES TALK ABOUT THE STUFF, AND A LOT OF IT

7   IS VERY NEGATIVE.

8           SOME OF IT'S GOOD, BUT THERE'S A LOT OF NEGATIVE.

9   AND I THINK THE FACT THAT I'VE GOTTEN THE DIALOGUE -- OR A

10  NEW SHOW IS DISCUSSING WHAT ART IS OR N.P.R. IS DISCUSSING

11  IT, AND THEY'RE USING MY STUFF AS THE EXAMPLE, I THINK I'VE

12  DONE THE BASIC THING OF SERIOUS ART, WHICH IS EXPAND SOME

13  DIALOGUE.

14          I THINK PEOPLE GET TOO HUNG UP IN THE CONTENT OF

15  WHAT THEY'RE LOOKING AT SOMETIMES AND THE EMOTION OF IT AND

16  DON'T SEE THAT; BUT I THINK IT'S PRETTY CLEAR THAT, IF YOU

17  REALLY THOUGHT ABOUT THE STUFF, IT WOULD BE SERIOUS ART EVEN

18  THOUGH IT MIGHT BE DISGUSTING TO MOST PEOPLE.

19  Q.   SO YOU'RE SAYING YOU'LL KNOW WHEN YOU SEE IT.

20  A.   NO.  NO.

21  Q.   WELL, I'M NOT UNDERSTANDING YOU.  I'M REALLY JUST

22  TRYING TO UNDERSTAND.  YOU'RE SAYING OKAY, THIS IS SERIOUS

23  ART.

24          WHAT IF THEY TOOK THAT PICTURE OF YOU JUMPING OUT

25  OF THE CLOSET AND SHOCKING MR. DIAMOND, FOR INSTANCE.

1    A.   OKAY.

2    Q.   AND THEY TOOK THAT PICTURE AND THEY BLEW IT UP, FRAMED

3    IT, AND PUT IT ON THE WALL OF A MUSEUM AND THEN PEOPLE

4    STARTED COMMENTING ON IT, OR LET'S SAY, THEY HAVE GOOD AND

5    BAD COMMENTS.   THEY SAY, "THIS IS A WONDERFUL PICTURE.   THIS

6    IS SO SHOCKING THAT IT CAUSES ME TO REALLY QUESTION MY

7    ASSUMPTIONS ABOUT THE STATUS QUO."

8    A.   YEAH.

9    Q.   OTHER PEOPLE SAY, "THIS IS RIDICULOUS.   IT'S SOME DUMB

10   PICTURE OF A GUY JUMPING OUT OF A CLOSET.   HOW TOTALLY

11   RIDICULOUS."

12        LET'S SAY THERE'S DISCUSSIONS ABOUT THAT.   THAT

13   THEN BECOMES SERIOUS ART?

14   A.   YES, JUST LIKE MARCEL DUCHAMP BROUGHT A URINAL, PUT IT

15   IN A SHOW, AND CALLED IT "FOUNTAIN" AND SIGNED IT.   IT

16   BECAME A SERIOUS PIECE OF ART.

17   Q.   SO, THEN, WHAT CANNOT BE SERIOUS?

18        IF THERE'S SOMEBODY WHO TALKS ABOUT IT AND PEOPLE

19   TALK ABOUT IT, WHETHER IT'S THEY SAY THIS IS SERIOUS ART --

20   OR MAYBE EVEN THE TALK IS NOT JUST POSITIVE/NEGATIVE.   THE

21   TALK MAY ITSELF BE WHETHER IT'S SERIOUS OR NOT SERIOUS ART.

22        THEN IT ALL BECOMES SERIOUS.   RIGHT?

23   A.   IN A SENSE.   IF IT GIVES A DEBATE OF WHAT IS SERIOUS

24   ART AND WE'RE TALKING ABOUT IT LIKE WE ARE NOW, YES, THIS

25   CONVERSATION HAS BEEN ELEVATED TO SERIOUS ART BECAUSE, AS

```
 1    HUMANS, WE'RE TALKING ABOUT IT.  SO YES, I BELIEVE THAT.

 2    Q.   ALL RIGHT.  SO YOUR METHODOLOGY IS THAT ANY TIME PEOPLE

 3    TALK -- RIGHTLY OR WRONGLY, POSITIVELY, NEGATIVELY -- ON

 4    ANYTHING, REGARDLESS OF WHETHER IT OTHERWISE MIGHT HAVE

 5    SERIOUS ARTISTIC VALUE, IT NECESSARILY THEN BECOMES SERIOUS

 6    ART.

 7    A.   LET ME SAY THIS -- AND I LEARNED THIS AS AN UNDERGRAD

 8    AT DEPAUL'S UNIVERSITY.  I CAN'T SAY EVERYTHING AND THAT

 9    EVERYTHING -- MAKE A BLANKET STATEMENT THAT EVERYTHING.

10    EVERYTHING IS NOT ALL THINGS.  THAT'S A TRAP.  I CAN'T SAY

11    EVERYTHING IS ART.  A LOT, I THINK THOUGH --

12    Q.   I'M NOT TRYING TO TRAP YOU, BY THE WAY.

13    A.   NO, NO.  I'M NOT SAYING YOU ARE, BUT I CAN'T SAY --

14    IT'S NOT ALL PIECES THAT ARE SHOCKING ARE ART.  IT'S NOT ALL

15    THIS OR ALL THAT.  ONCE I HEAR "ALL," I CAN'T WIN ON THAT

16    ONE.

17    Q.   BUT I'M NOT TRYING TO WIN OR LOSE.

18    A.   NO, I UNDERSTAND.

19    Q.   THIS IS NOT THE POINT.

20    A.   BUT THIS IS VERY IMPORTANT TO ME, OBVIOUSLY, AND I'M

21    TRYING TO DO MY BEST.

22    Q.   I UNDERSTAND.

23         BUT WHAT I'M TRYING TO SAY IS IF IT IS NOT ALL

24    SHOCKING DEPICTIONS HAVE SERIOUS ARTISTIC VALUE --

25    A.   IT'S NOT ALL.
```

1   Q.    -- WHICH YOU SAY YOU AGREE WITH ME ON THAT.

2   A.    YES.

3   Q.    THEN I HAVE TO KNOW WHAT IS YOUR METHOD OF DETERMINING

4   WHETHER IT IS OR IS NOT.  AND WHAT YOU SAID TO ME SO FAR IS

5   IF THERE IS DISCUSSION, SERIOUS DISCUSSION ABOUT IT -- NO

6   MATTER WHETHER IT'S POSITIVE, NEGATIVE, WHATEVER -- THEN IT

7   IS OF SERIOUS ARTISTIC VALUE.

8   A.    YES, IT ELEVATES IT IF IT WASN'T BEFORE.

9   Q.    SO, THEN, LITERALLY IF THERE IS DISCUSSION ABOUT

10  ANYTHING, IT HAS TO NECESSARILY HAVE SERIOUS ARTISTIC VALUE.

11  A.    IF THE DISCUSSION IS ABOUT THE, LET'S SAY, FOR

12  EXAMPLE, PROFOUND KIND OF IDEAS.  SO IF IT'S ABOUT A DOOR

13  KNOB BREAKING, I DON'T KNOW IF IT HAS SERIOUS ARTISTIC

14  VALUE.  BUT IF THE SUBJECT MATTER IS OF PROFOUND NATURE,

15  WHAT THE NATURE OF ART IS OR WHAT IS A POLITICAL NATURE OR A

16  TABOO NATURE, THEN, YES, I THINK IT --

17          EVEN THOUGH IT MIGHT BE TERRIBLE LOOKING, I THINK

18  IT'S BEEN ELEVATED TO SERIOUS ARTISTIC BECAUSE I THINK

19  MOST ARTISTS' POINT IS TO GET THEIR STUFF DISSEMINATED SO

20  PEOPLE CAN TAKE IT WHATEVER WAY THEY TAKE IT.  MOST PEOPLE

21  WANT TO DO IT PLEASING.  SO, YES, I THINK IT IS SERIOUS ART.

22  Q.    AND HOW DO YOU DETERMINE ON A CASE-BY-CASE BASIS, AS AN

23  EXPERT, WHETHER SOMETHING IS PROFOUND OR NOT PROFOUND?

24  A.    YOU KNOW, THESE ARE TOUGH QUESTIONS BECAUSE I DON'T

25  KNOW WHAT THE --

1    Q.   I'M JUST TRYING TO UNDERSTAND.

2    A.    OKAY.  HOW DO YOU TAKE IT AS AN EXPERT.  I WOULD READ

3    ALL THE LITERATURE I COULD READ ON IT, AND OBVIOUSLY, I'VE

4    GOT TO USE MY -- I DON'T WANT TO SAY "COMMON SENSE" BECAUSE

5    IT'S NOT -- THIS STUFF IS NOT COMMON AT ALL.  BUT I USE MY

6    MIND AND MY INTELLECT TO TRY TO DISSECT THIS INFORMATION,

7    THINK ABOUT IT IN KIND OF A PHILOSOPHICAL WAY AND TRY TO

8    MAKE THINGS --

9            YOU KNOW, I COULD BE WRONG ON EVERYTHING.  THAT'S

10   ART IS STILL A SUBJECTIVE THING.  EVEN, IN FACT, TASTE IS,

11   BUT SO IS WHETHER SOMETHING IS SERIOUS OR NOT.

12           YOU KNOW, I CAN LISTEN TO A PIECE OF MUSIC -- I

13   KNEW THIS GIRL WHO LISTENED TO J.S. BACH, AND SHE WENT CRAZY

14   BECAUSE SHE THOUGHT IT WAS SO BAD, AND I THINK IT'S THE MOST

15   BEAUTIFUL MUSIC -- AND I THOUGHT IT WAS THE MOST BEAUTIFUL

16   MUSIC, YOU KNOW, J.S. BACH, EVER.  SO, YOU KNOW, SOME PEOPLE

17   THINK BACH, YOU KNOW.  SO A LOT OF IT IS OPINION IN ART.

18           AND MY OPINION, I THINK, IS VALID BECAUSE I HAVE

19   PRODUCED SO MANY OF THESE THINGS, AND LIKE IT OR NOT, I'M

20   PROBABLY ONE OF THE LEADING EXPERTS IN THE WORLD ON THESE

21   KIND OF MOVIES.  AND IF WE WERE TALKING, LET'S SAY, ABOUT

22   SOME OTHER ARTISTIC VENTURE, MAYBE THAT WOULDN'T BE THE

23   CASE.

24           BUT BECAUSE IT HAS THIS NARRATIVE OF THE

25   SCATOLOGY, FOR EXAMPLE, I AM AN EXPERT BECAUSE I'VE DONE

```
 1   MORE THAN ANYBODY ON THIS EARTH ON THIS STUFF AND I'VE
 2   THOUGHT ABOUT IT, AND I THINK I'M A RELATIVELY INTELLIGENT
 3   PERSON.  I DO LOOK AT THINGS, AND I THINK IT HAS THAT VALUE
 4   BECAUSE IT'S BEEN ELEVATED TO THAT IF IT DIDN'T HAVE IT.  IF
 5   IT WASN'T AS CLEAR AT THE BEGINNING, I THINK IT'S CLEAR NOW.
 6   AND JUST LIKE A LOT OF WORKS WERE CONSIDERED OBSCENE MANY,
 7   MANY YEARS AGO ARE NOW TODAY MASTERPIECES.
 8            I AM NOT SAYING MY STUFF'S A MASTERPIECE.  I'M NOT
 9   COMPARING MYSELF TO THESE PEOPLE.  I'M NOT.
10            THE COURT:  OKAY.
11            MR. GRANT.
12            MR. GRANT:  YES, SIR.
13            THE COURT:  THANK YOU FOR BEING PATIENT, BUT GO
14   AHEAD.
15            MR. GRANT:  YES, YOUR HONOR.
16                  CROSS-EXAMINATION (RESUMED)
17   BY MR. GRANT:
18   Q.  YOU'VE TALKED A BUNCH WITH THE JUDGE ABOUT PEOPLE
19   TALKING ABOUT YOUR DIFFERENT ART AND THE FILMS THAT HAVE
20   BEEN CHARGED IN THE CASE.
21            JUST SO WE'RE CLEAR, YOU HAVEN'T SHOWN ANY OF
22   THESE THREE FILMS IN A GALLERY, HAVE YOU?
23   A.  AS OF NOW, NO.
24   Q.  AND YOUR WORK OR DISCUSSIONS OF YOUR WORK HASN'T BEEN
25   PRINTED IN ANY MAJOR ART JOURNAL, HAS IT?
```

```
 1   A.   YES, DISCUSSION HAS BEEN.

 2   Q.   WHAT ART JOURNAL WOULD THAT BE?

 3   A.   "FILMMAKER MAGAZINE."

 4   Q.   WHO'S THE PUBLISHER OF THAT?

 5   A.   I DON'T KNOW THE PUBLISHERS, BUT IT'S FAMOUS.  IT'S

 6   CALLED "FILMMAKER MAGAZINE."  THEY WROTE AN ARTICLE ABOUT

 7   ME, AND THEY DISCUSSED THE STUFF.

 8   Q.   AND WAS THAT POST-INDICTMENT?  WAS IT AFTER YOU WERE

 9   CHARGED IN THIS CASE?

10   A.   YEAH.  YES.

11             THE COURT:  DO YOU HAVE A COPY OF THAT ARTICLE?

12             THE WITNESS:  I COULD GET ONE.  I'M NOT SURE IF I

13   HAVE IT WITH ME.

14             THE COURT:  OKAY.

15             THE WITNESS:  BUT I HAVE ONE.  IT'S BASICALLY

16   TAKING THE JOSEPH K. -- YEAH, I THINK I DO HAVE IT.  IT'S

17   FROM THE "FILMMAKER" BLOG WHICH --

18             THE COURT:  I'M SORRY.  IT'S FROM A BLOG?

19             THE WITNESS:  WELL, IT'S "FILMMAKER MAGAZINE."

20   IT'S RIGHT HERE.  IT'S "FILMMAKER," AND THEY HAVE A

21   MAGAZINE, THEY HAVE A BLOG.

22             A LOT OF TIMES WHAT THEY DO IS THEY FIRST HAVE IT

23   ON THE INTERNET, THEY HAVE A BLOG, AND THEN IT GETS TO THE

24   MAGAZINE.

25             THE COURT:  YOU'RE MAKING A LOT OF NOISE FOR MY
```

```
 1    COURT REPORTER, PLEASE.
 2              THE WITNESS:  I'M SORRY.  I'M BREAKING THE PLACE.
 3              YEAH, SO.  SO YES, THEY WROTE ABOUT -- THEY WROTE
 4    ABOUT ME.
 5              THE COURT:  LET'S GO AHEAD AND MAKE A COPY OF
 6    THAT, AND WE'LL TAKE A LOOK AT IT.
 7              THE WITNESS:  OKAY, BOING, BOING.  AGAIN, IT'S --
 8              ARE YOU ONLY ASKING FOR LIKE ART-RELATED THINGS?
 9    BY MR. GRANT:
10    Q.   RIGHT, JOURNALS.  I MEAN, I KNOW YOU'RE TALKING ABOUT
11    BLOGS AND ON THE INTERNET.  IS THERE ANYTHING IN THE HARD --
12    LIKE AN ART --
13    A.   FROM WHAT I UNDERSTAND, "FILMMAKER MAGAZINE" HAD
14    PRINTED THIS AS WELL.
15    Q.   OKAY.  THANK YOU.
16              NOW, YOU'VE ALSO DISCUSSED ABOUT OTHER PIECES OF
17    WORK, AND I THINK WITH THE JUDGE, YOU DISCUSSED "THE
18    FOUNTAIN" AND YOU NAMED SOME OTHER PIECES.  I JUST WANT TO
19    SPEND A FEW MINUTES VERY QUICKLY ON THESE PIECES.
20              NOW, LET'S TALK ABOUT "THE FOUNTAIN" FOR JUST ONE
21    MOMENT.  THAT'S THE EXHIBIT OF THE URINAL?
22    A.   YES.
23    Q.   ALL RIGHT.  NOW, THAT WAS JUST THE ENTIRE EXHIBIT.  IT
24    WAS A URINAL?
25    A.   WELL, IT WAS THE ENTIRE EXHIBIT THAT WAS GOING TO BE IN
```

1  THE SHOW, BUT YEAH.

2  Q.  IT WASN'T A FILM?

3  A.  NO, NO, NO.  IT WAS A PHYSICAL URINAL.

4  Q.  AND THERE WASN'T ANYTHING ABOUT THAT EXHIBIT WHERE IT

5  DISPLAYED SEXUAL ACTS AT ALL?

6  A.  NO.  I DON'T THINK SO.

7  Q.  ALL RIGHT.  NOW, "NUDE DESCENDING A STAIRCASE," THAT

8  WAS A PAINTING AND NOT A FILM.  CORRECT?

9  A.  YES.

10  Q.  AND THAT PIECE DEPICTS THE MECHANICAL MOTION OF A NUDE

11  FEMALE BODY?

12  A.  I GUESS, YES.

13  Q.  IT'S NOT A REAL FEMALE?

14  A.  NO.

15  Q.  ALL RIGHT.  AND THAT PIECE OF WORK DID NOT INVOLVE ANY

16  WOMEN; IT DIDN'T SHOW HER DRINKING URINE DURING A SEX ACT?

17  A.  THE PAINTING?

18  Q.  RIGHT.

19  A.  NO.

20  Q.  IT DIDN'T DEPICT --

21  A.  IT HAD NOTHING TO DO WITH "FOUNTAIN."  IT'S JUST THE

22  SAME ARTIST.

23  Q.  RIGHT.  NO.  I'M TALKING ABOUT "NUDE DESCENDING A

24  STAIRCASE."

25  A.  "NUDE DESCENDING A STAIRCASE" WAS PAINTED BY

1   MARCEL DUCHAMP, WHO ALSO DID "FOUNTAIN," WHICH IS A

2   READY-MADE URINAL HE BOUGHT IN A STORE AND SIGNED IT AND

3   SENT IT IN TO THE SHOW FOR AN EXHIBIT.

4   Q.   YES, MR. ISAACS.  I UNDERSTAND.

5        BUT YOU MENTIONED THIS PIECE, I BELIEVE, IN YOUR

6   PLEADING, OR AT SOME POINT YOU MENTIONED "NUDE DESCENDING A

7   STAIRCASE."

8   A.   YES.

9   Q.   JUST TO BE CLEAR -- AND I JUST WANT TO MAKE SURE WE'RE

10  CLEAR FOR THE RECORD.  NOTHING ABOUT THAT PIECE OF WORK

11  SHOWS A SEX ACT --

12  A.   RIGHT.

13  Q.   -- LIKE IN THE FILMS THAT WE'VE CHARGED IN THIS CASE.

14  CORRECT?

15  A.   CORRECT.

16  Q.   OKAY.  NOW, I'LL PROBABLY BUTCHER THIS NAME, BUT IS IT

17  PIERO MANZONI?

18  A.   PIERO MANZONI, YES.

19  Q.   AND YOU DISCUSSED "THE CAN" EXHIBIT?

20  A.   YES.

21  Q.   NOW, THAT WAS A CAN THAT HAD A LABEL ON IT PURPORTING

22  TO HAVE FECES IN IT.  CORRECT?

23  A.   CORRECT.

24  Q.   ALL RIGHT.  AGAIN, THERE IS NO FILM COMPONENT TO THIS

25  EXHIBIT?

```
 1    A.   NO FILM COMPONENT.

 2    Q.   ALL RIGHT.  AND THERE IS NOTHING IN THE EXHIBIT THAT,

 3    AGAIN, INVOLVED WOMEN DOING ANY SORT OF SEX ACT, LIKE

 4    DRINKING URINE OR EATING FECES?

 5    A.   IN THE MANZONI THING, NO.

 6    Q.   RIGHT.  OKAY.  NO ORAL SEX WITH A HORSE?

 7    A.   IN THE MANZONI, NO.

 8    Q.   I'M JUST TRYING TO MAKE SURE YOU UNDERSTAND --

 9    A.   NO, THE MANZONI WASN'T A FILM AND DIDN'T HAVE ANY SEX

10    WITH A HORSE IN THE MANZONI CAN.

11    Q.   NO SEX ACTS --

12    A.   I DON'T KNOW.  MAYBE INSIDE THE CAN HE HAD SOMETHING,

13    BUT OTHER THAN THAT, NO.

14    Q.   NO SEX ACTS AT ALL?

15    A.   NO SEX ACTS AT ALL.

16              THE COURT REPORTER:  EXCUSE ME, COUNSEL.

17              MR. GRANT:  YES, MA'AM.

18              THE COURT REPORTER:  OKAY.  THANK YOU.

19              MR. GRANT:  THANK YOU.

20    BY MR. GRANT:

21    Q.   AND YOU DISCUSSED "THE TRAIL," I THINK YOU CALLED IT?

22    A.   YES.

23    Q.   OKAY.  AND THAT WAS A SCULPTURE?

24    A.   CORRECT.

25    Q.   AND THAT'S A DEPICTION OF WHAT, IT'S LIKE FECES COMING
```

1    OUT OF THE REAR END OF THE SCULPTURE?

2    A.    OF A NUDE WOMAN ON ALL FOURS, YES.

3    Q.    OKAY.  NO SEX ACTS INVOLVED IN THAT.  CORRECT?

4    A.    NO.

5    Q.    I MEAN, THE WOMAN'S NOT SITTING THERE WITH URINE OR

6    FECES?

7    A.    NO.  RIGHT.  NO SEX ACTS.  JUST HER.

8    Q.    AND I GUESS, MR. ISAACS, YOU TALKED TO THE JUDGE ABOUT

9    A NUMBER OF EXHIBITS.

10           IS IT FAIR TO SAY THAT NONE OF THOSE EXHIBITS THAT

11   YOU TESTIFIED TO INCLUDED SEX ACTS LIKE THOSE CHARGED IN THE

12   FILMS IN THIS CASE?

13           THE WITNESS:  CAN I ASK THE JUDGE A QUESTION?

14           THE COURT:  WELL, YOU'RE NOT HERE TO ASK ME

15   QUESTIONS.  YOU'RE NOT HERE TO ASK ANY QUESTIONS.  IT'S ONLY

16   A MATTER OF ANSWERING THE QUESTIONS.

17           THE WITNESS:  OKAY.

18   BY MR. GRANT:

19   Q.    I BELIEVE IT MAY JUST BE A "YES" OR "NO."

20           IS THERE ANY EXHIBIT THAT, YOU KNOW, YOU'VE TALKED

21   ABOUT AS A COMPARABLE, AS AN EXHIBIT, ANYTHING --

22   A.    I HAVE TALKED ABOUT AN EXHIBIT IN THE PAST THAT DOES

23   HAVE A SEX ACT.  IT'S GOT -- IT'S IN A MAINSTREAM MOVIE.

24   Q.    I'M JUST TRYING TO FOCUS ON YOUR PLEADING --

25   A.    WELL --

1    Q.   -- AND WHAT YOU OFFERED TO THE JUDGE --

2    A.   -- AS FAR AS --

3    Q.   -- ON WHAT MAKES YOU AN EXPERT.

4    A.   -- ANY SEX ACTS --

5          THE COURT:  MR. ISAACS, YOU'VE GOT TO LISTEN TO ME

6    WHEN I SAY DO NOT TALK OVER EACH OTHER.  WE'RE NOT GOING TO

7    HAVE A GOOD RECORD.

8          NOW, IT IS IMPOSSIBLE FOR MY COURT REPORTER TO

9    WRITE DOWN WHEN BOTH PEOPLE ARE TALKING OVER EACH OTHER.

10          THE WITNESS:  I'M SORRY.

11          THE COURT:  MR. GRANT.

12          MR. GRANT:  YES, SIR.

13   BY MR. GRANT:

14   Q.   I GUESS WHAT I'M GETTING AT IS IN YOUR PLEADING AND

15   YOUR DISCUSSIONS WITH THE JUDGE -- I JUST WANT TO BE CLEAR.

16          YOU SAID THERE WERE SOME PIECES THAT YOU

17   CONSIDERED WHEN YOU GIVE YOUR EXPERT OPINION.  AND ALL I

18   WANTED TO GET FROM YOU IS WOULD YOU AGREE WITH ME THAT NONE

19   OF THOSE EXHIBITS HAVE ANY DEPICTION OF A SEX ACT INVOLVING

20   WOMEN OR MALES EATING FECES, DRINKING URINE WHILE THEY ARE

21   PERFORMING SEX ACTS?

22   A.   OF THE EXHIBITS THAT I PUT IN THIS PAPER, WHICH MAY OR

23   MAY NOT BE ALL THE EXHIBITS, THERE IS NONE.

24          BUT THERE IS AN EXHIBIT I WOULD LIKE TO PUT IN

25   THAT DOES HAVE THAT FROM A MAINSTREAM MOVIE, BUT I MIGHT NOT

```
 1    PUT IT IN.

 2              MR. GRANT:  ALL RIGHT.

 3              THANK YOU VERY MUCH, YOUR HONOR.

 4              THE COURT:  OKAY.  MR. DIAMOND.  ANYTHING?

 5              MR. DIAMOND:  NOTHING, YOUR HONOR.

 6              THE COURT:  ALL RIGHT.  MR. ISAACS, THANK YOU VERY

 7    MUCH.  YOU MAY STEP DOWN.

 8              ALL RIGHT.  ANY FURTHER TESTIMONY OR ANYTHING

 9    REGARDING MR. ISAACS AS A POTENTIAL EXPERT WITNESS?

10              MR. DIAMOND:  I ASSUME, YOUR HONOR, THAT BECAUSE

11    WE STARTED WITH CROSS-EXAMINATION, THAT THE PLEADINGS WE

12    FILED HAVE ALREADY BEEN READ AND CONSIDERED BY THE COURT.

13              THE COURT:  OF COURSE.

14              MR. DIAMOND:  OKAY.  THEN WE HAVE NOTHING FURTHER.

15              THE COURT:  OKAY.  THEN I'LL HEAR ARGUMENT.

16              SINCE YOU'RE PROPOSING TO HAVE MR. ISAACS TESTIFY,

17    I'LL HEAR ARGUMENT FROM YOU, AND THEN I'LL HEAR ARGUMENT

18    FROM THE GOVERNMENT.  MR. DIAMOND.

19              MR. DIAMOND:  YES, YOUR HONOR.  MAY IT PLEASE THE

20    COURT --

21              THE COURT:  WHY DON'T YOU APPROACH THE LECTERN,

22    PLEASE.

23              MR. DIAMOND:  I CAN DO THAT.

24              THE COURT:  MR. DIAMOND, ALSO, I WOULD LIKE YOU TO

25    SUBMIT A COPY OF THAT BLOG ARTICLE THAT MR. ISAACS REFERRED
```

1    TO IN HIS TESTIMONY, IF YOU WOULD KINDLY DO THAT.

2              DON'T WALK ACROSS THE WELL OF THE COURT,

3    MR. ISAACS.

4              WOULD YOU KINDLY DO THAT AFTER THE PROCEEDINGS.

5       *(DEFENSE COUNSEL CONFERS WITH DEFENDANT SOTTO VOCE.)*

6              MR. DIAMOND:  YES, YOUR HONOR.

7              THE COURT:  ALL RIGHT.  VERY GOOD.  THANK YOU.

8              MAYBE I CAN FOCUS YOUR DISCUSSION.

9              MR. DIAMOND:  SURE.

10             THE COURT:  YOU KNOW, I'M NOT HERE TO JUDGE OR

11   DETERMINE WHETHER I AGREE OR DISAGREE WITH HIS CONCLUSION.

12   THAT'S NEITHER HERE NOR THERE.

13             I'M ONLY HERE TO DETERMINE, A, IS HE QUALIFIED; B,

14   DOES HE HAVE SOME SORT OF RELIABLE METHODOLOGY THAT COULD

15   LEAD TO WHATEVER CONCLUSION AND WHETHER THAT'S GOING TO BE

16   HELPFUL TO THE JURY SO THAT IT IS WHAT THEY CALL THE "FIT

17   REQUIREMENT."

18             SO IF YOU COULD ADDRESS THOSE, I'D APPRECIATE IT.

19             MR. DIAMOND:  YES.  I WANT TO BEGIN WITH AN

20   OBVIOUS STATEMENT, WHICH IS WE HAVE A UNIQUE SITUATION HERE

21   WHERE IT IS THE DEFENDANT WHO IS BEING OFFERED AS THE

22   EXPERT.  I'VE NEVER SEEN A CASE LIKE THIS BEFORE; BUT I

23   THINK IT MILITATES IN FAVOR OF ALLOWING HIS TESTIMONY,

24   ESPECIALLY BECAUSE THE COURT SEEMED TO SUGGEST THAT THERE IS

25   A LOT OF DISCRETION INVOLVED IN THE COURT DECIDING WHETHER

1   TO ALLOW THE OPINION TO BE GIVEN BY THE PROFFERED EXPERT OR

2   NOT.

3           IN THE CASE OF <u>STAGLIANO</u>, WE DID NOT HAVE A

4   DEFENDANT WHO IS BEING OFFERED AS THE EXPERT WITNESS.  WE

5   JUST HAD AN ART EXPERT FROM THE UNIVERSITY OF CALIFORNIA AT

6   SANTA BARBARA.

7           THE COURT:  WHY WOULD THAT MAKE A DIFFERENCE?

8           MR. DIAMOND:  I THINK BECAUSE THE SUBJECT MATTER

9   HERE IS SUBJECT MATTER THAT LENDS ITSELF TO MORE SUBJECTIVE

10  ANALYSIS THAN, SAY, A SCIENTIFIC QUESTION OF WHETHER D.N.A.

11  IS VALID OR NOT OR WHETHER FINGERPRINTS ARE A LEGITIMATE

12  METHOD OF IDENTIFYING PEOPLE OR, AS IN THE <u>DAUBERT</u> CASE,

13  WHETHER THE DRUG IN QUESTION COULD CAUSE THE AILMENT THAT

14  WAS SUFFERED BY THE PLAINTIFF IN THAT CASE BECAUSE THAT,

15  AFTER ALL, WAS A PERSONAL INJURY CASE.

16          HERE, WE HAVE THE DEFENDANT WHO MADE THE MOVIE IN

17  QUESTION, AT LEAST ONE OF THE THREE.  SO I THINK IT WOULD BE

18  HELPFUL TO THE JURY TO UNDERSTAND, FROM THE DEFENDANT'S

19  PERSPECTIVE, WHAT WAS THE PURPOSE OF THE MOVIE, WHAT WAS THE

20  MOVIE ABOUT, DOES IT HAVE ANY VALUE.

21           AND I DON'T KNOW WHETHER IT'S POSSIBLE TO

22  SEPARATE THE DEFENDANT AS THE EXPERT FROM THE DEFENDANT AS

23  THE FILMMAKER, AND IT MAY NOT BE NECESSARY TO MAKE A

24  DISTINCTION.

25           I DON'T KNOW WHETHER, FOR EXAMPLE, RULE 701 WOULD

```
 1   ALLOW MR. ISAACS TO TESTIFY AS TO WHAT HE INTENDED IN THE
 2   MOVIE.  SO IT MAY BE THAT THIS WHOLE DAUBERT HEARING IS AN
 3   ACADEMIC EXERCISE THAT MAY NOT REALLY BE NECESSARY TO
 4   RESOLVE, GIVEN THE FACT THAT THIS IS NOT A CASE INVOLVING
 5   DRUGS OR SOME SCIENTIFIC MATTER.
 6           INHERENTLY, OUR SUBJECTIVE IS SOMETHING THAT DEALS
 7   WITH ART (SIC).  YOU'VE GOT THE PRODUCER OF THE MOVIE, YOU
 8   HAVE HIS OPINION.  HE'S TRYING TO CONVEY TO THE JURY WHAT HE
 9   INTENDED BY THE MOVIE.  I THINK IT WOULD BE MORE DIFFICULT
10   TO TRY TO BREAK UP HIS TESTIMONY AND ALLOW HIM TO SAY ONE
11   THING BUT NOT SOMETHING ELSE.
12           THE COURT:  I THINK YOU'RE MAKING CERTAIN
13   ASSUMPTIONS WHICH I THINK WE BETTER GET ON THE TABLE SO WE
14   CAN APPROACH IT HEAD-ON, AND THAT IS YOU'RE SAYING THAT HIS
15   SUBJECTIVE REASONS FOR MAKING THIS ONE MOVIE -- IT'S ONLY
16   ONE, NOT THE OTHER.  SO IF THAT'S WHAT YOU'RE SAYING, THEN
17   HE HAS NOTHING TO SAY ABOUT THE OTHER TWO WHICH HE ONLY
18   DISTRIBUTED.
19           BUT EVEN ASSUMING FOR THE MOMENT THAT WE'RE ONLY
20   TALKING ABOUT "H.S.A. NO. 7," WHICH HE PRODUCED AND DIRECTED
21   IN MAKING.  SO HE'S THE FILMMAKER OF THIS PARTICULAR CHARGED
22   FILM, THEN MY QUESTION IS:  WHAT AUTHORITY DO YOU HAVE THAT
23   SUGGESTS THAT THE SUBJECTIVE INTENT IS RELEVANT TO OUR
24   INQUIRY?
25           BECAUSE IF YOU LOOK AT THE MILLER TEST, IT DOES
```

1    NOT SAY WHETHER THE DEFENDANT INTENDED TO MAKE SOMETHING

2    WITH ARTISTIC VALUE OR SERIOUS ARTISTIC VALUE OR NOT.  IT

3    SAYS WHETHER A REASONABLE PERSON -- WHICH IS AN OBJECTIVE

4    STANDARD -- WHETHER A REASONABLE PERSON WOULD FIND THAT THIS

5    HAD OR DID NOT HAVE SERIOUS ARTISTIC VALUE.

6            SO MY SENSE IS I QUESTION WHETHER, EVEN AS A

7    LAYPERSON, AS THE FILMMAKER, HE WILL BE PERMITTED TO TESTIFY

8    AS TO HIS INTENTIONS.  BECAUSE INTENTION TO HAVE ARTISTIC

9    VALUE OR NOT IS NOT AN ELEMENT, NOR DOES IT DEFEAT AN

10   ELEMENT OF THE OFFENSE.

11           MR. DIAMOND:  WE AGREE WITH THE COURT'S COMMENT

12   THAT ALONE, WHATEVER HIS SUBJECTIVE INTENT WAS, WOULD NOT BE

13   RELEVANT BY ITSELF.  BUT IN TERMS OF TESTIFYING IN THIS

14   CASE, IT SEEMS TO ME, THE JURY WOULD WANT TO KNOW, AT LEAST

15   TO SOME EXTENT, WHAT WAS THE PURPOSE OF THE MOVIE, WHAT WAS

16   THE PRODUCER OF THE MOVIE ATTEMPTING TO CONVEY TO THE

17   AUDIENCE, AND WHAT WOULD A REASONABLE AUDIENCE TAKE FROM THE

18   MOVIE.

19           I DON'T KNOW WHETHER YOU CAN SEPARATE THOSE TWO

20   CONCEPTS, BUT OBVIOUSLY, WE WILL NOT OFFER ANY EVIDENCE THAT

21   IS NOT ADMISSIBLE.

22           BUT IN TERMS OF WHETHER MR. ISAACS SHOULD BE ABLE

23   TO TESTIFY, THE FACT THAT HE IS THE ACTUAL PRODUCER OF AT

24   LEAST ONE THE THREE MOVIES AND THE DISTRIBUTOR OF THE OTHERS

25   WOULD MILITATE IN FAVOR OF ALLOWING THE COURT TO EXERCISE

1    DISCRETION TO ALLOW THE TESTIMONY BECAUSE, IN EXERCISING

2    DISCRETION, THE COURT IS TO CONSIDER FACTORS SUCH AS WOULD

3    THE JURY BE CONFUSED BY HIS TESTIMONY OR MISLED IN SOME WAY,

4    AND CLEARLY THAT WOULD NOT BE THE CASE.  THE JURY IS

5    INTELLIGENT AND WOULD PRESUMABLY FOLLOW THE JURY

6    INSTRUCTIONS.

7           SO WE DON'T HAVE THE DANGER HERE OF SOMEBODY

8    EXPLAINING D.N.A., AND I'VE READ SOME CASES ON D.N.A.  AND

9    IT'S VERY DIFFICULT TO UNDERSTAND COMPLETELY.

10          SO IN THAT SITUATION, WHERE WE'RE BRINGING IN AN

11   EXPERT IN AN AREA THAT NOBODY REALLY HAS ANY KNOWLEDGE OF, I

12   THINK IT'S IMPORTANT TO MAKE SURE THAT THE SO-CALLED EXPERT

13   DOES NOT JUST GIVE JUNK SCIENCE AND TOTALLY MISLEADS THE

14   JURY.

15          BUT IN A CASE LIKE THIS, WHERE, IRONICALLY, THE

16   JURY IS IN A BETTER POSITION TO EVALUATE THE MOVIE --

17   ALTHOUGH, ARGUABLY, SOMEBODY COULD ARGUE THAT THAT MILITATES

18   AGAINST ALLOWING AN EXPERT BECAUSE WHY DOES THE JURY NEED AN

19   EXPERT IF THE JURY COULD DO IT ITSELF.

20          ON THE OTHER HAND, I BELIEVE THE ARGUMENT

21   MILITATES IN FAVOR OF ALLOWING THE EXPERT BECAUSE THERE'S NO

22   DANGER THAT THE JURY IS GOING TO BE TOTALLY SWEPT OFF ITS

23   FEET AND MISLED BY SOME KIND OF JUNK SCIENCE.

24          THE COURT:  BUT THAT'S NOT REALLY THE STANDARD.

25   THE STANDARD IS IT'S GOT TO BE OF ASSISTANCE TO THE JURY.

```
 1   IF YOU'RE SAYING IT'S NOT OF ASSISTANCE TO THE JURY, BUT

 2   CERTAINLY IT CAN'T BE OF ANY HARM, THAT'S LIKE PUTTING IT ON

 3   ITS HEAD, THE INQUIRY.

 4            MR. DIAMOND:  WE THINK THAT HIS TESTIMONY WOULD

 5   HAVE SOME VALUE.

 6            THE COURT:  WHAT IS THE VALUE?

 7            MR. DIAMOND:  THE VALUE IS IT WILL ALLOW THE JURY

 8   TO DETERMINE OR AT LEAST HELP THE JURY DECIDE WHETHER OR NOT

 9   THE MOVIES HAVE SERIOUS ARTISTIC VALUE.

10            THE COURT:  AND WHY WOULD WHAT HE SAYS, EVEN AS A

11   FILMMAKER ON ONE OF THEM, HELP THEM AT ALL TO DECIDE IT ON

12   AN OBJECTIVE BASIS?

13            MR. DIAMOND:  BECAUSE THE JURY NEEDS TO KNOW WHAT

14   MAKES SOMETHING ARTISTIC AND WHAT GIVES --

15            THE COURT:  THEY'RE LOOKING AT THE FILM?  THEY

16   SHOULD LOOK AT THE FILM; THEY SHOULD LOOK AT THE WAY THE

17   FILM WAS SHOT; THEY SHOULD LOOK AT THE LIGHTING; THEY SHOULD

18   LOOK AT ALL THE PRESENTATION -- THE WAY IT IS -- WHICH THEY

19   CAN SEE BY LOOKING AT THE MOVIE.

20            WHAT WAS IN THE MIND OF THE FILMMAKER BEHIND THE

21   LENS IS NOT SOMETHING THAT IS SHOWN ON THE MOVIE.

22            DO YOU HAVE ANY CASE LAW, ANY AUTHORITY WHATSOEVER

23   THAT SAYS UNDER THE THIRD PRONG OF THE MILLER TEST, WHICH ON

24   ITS FACE IS OBJECTIVE STANDARD, THAT SOMEHOW IT IS RELEVANT

25   FOR THE FILMMAKER TO TESTIFY ABOUT HIS INTENTIONS?
```

```
 1              MR. DIAMOND:  I HAVE NO CASE THAT I CAN CITE THAT

 2    SUPPORTS THAT EXACT PROPOSITION, BUT I BELIEVE THAT IS WHAT

 3    THE LAW IS.

 4              THE COURT:  WELL, WHAT DO YOU BASE THAT ON?

 5              MR. DIAMOND:  THE JURY IS BEING ASKED, UNDER THE

 6    MILLER VERSUS CALIFORNIA TEST AND ALSO APPLIED IN THE PARIS

 7    ADULT THEATER CASE TO MAKE A DETERMINATION ON A NUMBER OF

 8    ISSUES, ONE OF WHICH IS DOES THE MOVIE HAVE SERIOUS ARTISTIC

 9    VALUE.

10              THE COURT:  WHETHER A REASONABLE PERSON WOULD FIND

11    THAT IT HAS SERIOUS ARTISTIC VALUE.

12              MR. DIAMOND:  RIGHT.  NOW, SOMETIMES IN OTHER

13    OBSCENITY CASES, EITHER THE PROSECUTION OR THE DEFENSE WILL

14    TRY TO CALL AS A WITNESS SOMEBODY WHO HAS CONDUCTED A SURVEY

15    TO SEE WHAT THE COMMUNITY STANDARD IS.

16              THE COURT:  THAT'S A TOTALLY DIFFERENT --

17              MR. DIAMOND:  I UNDERSTAND THAT.

18              THE COURT:  WELL, YOU'RE MIXING APPLES AND

19    ORANGES.

20              MR. DIAMOND:  WE'RE NOT DOING THAT HERE.

21              THE COURT:  I KNOW, BUT THAT DOESN'T MATTER

22    BECAUSE THAT'S ON A DIFFERENT PRONG.

23              WE'RE TALKING ABOUT -- YOU'RE RIGHT.  YOU'RE NOT

24    DOING THAT.  HE'S NOT PURPORTING TO TESTIFY AS TO COMMUNITY

25    ACCEPTANCE, ALTHOUGH I HAVE SERIOUS CONCERN AS TO WHETHER OR
```

```
 1   NOT HE'S GETTING IN THROUGH THE BACK DOOR WHAT HE CAN'T GET
 2   IN THROUGH THE FRONT DOOR BY THIS SO-CALLED COMPARISON WITH
 3   THESE EXHIBITS.  BUT BE THAT AS IT MAY, LET'S LEAVE THAT FOR
 4   ANOTHER DISCUSSION.
 5         MY QUESTION TO YOU STILL IS -- I GUESS YOU
 6   ANSWERED THE QUESTION -- IS THAT YOU HAVE NO AUTHORITY TO
 7   SUPPORT THE PROPOSITION THAT, UNDER THE THIRD PRONG OF THE
 8   MILLER TEST, THAT THE FILMMAKER'S SUBJECTIVE INTENT HAS ANY
 9   BEARING ON ANYTHING.
10         MR. DIAMOND:  I HAVE NO CASE THAT SUPPORTS THAT,
11   AND I'M NOT SAYING THAT THAT WOULD BE THE BASIS UPON WHICH
12   WE WOULD ARGUE.  BUT IT IS POSSIBLE THAT THE JURY MIGHT WANT
13   TO KNOW THAT, BUT IT'S ALSO POSSIBLE THE JURY WOULD NOT BE
14   PERMITTED TO CONSIDER THAT IN A JURY INSTRUCTION, AND WE'RE
15   NOT BASING MR. ISAACS' TESTIMONY ON THAT CONCEPT.
16         WE SIMPLY WANTED TO POINT THAT OUT, THAT THE JURY
17   MIGHT WANT TO CONSIDER THAT, IT MIGHT AFFECT IT IN SOME WAY
18   BUT --
19         THE COURT:  THE JURY CAN ONLY CONSIDER THINGS
20   WHICH ARE PROPERLY FOR THEM TO CONSIDER THAT ARE RELEVANT.
21         YOU KNOW, AS A TRIAL LAWYER, JURORS ARE PROBABLY
22   CURIOUS ABOUT A LOT OF THINGS, AND YOU KNOW WE DON'T JUST
23   SAY, "WHY DON'T YOU JUST GO AHEAD AND LET US KNOW WHAT YOU
24   WOULD LIKE TO KNOW, AND WE'LL BE HAPPY TO ANSWER ANY AND ALL
25   QUESTIONS."
```

85

```
1            EVEN FOR THE -- IF YOU WANT TO CALL IT -- THE MORE
2    ENLIGHTENED VIEW OF JURY TRIALS, THERE'S STILL NOT A
3    WHOLESALE PERMISSION OF THE JURY TO, AT ANY TIME, RAISE
4    THEIR HAND AND ASK A QUESTION AND IT HAS TO BE ANSWERED.
5    ALL OF THAT IS FILTERED THROUGH THE JUDGE AS WELL AS THE
6    LAWYERS SO THAT, IF THEY ASK A RELEVANT QUESTION, THEY CAN
7    HAVE AN ANSWER, BUT IF THEY ASK AN IRRELEVANT QUESTION, THEY
8    DON'T GET THE ANSWER.
9            SO THE MERE FACT THAT THE JURY MAY OR MAY NOT WANT
10   TO HEAR IT CANNOT GUIDE OUR DETERMINATION.  OUR
11   DETERMINATION HAS TO BE GUIDED BY WHAT IS RELEVANT UNDER THE
12   LAW.
13           MR. DIAMOND:  RIGHT.  THE COURTS HAVE RULED OVER
14   AND OVER AGAIN THAT IT IS NOT A REQUIREMENT OF THE
15   GOVERNMENT THAT IT PUT ON AN EXPERT WITNESS ON ANY OF THE
16   ISSUES, BUT THAT DOES NOT MEAN THAT THE DEFENDANT CANNOT --
17           THE COURT:  I AGREE.  I AGREE.
18           MR. DIAMOND:  -- PUT ON AN EXPERT WITNESS.
19           THE COURT:  I AGREE.  BUT, MR. DIAMOND, YOU'RE
20   SORT OF, YOU KNOW, DANCING AROUND WITHOUT BEING ANALYTICALLY
21   RIGOROUS IN TERMS OF -- WITH ALL DUE RESPECT, IN TERMS OF
22   WHAT WE'RE DOING HERE.
23           I DON'T DISAGREE.  THAT THEY DON'T HAVE TO PUT IT
24   ON DOESN'T MEAN YOU CAN'T PUT IT ON.  THAT'S NOT THE POINT.
25           THE POINT IS WHY SHOULD YOU BE ABLE TO PUT IT ON.
```

```
 1   YOU HAVE TO MAKE THAT SHOWING TO ME.  AND YOU'RE MOVING YOUR

 2   THEORIES QUITE LOOSELY BECAUSE, AT THE ONE MOMENT, YOU'RE

 3   TELLING ME, WELL, THIS EXPERT DAUBERT HEARING MAY ALL BE

 4   IRRELEVANT ANYWAY BECAUSE HE COULD TESTIFY JUST AS A

 5   FILMMAKER, AS A LAYPERSON TO THIS, AS A DEFENDANT; BUT WHAT

 6   I'M DOING IS I'M CHALLENGING WHAT YOU'RE SAYING.

 7            I DON'T THINK, UNLESS YOU GIVE ME SOME AUTHORITY

 8   THAT SAYS A FILMMAKER'S SUBJECTIVE INTENT HAS SOME

 9   RELEVANCE -- IF YOU DO GIVE ME THAT AUTHORITY, THEN I MIGHT

10   SAY OKAY, IF THAT IS RELEVANT, THEN THE JURY SHOULD HEAR

11   ABOUT IT.  AND IF THE JURY IS GOING TO HEAR ABOUT THAT, DOES

12   IT REALLY MATTER WHETHER WE CALL HIM AN "EXPERT" OR JUST A

13   "FILMMAKER."  THEN THAT ARGUMENT HAS MORE FORCE.

14            BUT IT'S A NONSTARTER IF YOU CAN'T GET PAST THE

15   FUNDAMENTAL FIRST STEP, WHICH IS WHAT DIFFERENCE DOES IT

16   MAKE, LEGALLY, WHAT HIS INTENTIONS WERE IN CREATING THE WORK

17   WHICH HE CALLS TO HAVE SERIOUS ARTISTIC VALUE.  IT'S JUST,

18   YOU LOOK AT IT, AND YOU DECIDE ON AN OBJECTIVE BASIS.

19            MR. DIAMOND:  I SUBMIT THAT WE HAVE NO CASE

20   AUTHORITY TO SUPPORT THE PROPOSITION THAT I'VE ADVANCED, BUT

21   WE WANT TO MAKE SURE THAT THIS RECORD IS COMPLETE BY NOTING

22   THAT WE BELIEVE THAT WE OUGHT TO BE ABLE TO DO THAT EVEN

23   THOUGH WE UNDERSTAND THAT, IF THERE'S NO CASE THAT SUPPORTS

24   THAT PROPOSITION, WE'LL DO WITHOUT IT.

25            THE COURT:  YOU HAVE NO AUTHORITY, WHETHER IT'S A
```

```
 1   CASE, STATUTE, POLICY, REASONS -- ANYTHING.
 2           MR. DIAMOND:  WELL, I WOULD SAY THAT WE, FIRST OF
 3   ALL, BELIEVE THAT THE STAGLIANO CASE IS NOT BINDING ON THIS
 4   COURT.  IT'S A SINGLE DISTRICT JUDGE DECISION.
 5           THE COURT:  I AGREE.
 6           MR. DIAMOND:  AND I BELIEVE, FOR EXAMPLE, THE
 7   RULING OF THE COURT THAT THE SANTA BARBARA ART EXPERT WAS
 8   NOT EVEN ALLOWED BY THIS DISTRICT COURT OPINION TO TESTIFY,
 9   I THINK THAT'S A SERIOUS PROBLEM WITH RESPECT TO THIS
10   DISTRICT COURT OPINION.
11           BUT I ATTEMPTED TO DISTINGUISH IT BY POINTING OUT
12   THAT WE DO HAVE A UNIQUE SITUATION HERE WHERE THE DEFENDANT
13   IS THE OFFERED EXPERT.
14           THE COURT:  BUT I GUESS THAT'S MY QUESTION.  WE'RE
15   GOING AROUND IN CIRCLES, AND I DON'T THINK WE'RE
16   ACCOMPLISHING ANYTHING, MR. DIAMOND.
17           MY QUESTION TO YOU IS THERE'S NO DOUBT THAT A
18   DEFENDANT HAS THE RIGHT TO PUT ON A DEFENSE.  THERE'S NO
19   DOUBT THAT THE DEFENDANT HAS A RIGHT TO TESTIFY IN HIS OWN
20   BEHALF.  GRANTED.  THOSE ARE ABSOLUTELY BEDROCK PRINCIPLES
21   WHICH WE ALL OBSERVE.  BUT JUST BECAUSE SOMEBODY IS A
22   DEFENDANT DOES NOT GIVE HIM LICENSE TO TALK ABOUT OR TESTIFY
23   ABOUT ANYTHING HE WANTS TO.
24           THE DEFENDANT, AS A WITNESS, IS AS CONSTRAINED BY
25   THE RULES OF EVIDENCE AND BY THE CONCEPT OF RELEVANCY AS
```

1    WELL AS ALL OTHER RULES OF EVIDENCE AS APPLICABLE TO ANY

2    WITNESS.  I'M SURE YOU'RE NOT PROPOSING THAT, BECAUSE

3    HE'S A DEFENDANT AND HE HAS A RIGHT TO TESTIFY ON HIS OWN

4    BEHALF, THAT HE CAN OTHERWISE THEN INTRODUCE ANYTHING THAT'S

5    NOT OTHERWISE ADMISSIBLE.

6         MR. DIAMOND:  IF HE, FOR EXAMPLE, CAME TO THIS

7    COURT AND THE ISSUE WAS IDENTITY -- LET'S ASSUME IT'S A BANK

8    ROBBERY CASE.  THE ISSUE WAS IDENTITY.  I DO NOT BELIEVE HE

9    WOULD BE ABLE TO TESTIFY THAT THE FINGERPRINTS THAT WERE

10   TAKEN ARE OF NO VALUE BECAUSE FINGERPRINTS HAVE NO

11   SCIENTIFIC VALUE.  I DON'T BELIEVE HE'D BE ABLE TO TESTIFY

12   THAT THERE'S NO SUCH THING AS D.N.A.

13        THE COURT:  SO YOU AGREE WITH ME THAT WHATEVER A

14   DEFENDANT WITNESS TESTIFIES ABOUT, HE OR SHE IS NEVERTHELESS

15   BOUND BY THE RULES OF EVIDENCE.

16        MR. DIAMOND:  ABSOLUTELY, ABSOLUTELY.

17        THE COURT:  OKAY.  SO HERE IS ALL I'M SAYING:  IF

18   THAT IS TRUE, THEN WHAT HE PURPORTS TO TESTIFY ABOUT -- THAT

19   IS, WHAT HIS INTENTIONS WERE IN MAKING THESE FILMS -- NOT

20   "THESE."  A FILM, ONE FILM, "H.S.A. NO. 7" -- THAT HAS TO

21   HAVE SOME RELEVANCE, AND THAT'S WHY WE'RE LOOKING AT DOES IT

22   HAVE ANY RELEVANCE TO THE OBJECTIVE INQUIRY.

23        IF YOU HAVE ANY AUTHORITY THAT SUGGESTS THAT IT

24   IS, I'LL BE MORE THAN HAPPY TO THINK THAT THAT WOULD BE

25   FINE.  BUT IN THE ABSENCE OF SOME AUTHORITY WHICH APPEARS TO

```
1   CONTRADICT WHAT THE LAW SAYS, WHICH IS AN OBJECTIVE
2   STANDARD, THEN I'M NOT INCLINED TO ALLOW HIM TO TESTIFY TO
3   THAT WHETHER YOU CALL HIM AN EXPERT OR YOU CALL HIM AS JUST
4   A DEFENDANT BECAUSE HE'S STILL BOUND BY THE RULES OF
5   EVIDENCE.
6          MR. DIAMOND:  WELL, WE'LL CONCEDE, FOR PURPOSES OF
7   DISCUSSION, THAT IT IS AN OBJECTIVE STANDARD AND DETERMINED,
8   BASED UPON A REASONABLE PERSON'S STANDARD, IT HAS TO BE
9   OBJECTIVE.  I BELIEVE THAT MR. ISAACS' TESTIMONY COVERED
10  THAT ADEQUATELY.  IN TERMS OF STRENGTH, OBVIOUSLY, WE DIDN'T
11  HIT A HOME RUN.  HE DIDN'T HIT A HUNDRED PERCENT, BUT I
12  THINK HE HIT 75, 80 PERCENT.
13         THE COURT:  IT'S NOT STRENGTH.  I'M NOT HERE TO
14  JUDGE THE CREDIBILITY, THE BELIEVABILITY OF HIS CONCLUSION.
15  I WANT TO MAKE IT VERY CLEAR.  IT'S NOT WHETHER I BELIEVE
16  HIM.  IF IT WERE A COURT TRIAL, IT WOULD BE DIFFERENT.  IT'S
17  NOT A COURT TRIAL.  THIS IS NOT EVEN A TRIAL.  THIS IS ONLY
18  A DAUBERT HEARING.  PERCENTAGE OF HOW HE DID, THAT'S GOT
19  NOTHING TO DO WITH IT.  IT'S GOT EVERYTHING TO DO WITH
20  METHODOLOGY.
21         BUT BEFORE WE GET ON TO THE SECOND TOPIC OF
22  METHODOLOGY, EVEN BY YOUR OWN ARGUMENT THAT SOMEHOW, AS THE
23  FILMMAKER, HE HAS SOME UNIQUE PERSPECTIVE, WHY WOULD HE BE
24  ABLE TO SAY ANYTHING ABOUT THE OTHER TWO COUNTS?  HE'S NOT
25  THE FILMMAKER.  HE'S ONLY A DISTRIBUTOR MUCH LIKE A
```

90

1    SALESPERSON.

2            MR. DIAMOND:  THE ARGUMENT WITH RESPECT TO THE

3    OTHER TWO MOVIES WOULD BE A WEAKER ARGUMENT.  WE HAVE A

4    STRONGER ARGUMENT, OBVIOUSLY, WITH RESPECT TO THE MOVIE THAT

5    HE MADE.

6            THE COURT:  OKAY.

7            MR. DIAMOND:  AND SO I WOULD CONCEDE THAT OUR

8    ARGUMENT WOULD BE MORE DIFFICULT TO MAKE WITH RESPECT TO

9    THE OTHER TWO MOVIES, BUT WE WOULD STILL MAKE IT.  I THINK

10   WE WOULD STILL SURVIVE, BUT IT WOULD BE MORE DIFFICULT.

11           BUT CLEARLY MR. ISAACS' TESTIMONY -- PROPOSED

12   TESTIMONY WOULD MEET THE MINIMUM THRESHOLD THAT WOULD BE

13   REQUIRED UNDER THE DAUBERT CASE FOR PURPOSES OF TESTIMONY

14   WITH RESPECT TO WHETHER A MOVIE HAS SERIOUS ARTISTIC VALUE.

15           THE COURT:  OKAY.  LET'S TALK SPECIFICALLY ABOUT

16   THAT.

17           WHAT ARE HIS QUALIFICATIONS TO DO THIS?

18           MR. DIAMOND:  WELL, WE START WITH HIS EDUCATION.

19   HE WENT TO THE STATE UNIVERSITY OF NEW YORK, AND HE HAS A

20   DEGREE IN COMMUNICATION ARTS, I BELIEVE, IS WHAT HE

21   TESTIFIED TO.  SO WE START WITH THE EDUCATION.

22           AND ACCORDING TO RULE 702 -- AND WE HAVE TO BE

23   GOVERNED BY RULES HERE -- RULE 702 SAYS:

24       "IF A SPECIALIZED KNOWLEDGE WILL ASSIST THE TRIER OF

25        FACT TO UNDERSTAND THE EVIDENCE OR TO DETERMINE A FACT

1    IN ISSUE, A WITNESS, QUALIFIED AS AN EXPERT BY

2    EDUCATION, MAY TESTIFY THERETO IN THE FORM OF AN

3    OPINION OR OTHERWISE."

4         SO HE HAS EDUCATION.

5         BUT BEYOND THAT, HE'S BEEN A FILMMAKER FOR 25

6    YEARS.  HE'S BEEN DOING THIS SORT OF THING.  HE HAS THE

7    EXPERIENCE, ESPECIALLY WITH THE PARTICULAR SPECIALIZED

8    SUBJECT MATTER HERE, WHICH IS SCATOLOGY, AS OPPOSED TO OTHER

9    TYPES OF MOVIES.

10        SO IT'S NOT JUST EDUCATION FROM THE UNIVERSITY OF

11   NEW YORK, BUT ALSO HE'S GOT THE EXPERIENCE.  HE'S GOT THE

12   KNOWLEDGE.

13        THE COURT:  SO ISN'T THIS A LITTLE BIT OF A

14   SELF-FULFILLING PROPHECY?  I DEAL IN SCATOLOGY; THEREFORE,

15   I'M AN EXPERT IN DETERMINING WHETHER OR NOT IT HAS ANY

16   ARTISTIC VALUE.

17        MR. DIAMOND:  HE HAS EXPERIENCE WITH THE SPECIFIC

18   SUBJECT MATTER, WHICH IS CERTAIN TYPES OF MOVIES OF A

19   CERTAIN NATURE.  HE HAS THE EXPERIENCE.

20        THE COURT:  SO WOULD YOU SAY, THEN, THAT ANYBODY

21   WHO MAKES A FILM THAT IS CHARGED WITH OBSCENITY IS

22   AUTOMATICALLY AN EXPERT?

23        MR. DIAMOND:  NOT AUTOMATIC.  I THINK THERE ARE

24   CERTAIN MINIMUM THINGS THAT HAVE TO BE ESTABLISHED, AND I

25   THINK THAT MR. ISAACS HAS DEMONSTRATED THAT IN HIS

```
 1    TESTIMONY.

 2           HE DOES ARTWORK.  HE DOES THE COUPONS FOR THE

 3    PIZZA PLACE AND THE LAUNDROMAT AND SOME OF THE OTHER THINGS.

 4    SO WE KNOW HE'S NOT JUST MAKING THIS UP.  SO HE HAS ARTISTIC

 5    ABILITY; HE'S GOT TRAINING; HE'S GOT EXPERIENCE; HE'S READ

 6    ABOUT POSTMODERNISM; HE'S APPLYING THAT TO HIS MOVIES, AND

 7    HE'S ATTEMPTING TO ASSIST THE JURY IN AN AREA THAT THE JURY

 8    MAY NEED SOME ASSISTANCE IN.

 9           THE COURT:  WHY DOES THE JURY NEED ASSISTANCE?  HE

10    SAYS HE THINKS THAT HE'S DOING IT SO THAT HE CAN DISABUSE

11    THE JURY OF THEIR MISTAKEN NOTION ABOUT WHETHER THEY ARE

12    GOING TO BE TURNED OFF BY THIS.  THAT WASN'T HIS PHRASE; BUT

13    IT WAS MORE MY PHRASE.

14           IS THAT THE PROPER OFFICE OF AN EXPERT IN THIS

15    INSTANCE?  I MEAN, HE'S NOT A PSYCHOLOGIST.  SO IS HE TRYING

16    TO ENSURE THAT THEY'RE NOT MISTAKEN PSYCHOLOGICALLY ABOUT

17    THEIR FEELINGS ABOUT THIS SUBJECT MATTER BECAUSE THEIR FIRST

18    REACTION IS GOING TO BE NEGATIVE?  IS THAT WHAT HE'S REALLY

19    TESTIFYING ABOUT?

20           MR. DIAMOND:  NO.  HE'S TESTIFYING AS TO WHETHER

21    OR NOT A REASONABLE, OBJECTIVE PERSON APPLYING AN OBJECTIVE

22    STANDARD COULD CONCLUDE THAT THE MOVIE HAS SERIOUS ARTISTIC

23    VALUE.

24           THE COURT:  OKAY.

25           MR. DIAMOND:  AND THE JURY MAY NOT UNDERSTAND HOW
```

```
 1    ARTISTS OPERATE, HOW THEY THINK, HOW THEY WORK.  AND

 2    MR. ISAACS, AS AN ARTIST AND AS SOMEBODY WHO'S EXPERIENCED

 3    IN THIS AREA, IS GIVING THE JURY A UNIQUE PERSPECTIVE,

 4    SOMETHING THE JURY MAY NOT KNOW OR HAVE IN ITS POSSESSION.

 5    NONE OF THE PROSPECTIVE JURY PANEL MEMBERS OR NONE OF THE

 6    JURY MEMBERS MIGHT HAVE ANY EXPERIENCE AT ALL IN THE ART

 7    WORLD.

 8            AND SO MR. ISAACS, BECAUSE OF HIS EXPERIENCE, CAN

 9    CONVEY THAT TO THE JURY IN A WAY THAT I CAN'T DO IT IF,

10    WITHOUT THE EXPERT, I'M LIMITED TO MAKING CLOSING ARGUMENT

11    BECAUSE I'M CONCERNED THAT, IF MR. ISAACS IS NOT PERMITTED

12    TO TESTIFY, ALL WE'LL HAVE LEFT IS LITTLE OLD ME DOING

13    CLOSING ARGUMENT WHERE THE GOVERNMENT IS GOING TO SAY,

14    "WELL, MR. DIAMOND CAN'T MAKE THAT ARGUMENT BECAUSE THERE'S

15    NO EVIDENCE IN THE RECORD TO SUPPORT HIS STATEMENT."  SO --

16            THE COURT:  I DON'T EVEN KNOW WHAT YOUR ARGUMENT

17    IS.  AND TO ME, WHY SHOULDN'T YOU BE ABLE TO MAKE AN

18    ARGUMENT AS TO WHETHER OR NOT A REASONABLE PERSON -- BECAUSE

19    YOU CAN MAKE ARGUMENTS ABOUT WHAT YOU THINK A REASONABLE

20    PERSON WOULD THINK.

21            MR. DIAMOND:  WHY NOT HAVE AN EXPERT WHO KNOWS

22    MORE THAN I TESTIFY AS TO WHAT --

23            THE COURT:  BUT HE'S NOT AN EXPERT REASONABLE

24    PERSON.

25            ARE YOU TRYING TO SUGGEST TO ME THAT HE'S AN
```

```
 1    EXPERT REASONABLE PERSON?
 2              MR. DIAMOND:  NO, I'M SAYING --
 3              THE COURT:  WELL, SO WHAT THEN?  BECAUSE THE
 4    QUESTION IS NOT WHETHER AN ARTIST OR FILMMAKER THINKS IT HAS
 5    SERIOUS ARTISTIC VALUE.  THE QUESTION IS WHETHER A
 6    REASONABLE PERSON WOULD THINK SO.
 7              SO IF YOU'RE PROFFERING HIM, I SUPPOSE, AS A
 8    REASONABLE PERSON EXPERT -- WHICH I WOULD THINK WOULD BE
 9    HIGHLY IRREGULAR AND VERY, VERY QUESTIONABLE -- THEN AT
10    LEAST YOU CAN LINE UP THE FIT.
11              BUT HERE -- OR IF THE INQUIRY WERE WOULD AN
12    ARTIST, TRAINED ARTIST, THINK THAT IT IS OF SERIOUS ARTISTIC
13    VALUE, THEN YOU'RE RIGHT.  THESE PEOPLE, CHANCES ARE, IN THE
14    JURY BOX -- THEY'RE NOT GOING TO BE ANY KIND OF AN ARTIST.
15    MAYBE SOME OF THEM MIGHT HAVE SOME ART BACKGROUND, BUT
16    THEY'RE NOT EXPERTS.
17              SO YOU HAVE AN EXPERT WHO IS AN ARTIST, ASSUMING
18    HE'S AN EXPERT, ASSUMING HE HAS QUALIFICATIONS, FINE.  THEN
19    AT LEAST YOU HAVE YOU A FIT.
20              HERE, UNLESS YOU'RE PROFFERING HIM AS A REASONABLE
21    PERSON EXPERT, WHERE'S THE FIT?
22              MR. DIAMOND:  WE'RE PROFFERING HIM AS AN EXPERT ON
23    WHETHER OR NOT THE MOVIE IN QUESTION HAS SERIOUS ARTISTIC
24    VALUE.
25              THE COURT:  OKAY.  I UNDERSTAND WHAT YOU'RE
```

```
 1    PROFFERING HIM FOR.  I'M JUST --

 2              MR. DIAMOND:  I UNDERSTAND.

 3              THE COURT:  LET ME MOVE ON THEN.

 4              WHAT ABOUT HIS METHODOLOGY?  THAT'S THE LAST AREA

 5    THAT WE CAN TALK ABOUT BEFORE I GIVE MR. GRANT AN

 6    OPPORTUNITY ALSO.

 7              WHAT ABOUT THE METHODOLOGY?  WHAT METHODOLOGY WERE

 8    YOU ABLE TO GLEAN AND PERHAPS ARTICULATE FOR ME FROM YOUR

 9    CLIENT'S TESTIMONY AS TO HOW IT IS THAT HE WOULD GO ABOUT

10    DECIDING WHETHER THIS DEPICTION IS OF SERIOUS VALUE OR

11    WHETHER THIS DEPICTION IS OF SERIOUS VALUE OR NOT.

12              MR. DIAMOND:  WELL, HE TESTIFIED -- AND THE COURT

13    OBVIOUSLY HEARD HIS TESTIMONY -- THAT THE QUESTION OF

14    WHETHER THE MOVIE HAS SERIOUS ARTISTIC VALUE DEPENDS, TO

15    SOME EXTENT, ON WHETHER OR NOT PEOPLE ARE HAVING A

16    DISCUSSION, WHETHER IT PROVOKES PEOPLE TO HAVE THOUGHTFUL

17    DISCUSSION AND ANALYSIS OF THE MOVIES IN QUESTION.  AND SO

18    THAT IS PART OF HIS METHODOLOGY.  THAT'S NOT THE ONLY PART,

19    BUT THAT WAS ONE PART.

20              THE COURT:  WHAT ELSE?  THAT'S THE ONLY PART I

21    HEARD.  WE WENT AROUND AND AROUND AND AROUND A LOT, AND

22    MR. ISAACS, I THINK WAS VERY FORTHRIGHT, ACTUALLY.  I THINK

23    WHAT HE DID SAY WAS VERY FORTHRIGHT BECAUSE HE WAS TRYING TO

24    ANSWER THE QUESTION THE BEST HE CAN.  I SUGGEST THAT HE WAS

25    HAVING SOME DIFFICULTY, NOT BECAUSE HE WAS TRYING TO BE LESS
```

```
 1    THAN FORTHRIGHT WITH ME, NOT AT ALL.  I DON'T THINK HE'S

 2    THAT WAY AT ALL.  I JUST THINK THERE'S A SERIOUS QUESTION AS

 3    TO WHETHER OR NOT THERE IS ANY METHODOLOGY AT ALL TO THIS

 4    OTHER THAN THE CONCLUSION.

 5          MR. DIAMOND:  WELL, I THINK THAT THE CONCEPT OF

 6    METHODOLOGY DIFFERS FROM SUBJECT MATTER TO SUBJECT MATTER.

 7          THE COURT:  I AGREE WITH THAT, TOO.

 8          MR. DIAMOND:  SO, I MEAN, TO DETERMINE

 9    ASTRONOMICAL ISSUES OR TO DETERMINE PHYSICS ISSUES OR

10    CHEMISTRY ISSUES OR MATHEMATICS, WE HAVE DIFFERENT TYPES OF

11    METHODOLOGY.  BUT FOR SOMETHING LIKE WHETHER MATERIAL HAS

12    ARTISTIC VALUE, I DON'T KNOW WHETHER OR NOT THE METHODOLOGY

13    CONCEPT EVEN REALLY APPLIES TO THIS SITUATION.

14          I SUPPOSE YOU COULD ARGUE OR SUGGEST THAT HE HAS

15    TO TAKE A SURVEY OF PEOPLE AND ASK A THOUSAND PEOPLE WHAT IS

16    THEIR OPINION ABOUT WHETHER SOMETHING HAS SERIOUS ARTISTIC

17    VALUE, BUT I DON'T THINK THAT'S THE ONLY WAY TO ESTABLISH

18    THE POINT.

19          I THINK YOU CAN DO IT IN OTHER METHODS, AND THIS

20    WAS THE METHOD THAT MR. ISAACS OFFERED THE COURT.

21          THE COURT:  OKAY.

22          MR. DIAMOND:  WE'RE NOT, AGAIN, DEALING WITH

23    SCIENCE OR MATHEMATICS OR PHYSICS OR CHEMISTRY.

24          THE COURT:  MR. DIAMOND, I ABSOLUTELY AGREE WITH

25    THAT STATEMENT, AS FAR AS IT GOES.  IT'S A FLEXIBLE CONCEPT,
```

97

```
 1    DAUBERT IS A VERY FLEXIBLE FRAMEWORK FOR ME TO PERFORM MY
 2    DUTY AS A GATEKEEPER.  I UNDERSTAND THAT.  NOBODY IS
 3    SUGGESTING -- AND I TOLD MR. ISAACS WHEN HE WAS ON THE
 4    STAND.  I'M NOT LOOKING FOR THE KIND OF RIGOROUS SCIENCE
 5    THAT ONE WOULD EXPECT FROM HARD SCIENCE SUBJECTS --
 6    MATHEMATICS, PHYSICS, CHEMISTRY, WHATEVER.
 7              I UNDERSTAND FROM KUMHO VERSUS CARMICHAEL THAT YOU
 8    HAVE TO ADJUST THE LEVEL OF INQUIRY TO THE SUBJECT OF THE
 9    EXPERT OPINION BEING PROFFERED.  I UNDERSTAND THAT.
10              SO IF YOU'RE TALKING ABOUT PSYCHIATRY, YOU'RE
11    TALKING ABOUT INTERNAL MEDICINE, DIAGNOSTIC TECHNIQUES OF
12    DOCTORS, YOU TALK ABOUT ENGINEERING, OR YOU TALK ABOUT HARD
13    SCIENCE -- IT'S ALL GOING TO BE VARIABLE AND FLEXIBLE TO
14    SUIT THE PROPER CIRCUMSTANCES.  I DON'T DISAGREE WITH THAT.
15              BUT I DO DISAGREE TO THE EXTENT THAT YOU MAY
16    SUGGEST THAT SOMEHOW METHODOLOGY IS WAIVED IN TERMS OF
17    DISCUSSION OF THE KIND THAT WE'RE HAVING.  I DON'T BELIEVE
18    THAT'S SUPPORTED BY ANY LAW.
19              I BELIEVE THAT THE CASE LAW IS TO THE CONTRARY,
20    THAT IT IS REQUIRED, A CERTAIN LEVEL OF RELIABILITY OF SOME
21    METHODOLOGY IS REQUIRED FOR ANY KIND OF EXPERT.  OTHERWISE,
22    THEN, IT'S JUST SORT OF LIKE A BLACK BOX SYNDROME.
23              YOU KNOW, I JUST SAY, "I'M GOING TO SAY THIS IS
24    THAT.  I'M GOING TO SAY THAT IS THAT.  I'M GOING TO SAY THAT
25    IS THAT," AND THAT'S IT.  YOU KNOW, I'M AN EXPERT; I CAN SAY
```

1    IT.  THAT'S NOT THE LAW.

2          SO IN ANY EVENT.  OKAY.  LET ME GIVE MR. GRANT AN

3    OPPORTUNITY, AND IF YOU HAVE SOME CONCLUDING REMARKS,

4    BRIEFLY, I'LL LET YOU DO THAT AFTER HE HAS A CHANCE.

5          MR. DIAMOND:  THANK YOU, YOUR HONOR.

6          THE COURT:  THANK YOU VERY MUCH.

7          MR. GRANT:  THANK YOU, YOUR HONOR.

8          THE COURT:  WELL, LET ME FIRST ASK YOU, MR. GRANT,

9    DO YOU AGREE WITH MR. DIAMOND THAT, EVEN IF MR. ISAACS WERE

10   NOT TESTIFYING AS AN EXPERT BUT HE WERE CALLED AS A  LAY

11   WITNESS/DEFENDANT WHO HAPPENED TO BE THE FILMMAKER, THAT HE

12   SHOULD BE ABLE TO, AS JUST A DEFENDANT/WITNESS, TESTIFY AS

13   TO WHAT HE WAS TRYING TO ACHIEVE FROM HIS MAKING OF AT LEAST

14   THIS ONE FILM, BECAUSE HE DIDN'T MAKE THE OTHERS -- BUT THIS

15   ONE FILM, "H.S.A. NO. 7"?

16         MR. GRANT:  NO, YOUR HONOR, NOT AT ALL.

17         ACTUALLY, THE INTENT OF MR. ISAACS IS OF NO

18   CONSEQUENCE TO THIS ISSUE.  IT'S AN OBJECTIVE STANDARD UNDER

19   THE THIRD PRONG OF MILLER, AND SO WHETHER OR NOT HE

20   TESTIFIES UNDER THE GUISE OF AN EXPERT, UNDER 702, OR THE

21   GUISE OF A LAY WITNESS, UNDER 701, IT'S NOT RELEVANT.

22   THERE'S ABSOLUTELY NO PROBATIVE VALUE TO THAT UNDER 403, AND

23   IT WOULD NOT HELP THE JURY IN ANY WAY COME TO THE CONCLUSION

24   OF WHETHER OR NOT THESE FILMS ARE OBSCENE.

25         THE COURT:  ALL RIGHT.  WHY DON'T YOU ALSO ADDRESS

1    HIS QUALIFICATIONS AND YOUR VIEW ON IT IN LIGHT OF THE

2    TESTIMONY, HIS METHODOLOGY -- YOUR VIEW OF IT IN LIGHT OF

3    HIS TESTIMONY AND WHATEVER RELEVANCE OR FIT THAT YOU SEE MAY

4    OR MAY NOT BE THERE.

5              MR. GRANT:  THANK YOU, YOUR HONOR.  I'LL DO JUST

6    THAT, AND I'LL START WITH THE QUALIFICATIONS, IF IT PLEASES

7    THE COURT.

8              THE COURT:  YES.

9              MR. GRANT:  I DON'T BELIEVE THAT THE DEFENSE HAS

10   MET THEIR BURDEN IN ANY WAY TO SHOW EVEN INITIALLY THAT

11   MR. ISAACS IS QUALIFIED TO TESTIFY TO THE THIRD PRONG OF THE

12   MILLER TEST, WHETHER OR NOT THERE'S SERIOUS ARTISTIC VALUE

13   TO THE CHARGED FILMS.

14             MR. DIAMOND BRIEFLY SPOKE ABOUT THE DEFENDANT'S

15   EDUCATION, AND I JUST POINT OUT TO THE COURT, THE ONLY

16   EVIDENCE THAT IS IN FRONT OF THIS COURT IS THAT MR. ISAACS

17   RECEIVED A DEGREE IN 1977 ON COMMUNICATIONS ART.

18             THE QUESTION, I BELIEVE, WAS ASKED BY THE COURT ON

19   WHETHER OR NOT HE HAD A DEGREE IN ART HISTORY.  THE ANSWER

20   WAS NO.  THERE'S REALLY NO SUBSTANCE TO WHAT SORT OF COURSES

21   HE TOOK OR THE FOCUS OF THE PROGRAM THAT HE WAS INVOLVED IN.

22             SO I THINK IN REGARDS TO EDUCATION, THERE'S REALLY

23   NOTHING THAT'S BEEN PROVIDED TO THIS COURT THAT WOULD ASSIST

24   THE COURT IN DECIDING WHETHER OR NOT MR. ISAACS IS QUALIFIED

25   TO GIVE AN OPINION IN THIS AREA.

```
 1          REGARDING ANY SORT OF SPECIALIZED TRAINING, AGAIN,
 2   I THINK THE QUESTION WAS ASKED OF MR. ISAACS, AND THERE
 3   REALLY IS NO SPECIALIZED TRAINING.  IT SEEMS FROM, AT LEAST
 4   THE EVIDENCE IN FRONT OF THIS COURT, THAT MR. ISAACS HAS
 5   READ A BOOK OR TWO, HE'S GONE ONLINE AND READ SOME BLOGS,
 6   AND KIND OF RESEARCHED THE HISTORY OF ART, AT LEAST SOME
 7   ASPECT OF THE HISTORY OF ART.
 8          BUT THERE'S NOTHING THAT'S BEEN PROVIDED THAT
 9   WOULD SUGGEST THAT HE'S FOCUSED ANY TRAINING THAT HE MAY
10   HAVE RECEIVED ON HOW TO EVALUATE SERIOUS ARTISTIC VALUE IN
11   SOMETHING THAT MAY BE DETERMINED TO BE A PIECE OF ART OR AN
12   EXHIBIT OF SOME SORT.  SO I DON'T EVEN THINK THAT THERE'S
13   ANY IDEA THAT THERE'S SPECIALIZED TRAINING.
14          I THINK WHERE THE DEFENSE IS TRYING TO HANG THEIR
15   HAT IS ON MR. ISAACS' EXPERIENCE, AND THE QUESTIONS THAT I
16   PUT FORTH ON EXAMINATION WERE TRYING TO SHOW HOW THAT SORT
17   OF PROFFER IS NOT EXACTLY FITTING TO WHAT THE TESTIMONY IS
18   GOING TO BE.
19          I'D LIKE TO FOCUS, FOR EXAMPLE, ON THE ADVERTISING
20   AGENCY.  I THINK YOU'LL SEE FROM THE EXHIBITS THAT THE
21   GOVERNMENT PUT FORWARD, SIR, THAT WHAT WE'RE TALKING ABOUT
22   HERE IS MAYBE 20-PLUS YEARS OF ADVERTISING EXPERIENCE WHERE
23   HE BUILT FLYERS OR SOME SORT OF MARKETING TOOL TO HELP
24   BUSINESSES GENERATE REVENUE.  WE'RE TALKING ABOUT COUPONS.
25          IF YOU'RE GOING TO LOOK AT COMPARABLES THERE,
```

```
1    THERE'S REALLY NOTHING COMPARABLE, AT LEAST THAT'S BEEN

2    PRESENTED ON THE RECORD, THAT WOULD SUGGEST THAT THAT'S

3    COMPARABLE TO BEING ABLE TO LOOK AT A FILM THAT HAS

4    SCATOLOGICAL, YOU KNOW, UNDERTONES OR, YOU KNOW, WE'RE

5    TALKING DIRECTLY ABOUT SEX ACTS WITH WOMEN INVOLVING FECES,

6    ET CETERA.

7            THERE'S NOTHING ABOUT THAT ADVERTISING AGENCY THAT

8    WOULD SUGGEST OR LEND ITSELF TO HELPING MR. ISAACS COME TO A

9    CONCLUSION ON WHETHER OR NOT THERE'S SERIOUS ARTISTIC VALUE.

10   SO I WOULD JUST OFFER THAT IT'S REALLY IRRELEVANT TO THIS

11   ISSUE AT HAND.

12           NOW, THERE WAS ALSO THIS DISCUSSION ABOUT THE

13   VIDEOS AND THE FACT THAT MR. ISAACS HAS SPENT TEN YEARS IN

14   THIS SCATOLOGICAL ARENA, MAKING THESE 39 OR MAYBE MORE

15   VIDEOS.

16           AGAIN, I THINK THE ONLY THING THAT THAT TENDS TO

17   PROVE IS THAT HE MAY HAVE SOME EXPERIENCE IN HOW TO MAKE A

18   VIDEO THAT HE CAN PUT ON THE INTERNET AND SELL.  I MEAN,

19   THAT'S REALLY WHAT IT COMES DOWN TO.

20           I THINK IT'S SORT OF CIRCULAR TO SAY, "OH, WELL,

21   BECAUSE I MAKE THE VIDEOS, WELL, THEN, I'M DE FACTO AN

22   EXPERT ON WHETHER OR NOT THIS HAS SERIOUS ARTISTIC VALUE."

23           I MEAN, THERE'S BEEN NO EVIDENCE, YOUR HONOR,

24   PRESENTED THAT, WHEN MR. ISAACS MADE THESE FILMS, HIS

25   INTENT WAS TO GO OUT THERE AND GENERATE AND SAY, YOU KNOW,
```

```
 1    PART OF WHAT HE LOOKS AT IS IF PEOPLE ENGAGE HIS WORK.  I

 2    MEAN, THERE'S JUST NO EVIDENCE OF THAT.

 3              THE LITTLE BIT OF EVIDENCE OF THAT THAT'S COME OUT

 4    IN TESTIMONY WAS ACTUALLY THAT POST-INDICTMENT THERE'S BEEN

 5    SOME DISCUSSIONS ABOUT THE CASE.

 6              SO I THINK THAT IT'S SORT OF CONCLUSORY THAT

 7    THERE'S REALLY -- JUST THE FACT THAT HE MAKES THE VIDEOS IN

 8    AND OF THEMSELVES JUST DOES NOT, IN ANY WAY, MAKE HIM AN

 9    EXPERT OR GIVE HIM THE QUALIFICATIONS TO TESTIFY IN THIS

10    ARENA.

11              I'D ALSO JUST LIKE TO BRIEFLY POINT OUT, YOUR

12    HONOR, THAT I THINK IT'S IMPORTANT TO AT LEAST NOTE THAT,

13    YOU KNOW, MR. ISAACS ISN'T RECOGNIZED IN ANY AREA AS AN

14    EXPERT.  AND I KNOW THAT'S NOT DETERMINATIVE, BUT I THINK IT

15    DOES AT LEAST GO TO THE IDEA THAT -- I MEAN, WE'RE TALKING

16    ABOUT A CASE WHERE HE SITS AS A DEFENDANT AS THE FIRST CASE

17    AND THE ONLY CASE WHERE HE'S TRIED OR EVEN ATTEMPTED TO

18    QUALIFY AS A EXPERT IN ANY AREA.  I'D JUST LIKE TO BRING

19    THAT TO THE COURT'S ATTENTION.

20              THEN, KNOWLEDGE.  I MEAN, I'M SOMEWHAT CONFUSED ON

21    THAT.  BUT IT SEEMS AS IF THE KNOWLEDGE BASE IS LOOKING AT

22    THESE COMPARABLES AND SORT OF HIS GOING ONLINE AND READING

23    BOOKS ABOUT SORT OF THE HISTORY OF ART IN GENERAL.  AND I

24    WOULD POINT OUT, YOUR HONOR, THAT IT'S THE GOVERNMENT'S

25    POSITION THAT THIS IS AN ATTEMPT BY THE DEFENSE TO SORT OF
```

1    SMUGGLE IN THESE COMPARABLES -- WHAT THEY CALL

2    "COMPARABLES," AND NOT MEET THE WOMACK TEST WHICH HAS BEEN

3    ADOPTED IN THIS CIRCUIT THROUGH PINKUS.

4              I MEAN, INITIALLY, WHAT WE HAVE TO SHOW AS FAR AS

5    COMPARABLES GO IS THAT THERE ARE MATTERS THAT ARE SIMILAR IN

6    NATURE.

7              AND I THINK THAT THE QUESTIONS THAT I ENDED WITH,

8    YOUR HONOR, MADE IT VERY CLEAR THAT THESE PIECES OF ART,

9    ALTHOUGH THERE MAY HAVE BEEN IN HISTORY SOME DISCUSSION

10   ABOUT THEIR VALUE, THEY'RE JUST NOT AT ALL COMPARABLE TO

11   WHAT WE'RE DEALING WITH IN THIS ARENA, IN THESE CHARGED

12   FILMS.  IT'S JUST NOT.  I MEAN, IT'S REALLY JUST APPLES AND

13   ORANGES.

14             THE COURT:  BUT ARE YOU SAYING THAT IT SHOULD NOT

15   BE ADMITTED AS COMPARABLE FOR PURPOSES OF THE SECOND PRONG,

16   WHICH I WOULD AGREE WITH YOU, AND PREVIOUSLY, BEFORE YOU

17   CAME INTO THE CASE, I HAD EXCLUDED CERTAIN ATTEMPTS TO

18   INTRODUCE SO-CALLED COMPARABLES BECAUSE IT DID NOT MEET THE

19   NINTH CIRCUIT TEST AS LAST FORMULATED OR ARTICULATED IN

20   PINKUS.

21             I GUESS, IN THIS INSTANCE, WHAT HE'S PURPORTING TO

22   SAY IS NOT THAT THESE ARE COMPARABLE SO THAT IT TENDS TO

23   SHOW COMMUNITY ACCEPTANCE, OR MORE PRECISELY, THE FLIPSIDE

24   OF THAT, THAT THE STANDARD OF THE RELEVANT COMMUNITY WOULD

25   NOT REGARD THIS AS A DEPICTION THAT IS PATENTLY OFFENSIVE.

```
 1          I GUESS THE NOTION IS IF IT'S ACCEPTABLE TO THE

 2   COMMUNITY -- NOT JUST AVAILABLE BUT ACCEPTABLE TO THE

 3   COMMUNITY, THEN THE COMMUNITY IS NOT GOING TO VIEW IT AS

 4   PATENTLY OFFENSIVE.

 5          BUT WE'RE NOT TALKING ABOUT THAT ELEMENT.  WE'RE

 6   TALKING ABOUT THE THIRD ELEMENT OF MILLER, AS TO WHETHER OR

 7   NOT THAT HAS ANY SERIOUS ARTISTIC VALUE.

 8          WOULD MR. DIAMOND, REGARDLESS OF THIS TESTIMONY BY

 9   MR. ISAACS AS A PURPORTED EXPERT, NEVERTHELESS BE ABLE TO

10   INDEPENDENTLY INTRODUCE THAT SO THAT A JURY, IN ASSESSING A

11   REASONABLE PERSON'S FINDING AS TO WHETHER THIS IS OF SERIOUS

12   ARTISTIC VALUE, CAN LOOK AT IT AND SAY, "OKAY, HERE ARE

13   OTHER THINGS THAT EVIDENTLY HAVE HAD SOME ARTISTIC VALUE"?

14          I MEAN, MAYBE THE PAINTING, MAYBE THE SCULPTURE,

15   MAYBE THIS CAN OF ARTIST FECES THAT SUPPOSEDLY HAS GONE NOT

16   ONLY IN THE MUSEUM BUT HAS GONE UP IN PRICE AND THERE'S

17   SOME -- WHATEVER IT IS.  WOULD HE NOT BE ABLE TO DO THAT

18   INDEPENDENT OF ANY TESTIMONY?

19          MR. GRANT:  WELL, YOUR HONOR, I THINK THAT IT

20   WOULD DEPEND ON THE WORK OF ART OR THE EXHIBIT BECAUSE I

21   THINK THAT IT WOULD HAVE TO, AT A MINIMUM, SHOW THAT THERE'S

22   SOME PROBATIVE VALUE TO PROVIDING THIS EVIDENCE TO THE JURY.

23          I MEAN, IF THEY'RE NOT AT ALL SIMILAR AND,

24   THEREFORE, NOT RELEVANT, I MEAN, I THINK IT WOULD JUST BE A

25   BASIC 403 ARGUMENT.  RIGHT.  THERE'S NO PROBATIVE VALUE.  I
```

```
 1    MEAN, THE PREJUDICE -- ACTUALLY, IT'S NOT EVEN A

 2    PREJUDICE ARGUMENT, YOUR HONOR.  IT'S BASICALLY CONFUSING

 3    THE ISSUES.

 4            I MEAN, IF I WAS TO JUST DRAW A LINE ON THE PAPER

 5    OR MR. DIAMOND SAID, "LOOK, THIS IS SOMETHING THAT HAS

 6    SERIOUS ARTISTIC VALUE," I MEAN, I DON'T KNOW.  IT WOULD BE

 7    CONFUSING TO ME AS A JUROR TO SAY, WELL, HOW DOES THIS AT

 8    ALL RELATE TO A FILM WHERE --

 9            THE COURT:  SLOW DOWN.

10            MR. GRANT:  I'M SORRY.  PARDON ME.

11            HOW DOES IT RELATE TO A FILM WHERE A FEMALE IS,

12    YOU KNOW, ORALLY COPULATING A HORSE?  I MEAN, IT JUST SEEMS

13    LIKE IT WOULD BE A WASTE OF TIME AND CONFUSING.

14            AND THAT'S WHAT I WAS TRYING TO GET AT WITH MY

15    QUESTIONS, YOUR HONOR.  EVEN THOUGH WE'RE NOT TALKING ABOUT

16    THE SECOND PRONG, THERE STILL NEEDS TO BE, JUST UNDER THE

17    BASIC RELEVANCY 403 ARGUMENT, THAT THEY HAVE TO BE

18    COMPARABLE IN SOME WAY, JUST SOMETHING AT ALL.

19            I MEAN, FOR EXAMPLE, "THE FOUNTAIN," JUST AS AN

20    EXAMPLE.  I MEAN, LOOK, I'M CERTAINLY NOT GOING TO DEBATE

21    MR. ISAACS ON THE HISTORY OF THAT PIECE, DUCHAMP.  I'M NOT

22    GOING TO, YOU KNOW, AND THE EXHIBIT.  I WON'T DO THAT.

23            BUT I THINK IT'S VERY CLEAR, WHEN YOU LOOK AT THE

24    QUESTIONS I ASKED AND THEN WHAT WAS PROVIDED IN THE

25    PLEADING -- AND WE'RE TALKING ABOUT APPLES AND ORANGES.
```

```
 1              WE'RE TALKING ABOUT A URINAL THAT JUST SITS THERE,

 2    A WHITE URINAL WITH A SIGNATURE ON IT, AND THEN WE'RE

 3    TALKING ABOUT THESE VIDEOS.  I MEAN, I JUST DON'T SEE ANY

 4    RELEVANCE TO THAT.

 5              SO TO ANSWER YOUR QUESTION, IF MR. DIAMOND CAN

 6    SHOW SOMETHING THAT HE CHOOSES TO OFFER, IF HE CAN LAY A

 7    FOUNDATION THAT THIS IS RELEVANT AND WOULD ASSIST THE JURY

 8    IN MAKING ITS DETERMINATION UNDER THE OBJECTIVE, REASONABLE

 9    PERSON PRONG, THE THIRD PRONG OF MILLER, THEN IT WOULD BE

10    TOTALLY ACCEPTABLE.

11              THE COURT:  WELL, WHAT ABOUT "THE TRAIL"?

12              MR. GRANT:  YES, SIR.

13              I MEAN, AGAIN, I THINK "THE TRAIL" IS ALSO -- I

14    THINK IF YOU JUST LOOK AT IT JUST VERY QUICKLY, YOU KNOW,

15    YOU'VE GOT A SCULPTURE OF A WOMAN, A WOMAN'S BODY ON ALL

16    FOURS AND THIS, YOU KNOW, FECES COMING OUT.  I ALSO DON'T

17    BELIEVE THAT THAT'S SIMILAR.  IF YOU REALLY GET INTO IT,

18    IT'S NOT SIMILAR.

19              THE COURT:  HOW SIMILAR DOES IT HAVE TO BE BEFORE

20    MR. DIAMOND CAN PUT THAT ON AS EVIDENCE SO THAT HE CAN ARGUE

21    THAT, LOOK, IF THIS THING IS IN A MUSEUM AND IT'S LOOKED

22    UPON AS A WORK OF ART, THAT THESE THREE FILMS YOU SHOULD

23    FIND, AS REASONABLE PEOPLE, ALSO TO HAVE SERIOUS ARTISTIC

24    VALUE?

25              MR. GRANT:  GOOD QUESTION, YOUR HONOR.
```

```
 1            I THINK AND, YOU KNOW, OFF THE TOP OF MY HEAD, THE
 2    FIRST THING THAT POPS INTO MY HEAD IS THAT, YOU KNOW, WE'RE
 3    DEALING WITH FILMS.  WE'RE NOT TALKING ABOUT THE FACT THAT
 4    THIS IS FILM, YOU KNOW -- FOR EXAMPLE, "H.S.A. NO. 7."
 5    WE'RE NOT HERE TODAY BECAUSE THIS FILM HAS FECES IN IT.
 6            WE'RE HERE TODAY BECAUSE WE HAVE A PATENTLY
 7    OFFENSIVE SEXUAL ACT.  OKAY.  AND THAT'S THE COMBINATION OF
 8    THE URINE AND THE FECES AND THE SEXUAL --
 9            THE COURT:  WOULD WE BE HERE IF URINE AND FECES
10    WERE NOT INVOLVED IN "H.S.A. NO. 7"?
11            MR. GRANT:  I DON'T KNOW IF I CAN ANSWER THAT.
12    I'M NOT SURE ABOUT THAT, SIR.
13            I MEAN, THE FIRST THING I THINK IS THAT, YOU KNOW,
14    AGAIN, UNDER THE MILLER TEST WE HAVE TO PROVE THAT IT'S A
15    PATENTLY OFFENSIVE SEXUAL ACT.
16            THE COURT:  BUT DON'T YOU THINK IT'S INHERENTLY
17    PART OF THE -- IT'S AS A WHOLE.  WE'RE NOT DISSECTING IT.
18    WE HAVE TO LOOK AT THE FILM AS A WHOLE.
19            MR. GRANT:  YES, SIR.
20            THE COURT:  SO IT SEEMS TO ME THAT IF IT WERE --
21    AND I DON'T REMEMBER EXACTLY.  I KNOW YOU HAVE BEEN HELPFUL
22    IN YOUR FILINGS IN TERMS OF AT LEAST DESCRIBING THE GENERAL
23    SCENES OF THESE FILMS.  BUT ASSUMING IT HAD SHOWED SCENES OF
24    ORAL COPULATION OF A WOMAN WITH A MALE PERSON'S PENIS, BUT
25    IF IT WERE NOT SOMETHING WHERE URINE OR FECES OR VOMIT WERE
```

```
 1    INVOLVED, DO YOU THINK THAT THERE WOULD EVEN BE A CASE HERE?

 2            MR. GRANT:  SIR, I TRULY CANNOT ANSWER THAT

 3    ENTIRELY.

 4            I THINK THAT WHAT SHOCKS, YOU KNOW, WHAT MAKES IT

 5    PATENTLY OFFENSIVE, AT LEAST IN MY OPINION, WOULD BE THAT

 6    WE'RE DEALING WITH A COMBINATION OF ALL OF THESE THINGS.

 7    WE'RE TAKING A SEXUAL ACT WITH THE --

 8            THE COURT:  I THINK THAT'S RIGHT.

 9            MR. GRANT:  YES, SIR.

10            THE COURT:  THAT'S RIGHT.  SO WE CAN'T SAY THAT

11    THE PRESENCE OF URINE, FECES, OR VOMIT DOESN'T MAKE ANY

12    DIFFERENCE.

13            MR. GRANT:  THAT'S RIGHT.  YES, YOUR HONOR.

14            THE COURT:  AND SO DO WE HAVE TO HAVE ALL OF THAT

15    COMBINATION?

16            IN OTHER WORDS, IN ORDER TO BE COMPARABLE, DO WE

17    NOT ONLY HAVE TO HAVE THE SUBJECT OF FECES AND THE PRESENCE

18    OF FECES AND URINE, BUT ALSO A SEX ACT OF SOME SORT BEFORE

19    YOU THINK THAT THERE IS SOME SUFFICIENT COMPARABILITY FOR

20    PURPOSES OF THE THIRD PRONG -- FORGET FOR PURPOSES OF THE

21    SECOND PRONG BECAUSE THAT'S NOT GOING TO COME IN, BUT FOR

22    PURPOSES OF THIRD PRONG?

23            MR. GRANT:  I BELIEVE SO.  YES, YOUR HONOR.

24            THE COURT:  NOTHING SHORT OF ALL OF THE ELEMENTS

25    WOULD BE SUFFICIENT TO COMPARE FOR PURPOSES OF DETERMINING
```

```
 1   WHETHER OR NOT THIS IS OR IS NOT OF ANY SERIOUS ARTISTIC

 2   VALUE.

 3           MR. GRANT:  WELL, YOUR HONOR, I CAN'T THINK OF

 4   ANYTHING RIGHT OFF THE TOP OF MY HEAD, BUT I THINK THAT IF

 5   WE'RE GOING TO TALK ABOUT COMPARABLES AND THE MATTERS ARE

 6   SIMILAR, THEN WE NEED TO HAVE THOSE SIMILAR ELEMENTS.

 7           BUT YOU KNOW, YOUR HONOR, I DON'T THINK WE EVEN

 8   GET THERE IN REGARDS TO -- I MEAN, I DON'T EVEN THINK IT'S A

 9   CLOSE CALL IN REGARDS TO WHAT THE DEFENDANT HAS OFFERED IN

10   HIS PLEADING AND DISCUSSED ON THE STAND TODAY.  I MEAN,

11   THERE WAS NOT ONE OF THOSE WHAT HE CALLS "COMPARABLES" THAT

12   DEALT WITH ANY SEX ACT, THAT DEALT WITH ANYTHING --

13           I MEAN, YES, WE HAD "THE CAN" AND "THE TRAIL" THAT

14   HAD FECES IN IT.  BUT BESIDES THAT, THERE'S JUST ABSOLUTELY

15   NOTHING THAT WOULD BE COMPARABLE TO THE FILMS WE'RE DEALING

16   WITH.  WE'RE NOT EVEN TO THE POINT WHERE THERE'S AT LEAST A

17   SEX ACT.  YOU KNOW, WE'RE NOT EVEN AT THAT CLOSE LINE,

18   YOUR HONOR.

19           AND THAT WAS THE PURPOSE OF THE QUESTIONS THAT I

20   ASKED MR. ISAACS AT THE END WAS JUST TO SHOW THAT, ALTHOUGH

21   THAT'S AN INTERESTING ART HISTORY LESSON ABOUT WHAT MIGHT BE

22   POST-MODERN ART AND THE EVOLUTION OF IT, IT REALLY DOESN'T

23   OFFER ANY -- IT HAS NO SIGNIFICANCE TO US IN THIS TRIAL

24   BECAUSE IT HAS NO CONNECTION TO THE SCATOLOGICAL MOVIES

25   WE'RE TALKING ABOUT OR THE BESTIALITY FILM.
```

```
 1          THE COURT:  OKAY.  WHAT ABOUT METHODOLOGY THEN?
 2   WHY DON'T YOU ADDRESS THAT, AND THEN WE'LL HAVE MR. DIAMOND
 3   RESPOND, IF HE HAS ANYTHING.
 4          MR. GRANT:  YOU KNOW, YOUR HONOR, I THOUGHT I HAD
 5   AN ARGUMENT FOR THIS PRIOR TO TODAY, AND THEN IT GOT A
 6   LITTLE EVEN MORE CONFUSING FOR ME AS I SAT HERE LISTENING TO
 7   THE TESTIMONY.
 8          REALLY, WHAT IT SEEMS FROM THE TESTIMONY THAT WAS
 9   PRESENTED TODAY IS THAT THERE WOULD BE ABSOLUTELY NO
10   RELEVANCE TO MR. ISAACS' TESTIMONY BECAUSE WE REALLY DON'T
11   EVEN GET TO METHODOLOGY BECAUSE THE OPINION THAT HE'S
12   OFFERING IS WHAT HIS INTENT WAS WHEN HE MADE THE FILM.
13          SO I JUST WANTED TO POINT THAT OUT BECAUSE, AS I
14   STARTED TO SORT OF TRY TO ARTICULATE THIS METHODOLOGY
15   ARGUMENT, I'M TRYING TO THINK TO MYSELF WHAT METHOD DOES HE
16   HAVE TO GET TO THE OPINION OF SERIOUS ARTISTIC VALUE, AND WE
17   REALLY DON'T EVEN GET THERE.
18          I THINK THOSE ARE QUESTIONS THAT THE COURT DREW
19   OUT, AND MR. ISAACS WAS FORTHRIGHT AND SAID, "YOU KNOW, I'M
20   HERE TO" -- I THINK HE SAID SOMETHING TO THE EXTENT OF TAKE
21   THE MISTAKEN NOTION OF EMOTION OUT OF THIS.  AND HE
22   SPECIFICALLY SAID THAT "WHAT ART IS IS SUBJECTIVE."  HE
23   SAID IF SOMETHING IS SERIOUS, IF IT HAD SERIOUS ARTISTIC
24   VALUE, IT'S SUBJECTIVE.
25          AND SO BECAUSE WE KNOW THAT THE THIRD ELEMENT GOES
```

```
 1    TO AN OBJECTIVE, REASONABLE PERSON STANDARD, IF WE CAN EVEN

 2    FIND THE METHODOLOGY IN THERE, I DON'T THINK WE EVEN GET TO

 3    THE APPROPRIATE OPINION.  BUT IN REGARDS TO METHODOLOGY, I

 4    THINK THAT GOT CONFUSING ALONG THE WAY BECAUSE I DON'T

 5    BELIEVE THERE IS ANY OBJECTIVE, MEANINGFUL LINE THAT

 6    MR. ISAACS TESTIFIED TO, TO BE ABLE TO DETERMINE IF

 7    SOMETHING HAS SERIOUS ARTISTIC VALUE.

 8              IT WAS VERY CIRCULAR.  I MEAN, FIRST IT WAS "ART

 9    IS WHAT ARTISTS DO" AND "ALL ART HAS SOME SERIOUS ARTISTIC

10    VALUE."

11              THEN AS WE PROBED INTO THAT, IT BECAME MORE ABOUT

12    WHETHER OR NOT THE ART WAS DISCUSSED.  AND THEN, YOU KNOW,

13    THAT INITIALLY STARTED WITH, WELL, IT DEPENDS ON THE NUMBER

14    OF PEOPLE THAT DISCUSS IT.

15              AND THEN IT TURNED INTO WHETHER IT'S A MEANINGFUL

16    DISCUSSION, WHICH -- BY THE WAY, THAT'S ALL SUBJECTIVE.

17    THERE'S NO OBJECTIVE TEST FOR MR. ISAACS TO DETERMINE

18    WHETHER SOMETHING -- OR AT LEAST HE DIDN'T OFFER THAT

19    TESTIMONY ABOUT WHETHER SOMETHING IS A PROFOUND DISCUSSION.

20              THE COURT:  WELL, MERELY BECAUSE SOMETHING IS

21    SUBJECTIVE DOES NOT MEAN IT CANNOT MEET THE METHODOLOGY

22    TEST.

23              A MEDICAL DOCTOR LOOKING AT SOMEBODY CAN EXERCISE

24    SOME LEVEL OF SUBJECTIVE JUDGMENT, BUT THAT DOESN'T MEAN

25    THAT AN INTERNAL MEDICINE SPECIALIST CAN'T TALK ABOUT HIS
```

```
 1   DIAGNOSIS.  EVEN IF HIS DIAGNOSIS IS NOT RELATED, LET'S SAY,
 2   STRICTLY TO A BLOOD TEST OR AN X-RAY OR AN M.R.I. OR ANY
 3   OTHER FORM OF OBJECTIVELY VERIFIABLE RESULT.  RIGHT?
 4           MR. GRANT:  YES, SIR.
 5           THE COURT:  SO JUST BECAUSE IT'S SUBJECTIVE IS
 6   NOT, IN AND OF ITSELF, DETERMINATIVE.
 7           MR. GRANT:  I THINK I'D BE MORE CORRECT IF I
 8   STATED THAT HIS OPINION HAS NO BASIS FOR IT.  I GUESS THAT'S
 9   WHAT I'M GETTING AT.
10           IT'S HARD TO REALLY ARTICULATE BECAUSE I NEVER
11   REALLY FOUND THROUGH EITHER THE PLEADING OR THROUGH THE
12   TESTIMONY IF THERE WAS ACTUALLY A METHODOLOGY USED.  YOU
13   KNOW, IT'S MORE LIKE THE ADVISORY -- I THINK IN 2000, THERE
14   WAS AN ADVISORY COMMITTEE NOTE FOR 702 THAT SAYS THE
15   GATEKEEPING FUNCTION REQUIRES MORE THAN JUST TAKING THE
16   WITNESS'S WORD FOR IT.
17           AND THAT'S WHAT I FELT LIKE FROM THE TESTIMONY.
18   IT WAS LIKE, LOOK, I'VE DONE THIS FOR A NUMBER OF YEARS;
19   I'VE MADE THESE FILMS, AND THERE WAS NO EVIDENCE THAT
20   INITIALLY THAT HE MADE THESE FILMS TO ENGAGE ANYONE.
21           BUT, YOU KNOW, AFTER HIS INDICTMENT, THEN THERE'S
22   THIS DISCUSSION BY PEOPLE AND BLOGS ON THE INTERNET, AND
23   SO TAKE MY WORD FOR IT THAT BECAUSE OF THAT -- NO BASIS
24   FOR WHY THAT IS THE RELEVANT STANDARD OR WHY THAT'S EVEN AN
25   APPROPRIATE METHODOLOGY.  JUST TAKE MY WORD FOR IT THAT, IF
```

1    PEOPLE ARE OUT THERE AND THEY ARE TALKING ABOUT IT, THEN IT

2    HAS SERIOUS ARTISTIC VALUE.

3              AND YOU KNOW, YOUR HONOR, NOTHING HAS BEEN

4    PRESENTED TO THIS COURT THAT WOULD SUGGEST THAT ANYBODY ELSE

5    HAS EVER EVEN ATTEMPTED TO USE THAT TYPE OF METHODOLOGY.

6              YOU KNOW, THERE'S NO TESTIMONY AT ALL THAT THERE'S

7    ANYTHING ABOUT -- AND THAT'S WHERE THE SUBJECTIVE PART COMES

8    IN.  THERE WAS NO TESTIMONY AT ALL OR ANY EVIDENCE PRESENTED

9    THAT IT'S MORE THAN JUST ME SAYING IT.  "ME" BEING

10   MR. ISAACS.  YOU KNOW, I'M SAYING THAT BECAUSE PEOPLE GO ON

11   THE INTERNET AND TALK ABOUT ME AND TALK ABOUT MY CHARGES AND

12   TALK ABOUT THE FILMS THAT I PRODUCED THAT LED TO THESE

13   CHARGES, WELL, THEREFORE, THEN IT HAS TO HAVE SERIOUS

14   ARTISTIC VALUE.

15             YOUR HONOR, HE TESTIFIED THAT THAT'S ALL

16   SUBJECTIVE, AND I GUESS THAT'S THE SUBJECTIVE PART IS

17   THAT --

18             I MEAN, WHAT I'M GETTING IS HE TESTIFIED THAT, YOU

19   KNOW, OTHER PEOPLE COULD COME TO THE SAME CONCLUSION OR A

20   DIFFERENT CONCLUSION AND I THINK THAT GOES --

21             THE COURT:  I SUPPOSE WHAT YOU'RE SAYING IS THAT

22   EVEN SUBJECTIVITY HAS TO BE SOMEWHAT TETHERED TO SOME

23   UNDERLYING BASIS THAT CAN SOMEHOW BE INQUIRED INTO FOR US TO

24   DETERMINE WHETHER OR NOT IT COULD LEAD TO A CERTAIN -- IT

25   COULD REASONABLY LEAD TO A CERTAIN CONCLUSION.

```
 1              SO A DOCTOR'S SUBJECTIVE OBSERVATION IS BASED UPON
 2    TRAINING, BASED UPON EXPERIENCE, BASED UPON WHAT HE KNOWS
 3    THAT, IF YOU WERE TO RESPOND A CERTAIN WAY, THAT HE CAN DRAW
 4    CERTAIN CONCLUSIONS WHICH HE CAN TALK ABOUT AS OPPOSED TO A
 5    DOCTOR COMING IN AND SAYING, "JUST TAKE MY WORD FOR IT.
 6    THIS GUY IS SICK."
 7              MR. GRANT:  THAT'S WHAT I WAS TRYING TO
 8    ARTICULATE, YES, YOUR HONOR, EXACTLY THAT.
 9              I MEAN, WHEN YOU HAVE A DAUBERT HEARING AND A
10    MEDICAL EXPERT COMES IN, THEY'RE GOING TO SIT THERE AND TELL
11    YOU WHAT JOURNALS THEY READ, WHAT PEER REVIEW MATERIAL, AND
12    THEN THEY'RE GOING TO GIVE YOU -- MAY GIVE YOU A SUBJECTIVE
13    OPINION, BUT IT'S GOING TO BE BASED IN SOMETHING.
14              AND I DIDN'T SEE ANY TESTIMONY OR ANYTHING IN THE
15    PLEADING THAT WOULD SUGGEST IT'S MORE THAN JUST SORT OF LIKE
16    A SMELL TEST; JUST TAKE MY WORD FOR IT.
17              I THINK THAT GOES TO THE -- IF I MAY, YOUR HONOR,
18    IT GOES TO SORT OF THE FIT REQUIREMENT.  IT'S THE
19    GOVERNMENT'S POSITION THAT, BASED ON WHAT WE JUST DISCUSSED,
20    THIS JUST CANNOT BE USEFUL AT ALL TO THE JURY.
21              I MEAN, AGAIN, IT GOES TO THE FACT THAT, REALLY,
22    THE OPINION THAT MR. ISAACS WANTS TO PRESENT IS "MY INTENT
23    WHEN I MADE THESE FILMS WAS TO HAVE IT OUT THERE IN THE
24    ARTISTIC WORLD TO BE DEBATED."
25              HIS OTHER THING THAT HE SAID HE WANTED TO TESTIFY
```

1    TO WAS, LOOK, I WANT THE JURY TO UNDERSTAND THAT IT'S NOT

2    ALL ABOUT EMOTION.

3            YOUR HONOR, THOSE THINGS ARE NOT RELEVANT TO WHAT

4    THE GOVERNMENT HAS TO PROVE OR TO DISPROVE ANY OF THE

5    ELEMENTS THAT THE GOVERNMENT HAS TO PROVE IN THIS CASE.  IT

6    JUST WON'T ASSIST THE JURY.  IT WON'T ASSIST THEM.  I MEAN,

7    IT GOES BACK TO THE PARIS THEATER CASE.  AND, YOU KNOW, THAT

8    COURT WAS CLEAR THAT THE FILMS ARE THE BEST EVIDENCE OF WHAT

9    THEY REPRESENT.

10           NOW, THE COURT DIDN'T SAY, YOU KNOW, THAT AN

11   EXPERT SHOULD NEVER BE ALLOWED IN THIS AREA WHEN WE'RE

12   DEALING WITH OBSCENITY, BUT THE COURT DID SAY THAT JUDGING

13   WHETHER A PARTICULAR FILM IS OBSCENE IS NOT A SUBJECT THAT

14   LENDS ITSELF TO THE TRADITIONAL USE OF EXPERT TESTIMONY.

15           AND I THINK THAT THIS HEARING IS ACTUALLY A

16   PERFECT EXAMPLE OF WHY THAT IS.  WE'RE REALLY NOT OFFERING

17   ANYTHING TO THEM EXCEPT FOR THIS OPINION THAT IS NOT ROOTED

18   IN ANYTHING OTHER THAN SORT OF MR. ISAACS'S, YOU KNOW, GOING

19   OUT INTO THE INTERNET AND KIND OF LOOKING AROUND AND READING

20   ABOUT HISTORY AND ALL THE THINGS WE'VE DISCUSSED.

21           THE JURY CAN LOOK AT THAT.  THE JURY CAN MAKE A

22   DETERMINATION OF WHETHER, TO A REASONABLE PERSON, THIS WOULD

23   HAVE SERIOUS ARTISTIC VALUE.

24           MR. DIAMOND MENTIONED THE STAGLIANO CASE, AND OF

25   COURSE, THAT'S PERSUASIVE PRECEDENT, YOUR HONOR.  BUT I

1    THINK IT'S VERY MUCH ON POINT WITH THE CASE THAT WE HAVE

2    HERE.

3              VERY BRIEFLY, IF I MAY.  THIS IS A CASE WHERE THE

4    DEFENDANT WAS CHARGED WITH DISTRIBUTING OBSCENE FILMS, AND

5    THE DEFENSE ATTEMPTED TO PUT UP A PROFESSOR OF ART FROM U.C.

6    SANTA BARBARA TO DISCUSS WHETHER OR NOT THESE FILMS HAD

7    SERIOUS ARTISTIC VALUE.

8              AND THE COURT IN THAT CASE RULED FROM THE BENCH

9    THAT THE PROFESSOR WOULD NOT BE ABLE TO TESTIFY, AND THE

10   REASONING WAS THAT THE OPINION WAS NOT ROOTED IN RELIABLE

11   PRINCIPLES, WHICH IS WHAT I BELIEVE WE'VE ESTABLISHED

12   HERE -- THE METHODOLOGY WAS NEBULOUS, SUBJECTIVE, AND

13   LACKING IN RIGOR AND DETAIL.

14             REALLY, I DON'T THINK THAT THE METHODOLOGY WAS

15   EVEN THOUGHT OF OR ARTICULATED UNTIL IT WAS KIND OF EXPLORED

16   HERE IN COURT.  BUT IT'S THE GOVERNMENT'S POSITION THAT

17   THERE REALLY IS NO METHODOLOGY, AND IT WAS NOT A HELPFUL

18   GUIDE TO THE JURY.

19             I MEAN, THIS IS A PERSON THAT, YOU KNOW, HAS AT

20   LEAST SOME QUALIFICATIONS IN THE ART WORLD, AND THE JUDGE

21   WAS CLEAR THAT IT'S NOT ABOUT THE QUALIFICATIONS BUT IT'S

22   JUST -- IT JUST ISN'T GOING TO ASSIST AND THE OPINION YOU'RE

23   GOING TO GIVE IS JUST NOT BASED ON RELIABLE METHODOLOGY.

24             I THINK THAT THIS CASE THAT WE'RE SITTING HERE

25   TODAY WITH, SIR, FITS DIRECTLY ON POINT WITH THAT CASE.

```
 1            THE COURT:  HAS THERE BEEN AN APPELLATE

 2   DISPOSITION OF THAT STAGLIANO CASE?

 3            MR. GRANT:  NO, YOUR HONOR.

 4            THE COURT:  IS IT PENDING?

 5            MR. GRANT:  I'M NOT SURE ON THAT.  I HAVEN'T SEEN

 6   ANYTHING ON THE LEXIS THAT WOULD SUGGEST THAT.

 7            THE COURT:  OKAY.

 8            MR. GRANT:  YOUR HONOR, UNLESS YOU HAVE ANY

 9   QUESTIONS FOR ME, I BELIEVE THAT I HAVE COMPLETED.

10            THE COURT:  RIGHT.  THANK YOU VERY MUCH.

11            MR. DIAMOND, IF YOU'LL JUST TAKE A FEW MINUTES TO

12   CONCLUDE.

13            MR. DIAMOND:  MY UNDERSTANDING IS THAT THE CASE

14   WAS DISMISSED ON OTHER GROUNDS AFTER THE COURT MADE ITS

15   RULING THAT IT MADE.

16            THE COURT:  SO THERE WILL BE NO APPELLATE

17   DISPOSITION?

18            MR. DIAMOND:  THAT'S MY UNDERSTANDING.  THERE'S

19   NO -- AND MAYBE I CAN, IF I'M CORRECT, I THINK THE

20   GOVERNMENT IS AGREEING WITH ME.

21            MR. GRANT:  YES.

22            MR. DIAMOND:  SO MAYBE THIS WILL BE THE APPELLATE

23   CASE.  WE NEVER KNOW.

24            THE COURT:  WHY NOT?

25            MR. DIAMOND:  I WOULD SUBMIT THAT THE METHODOLOGY
```

```
 1    USED BY MR. ISAACS IS SUFFICIENT TO WITHSTAND AN ATTACK

 2    BASED UPON DAUBERT.  I THINK THAT THERE IS ENOUGH IN THE

 3    RECORD TO ESTABLISH THAT MR. ISAACS USED A METHOD BY WHICH

 4    HE CAME TO HIS CONCLUSION THAT THE MOVIE -- OR ALL THREE,

 5    ACTUALLY, HAVE SERIOUS ARTISTIC VALUE.

 6          TO SOME EXTENT, WHEN THE SUPREME COURT DECIDED ON

 7    A 5-TO-4 BASIS WITH CHIEF JUSTICE BURGER WRITING FOR THE

 8    MAJORITY IN THE PARIS ADULT THEATER CASE, I DON'T THINK THE

 9    COURT WAS FOCUSING ON THIS PARTICULAR ISSUE.

10          TO SOME EXTENT, THE TWO CONCEPTS DON'T REALLY

11    MESH -- THE QUESTION OF WHETHER OR NOT A MOVIE HAS SERIOUS

12    ARTISTIC VALUE ON THE ONE HAND AND THE RULE 702

13    JURISPRUDENCE ON THE OTHER --

14          TO THE EXTENT THAT THEY DON'T MESH, I WOULD SUBMIT

15    THAT THE FIRST AMENDMENT TO THE U. S. CONSTITUTION WOULD

16    REQUIRE THAT THE DEFENSE BE PERMITTED TO EXPLAIN TO THE JURY

17    THROUGH A WITNESS, AN EXPERT WITNESS, WHY THE MOVIE HAS

18    SERIOUS ARTISTIC VALUE.

19          THE JURY, OBVIOUSLY, IS FREE TO DISREGARD ANY

20    OPINION THE EXPERT OFFERS; AND IF IT'S THAT OBVIOUS TO THE

21    GOVERNMENT THAT THE MOVIE IS CLEARLY OBSCENE, THE GOVERNMENT

22    SHOULD HAVE NO FEAR IF MR. ISAACS IS PERMITTED TO TESTIFY IN

23    THIS LIMITED AREA.

24          WE ALSO AGREE WITH THE COURT THAT WE'RE NOT TRYING

25    TO GET THROUGH THE BACK DOOR EVIDENCE WE COULD NOT GET IN
```

```
 1    THE FRONT DOOR.  WE HAVE NO INTENTION OF TRYING TO ARGUE
 2    COMPARABLE MATERIAL ON THE COMMUNITY STANDARD ISSUE.  WE
 3    WOULD BE SANCTIONED -- I WOULD BE SANCTIONED IF I TRIED TO
 4    MAKE THAT ARGUMENT.  WE HAVE NO PLAN TO DO THAT.
 5            BUT I THINK ON THE ISSUE OF ARTISTIC VALUE, IT IS
 6    HELPFUL TO KNOW -- AND THE JURY SHOULD KNOW -- THAT THERE
 7    ARE OTHER ARTISTIC RENDERINGS OUT THERE IN THE REAL WORLD
 8    THAT DEAL WITH THE SUBJECT SO THAT --
 9            THE COURT:  WHAT'S THE SUBJECT?  IS THE SUBJECT
10    DIVORCEABLE FROM THE PRESENCE OF SEXUAL ACTS?  BECAUSE IF IT
11    WERE, I'M NOT EVEN SURE THAT IT WOULD QUALIFY AS AN OBSCENE
12    FILM -- RIGHT? -- BECAUSE DOESN'T IT HAVE TO BE SOMETHING AS
13    APPEALING TO THE PRURIENT INTEREST IN SEXUAL ACTS?  IT'S NOT
14    JUST ANY PRURIENT INTEREST.
15            I THINK WHEN YOU READ MILLER AND YOU READ PARIS
16    ADULT THEATER, ALTHOUGH THAT PART DOESN'T NECESSARILY GET
17    CARRIED FORTH IN ALL THE ITERATIONS OF THE MILLER TEST, IT
18    CLEARLY WAS DISCUSSED BY THE SUPREME COURT TO BE IN THAT
19    CONTEXT.
20            MR. DIAMOND:  WELL, I DON'T BELIEVE THE COURT HAS
21    LIMITED OBSCENITY TO SEX ACTS.  I THINK THAT DEALING WITH
22    DEFECATION AND URINATION, WHICH ARE NOT SEX ACTS, WOULD ALSO
23    ARGUABLY ALLOW A JURY TO CONCLUDE THE MATERIALS ARE OBSCENE
24    WITHOUT SHOWING SEX.
25            THE COURT:  THAT'S SORT OF LIKE THE FLIPSIDE OF
```

```
 1    WHAT WE REALLY OUGHT TO BE LOOKING AT.  WE'RE NOT LOOKING AT

 2    WHETHER OR NOT THOSE OTHER EXHIBITS LIKE "THE URINAL" OR

 3    "THE TRAIL" SHOULD BE DECLARED OBSCENE.  WE ARE ONLY LOOKING

 4    AT WHETHER OR NOT THEY HAVE ANYTHING TO SAY ABOUT WHETHER

 5    THESE FILMS, WHICH DO INVOLVE SEX ACTS, AND IN COMBINATION,

 6    THE ENTIRE SUBJECT MATTER THAT MAY ALSO INCLUDE FECES, IS OF

 7    ANY RELEVANCE TO DETERMINING ARTISTIC VALUE.

 8              SO WHEN YOU SAY "THE SUBJECT MATTER," HOW DO YOU

 9    DEFINE THE SUBJECT MATTER?

10              MR. DIAMOND:  I THINK THAT CLEARLY THOSE MATERIALS

11    THE COURT JUST DESCRIBED ARE RELEVANT TO THE ISSUE OF

12    ARTISTIC VALUE.  THEY ARE NOT RELEVANT, ARGUABLY, TO THE

13    ISSUE OF COMMUNITY STANDARD IF THEY ARE NOT COMPARABLE UNDER

14    THE WOMACK CASE AND OTHER CASES.  BUT MR. ISAACS REFERRED TO

15    THEM IN THE CONTEXT OF PERSUADING THE JURY THAT MATERIALS OR

16    MOVIES THAT DEAL WITH THESE KINDS OF SUBJECT MATTER CAN

17    STILL BE CONSIDERED SERIOUS.

18              THE COURT:  WELL, WHAT'S THE SUBJECT MATTER?  THE

19    SUBJECT MATTER OF THE URINAL IS SO FAR DIFFERENT FROM THE

20    SUBJECT MATTER OF THESE FILMS.

21              MR. DIAMOND:  WELL, YOU CAN RELATE THE TWO.  THEY

22    DO ARGUABLY HAVE SOME COMMON THEME CONNECTING THE TWO IN

23    TERMS OF URINE OR DEFECATION OR BODY WASTE, THAT SORT OF

24    THING.

25              SO THE REAL QUESTION IS WILL THE JURY BE MISLED IF
```

```
 1   WE DON'T PUT ON MR. ISAACS INTO BELIEVING THAT ANYTHING THAT
 2   DEALS WITH DEFECATION OR URINATION OR SEX MUST AUTOMATICALLY
 3   NOT HAVE OR COULD NEVER HAVE SERIOUS ARTISTIC VALUE.  SO I
 4   THINK IT'S IMPORTANT TO KNOW AND I THINK IT'S IMPORTANT FOR
 5   THE JURY TO KNOW THAT --
 6           THE COURT:  NOBODY IS GOING TO MAKE THAT ARGUMENT.
 7   NOBODY CAN MAKE THAT ARGUMENT BECAUSE IT WOULD BE CONTRARY
 8   TO LAW.  YOU HAVE TO LOOK AT THE WORK AS A WHOLE.
 9           SO MR. GRANT'S NOT GOING TO GET UP -- OR HE'S NOT
10   GOING TO BE PERMITTED TO GET UP HERE AND SAY, "IT INVOLVES
11   SEX, THEREFORE, NO ARTISTIC VALUE."
12           IF HE DID THAT, HE WOULD HAVE NO CREDIBILITY AT
13   ALL BECAUSE EVERYBODY KNOWS THE CONTRARY, THAT YOU CAN'T
14   JUST FOCUS ON ONE THING.  SO, I MEAN, HE'S NOT GOING TO SAY
15   THAT.  HE'S GOING TO HAVE TO ARGUE WHAT THE LAW SAYS, WHICH
16   IS YOU TAKE THE THING AS A WHOLE.
17           MR. DIAMOND:  BUT THERE IS A DANGER THAT, WITHOUT
18   THE EXPERT TESTIMONY THAT WE'RE SEEKING TO ELICIT FROM
19   MR. ISAACS, THAT ONE OR MORE MEMBERS OF THE JURY COULD
20   ERRONEOUSLY CONCLUDE THAT THE SUBJECT MATTER ITSELF WOULD
21   DISQUALIFY THE MATERIAL FROM BEING CONSIDERED AS HAVING
22   SERIOUS ARTISTIC VALUE.
23           THE COURT:  THAT'S A VOIR DIRE QUESTION, NOT FOR
24   EXPERT TESTIMONY.
25           IF YOU'RE WORRIED ABOUT THESE PEOPLE HAVING
```

```
 1    PRECONCEIVED NOTIONS THAT, IF IT INVOLVES SEX, THAT'S IT;

 2    IT'S GOT TO BE OBSCENE, ANYTHING THAT'S OPENLY SEXUAL HAS

 3    GOT TO BE OBSCENE, ANYTHING HAVING TO DO WITH ORAL

 4    COPULATION, AUTOMATICALLY OBSCENE.

 5             THOSE MAY BE QUESTIONS THAT WE MIGHT POSE TO MAKE

 6    SURE THAT THEY ARE ABLE TO FOLLOW THE LAW AS OPPOSED TO

 7    HAVING PRECONCEIVED NOTIONS.  THAT'S CONTRARY TO LAW.

 8             MR. DIAMOND:  I THINK THERE IS SOME OVERLAP,

 9    THOUGH.  I THINK THERE'S STILL -- I THINK IT'S STILL

10    HELPFUL.  IN ADDITION TO ALL THE OTHER REASONS FOR OFFERING

11    THE EXPERT AND FOR ARGUING THAT MR. ISAACS IS QUALIFIED, IN

12    ADDITION TO ALL THE ARGUMENTS, I THINK IT'S NOT TOTALLY

13    IRRELEVANT TO ALSO CONSIDER IN DECIDING WHETHER TO EXERCISE

14    DISCRETION TO ALLOW THE WITNESS TO TESTIFY AS AN EXPERT,

15    THAT THERE'S AT LEAST SOME DANGER THAT ONE OR MORE MEMBERS

16    OF THE JURY COULD DISREGARD A JURY INSTRUCTION THAT TELLS

17    THEM THAT SEX ITSELF IS NOT TO BE EQUATED WITH OBSCENITY AND

18    THERE HAS TO BE SOMETHING MORE.

19             THERE'S ALWAYS THAT DANGER AND THEREFORE --

20             THE COURT:  WELL, I'M NOT SURE THAT -- LET'S BE

21    CAREFUL.  I'M NOT CERTAIN THAT THAT'S GOING TO BE A JURY

22    INSTRUCTION FRAMED JUST LIKE WHAT YOU SAID.

23             MR. DIAMOND:  WELL, I'M JUST SAYING, IN MAKING

24    SURE THE JURY FOLLOWS THE LAW AND IS NOT MISLED, IT WOULD BE

25    HELPFUL FOR MR. ISAACS' TESTIMONY TO BE OFFERED TO THE JURY
```

```
 1   FOR ITS CONSIDERATION.  AND IF, AS THE GOVERNMENT SAYS, THE
 2   TESTIMONY IS NOT RELIABLE OR MR. ISAACS LACKS THE EXPERIENCE
 3   OR TRAINING OR KNOWLEDGE TO OFFER THE OPINION, THAT'S AN
 4   ARGUMENT THAT THE GOVERNMENT CAN MAKE TO THE JURY, AND THE
 5   JURY CAN DISREGARD MR. ISAACS' TESTIMONY.
 6            BUT WE DO NEED HIS TESTIMONY UNDER THE FIRST
 7   AMENDMENT TO PROTECT HIS RIGHTS TO A FAIR TRIAL AND TO GET A
 8   JURY TO DETERMINE WHETHER OR NOT, AMONG OTHER THINGS, THE
 9   MOVIES DO OR DO NOT LACK SERIOUS ARTISTIC MERIT.
10            THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.
11            WOULD YOU PLEASE FILE THAT ADDITIONAL DOCUMENT
12   ABOUT THE BLOG ARTICLE, MR. DIAMOND?
13            MR. DIAMOND:  I'M NOT SURE IF MR. ISAACS HAS EXTRA
14   COPIES NOW.
15            THE COURT:  NO, NO.  HE DOESN'T HAVE TO DO IT NOW.
16            MR. DIAMOND:  OH, NOT TODAY.  OKAY.
17            THE COURT:  JUST FILE IT, LET'S SAY, BEFORE THE
18   END OF THE WEEK.
19            MR. DIAMOND:  SURE.
20            THE COURT:  IF THAT'S OKAY WITH YOU.
21            MR. DIAMOND:  ABSOLUTELY.
22            THE COURT:  OKAY.  SO MAKE SURE COUNSEL RECEIVES A
23    COPY OF IT.
24      (DEFENSE COUNSEL CONFERS WITH DEFENDANT SOTTO VOCE.)
25            MR. DIAMOND:  THERE MAY BE MORE THAN ONE.  CAN WE
```

```
 1   PROVIDE THE COURT WITH ALL THE BLOGS AND ARTICLES?  I THINK
 2   THAT HE WAS ASKED ABOUT ONE, BUT THERE'S MORE THAN ONE.
 3          THE COURT:  THAT'S FINE.
 4          DO YOU HAVE AN OBJECTION TO THAT?
 5          MR. GRANT:  WE JUST WOULD LIKE THE OPPORTUNITY TO
 6   REPLY IN SUBSTANCE.
 7          THE COURT:  OKAY.  SO WHY DON'T YOU DO THAT.  JUST
 8   FILE WHATEVER IT IS, THE NUMBER OF COPIES OF DIFFERENT
 9   ARTICLES THAT HE HAS.  MAKE SURE COUNSEL HAS A COPY OF IT,
10   AND CAN YOU DO THAT ALL BY, LET'S SAY, NEXT MONDAY?
11          MR. DIAMOND:  I'M SURE WE COULD.
12          THE COURT:  OKAY.  SO WHY DON'T YOU DO THAT BY
13   NEXT MONDAY, AND THEN I'LL GIVE YOU UNTIL THE MONDAY
14   THEREAFTER, WITH FIVE PAGES OR LESS, JUST TO COMMENT ON THAT
15   EVIDENCE WHATSOEVER.
16          AND THEN WE'LL TAKE THE MATTER UNDER SUBMISSION
17   THEREAFTER, AND I'LL THINK ABOUT IT, AND I'LL MAKE MY
18   RULING.
19          MR. DIAMOND:  THAT WILL BE FINE.  I'M HOPING TO
20   STILL HAVE MY SECRETARY.  HER DAUGHTER IS PREGNANT, AND THE
21   GRANDSON IS DUE ANY DAY NOW.  SO I MAY BE SHORT-HANDED AT MY
22   OFFICE.
23          THE COURT:  DO YOU NEED MORE TIME TO DO THAT?
24          MR. DIAMOND:  WELL, THE BABY IS DUE BY THE 31ST OF
25   JANUARY.  SO IF MY SECRETARY IS OUT FOR A WEEK OR TWO.  SHE
```

```
 1    WANTS TO TAKE GRANDMOTHERLY LEAVE.

 2              THE COURT:  I DON'T NEED TO KNOW --

 3              MR. DIAMOND:  OKAY.

 4              THE COURT:  -- THE VERY INTERESTING HISTORY AND

 5    BIOGRAPHY HERE.

 6              I'M JUST ASKING YOU HOW MUCH TIME DO YOU

 7    REASONABLY NEED?  I'M WILLING TO BE FLEXIBLE.

 8              MR. DIAMOND:  THE LONGER THE BETTER, WHATEVER TIME

 9    WE CAN GET.

10              THE COURT:  WELL, YOU TELL ME.

11              MR. DIAMOND:  I WOULD SAY THREE WEEKS WOULD BE

12    FINE.

13              THE DEFENDANT:  WE COULD GET IT AND DO IT.

14              THE COURT:  FINE.  THREE WEEKS, FILE IT, SERVE IT

15    ON THEM.

16              AND THE WEEK THEREAFTER, GIVE ME NO MORE THAN FIVE

17    PAGES AND COMMENT ONLY ON WHAT THE FILING IS.

18              AND THEN I'LL TAKE IT UNDER SUBMISSION, AND I'LL

19    ISSUE MY RULING.

20              MR. DIAMOND:  SO WHAT THE DEFENSE IS FILING IS THE

21    DOCUMENT ITSELF, NOT COMMENT, AND THE GOVERNMENT FILES

22    COMMENTS IN RESPONSE.

23              THE COURT:  WELL, IF YOU WANT TO FILE -- I'LL TELL

24    YOU THIS:  YOU CAN FILE THE DOCUMENT, AND I'LL LET YOU HAVE

25    FIVE PAGES OR LESS TO TELL ME WHAT'S THE SIGNIFICANCE OF IT,
```

1    AND HE CAN HAVE FIVE PAGES TO SAY WHY IT'S NOT.  THAT WAY,

2    IT'S FAIR.  BOTH SIDES HAVE AT LEAST AN ABILITY TO COMMENT

3    ON IT.  OKAY?

4              MR. DIAMOND:  THANK YOU VERY MUCH, YOUR HONOR.

5              MR. GRANT:  THANK YOU, YOUR HONOR.

6              THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH,

7    COUNSEL.  I APPRECIATE IT.

8              THE CLERK:  THIS COURT NOW STANDS IN RECESS.

9              *(PROCEEDINGS CONCLUDED AT 5:00 P.M.)*

10                        --OOO--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          CERTIFICATE

 2

 3         I HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

 4   TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

 5   CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

 6   PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

 7   TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

 8   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

 9

10   DATED THIS 26TH DAY OF JULY, 2011.

11

12              /S/ MARY RIORDAN RICKEY
                MARY RIORDAN RICKEY
13              OFFICIAL COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25
```