# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF DOCUMENT DISCREPANCIES

FILED
CLERK, U.S. DISTRICT COURT
FEB 29 2012
CENTRAL DISTRICT OF CALIFORNIA
BY ___ DEPUTY

To: ☑ U.S. District Judge / ☐ U.S. Magistrate Judge __King__

From: __D Johnson__, Deputy Clerk    Date Received: __2/27/12__

Case No.: __7-732 GHK__    Case Title: __USA-v-Im Isaacs__

Document Entitled: __Letter__

Upon the submission of the attached document(s), it was noted that the following discrepancies exist:

- ☐ Local Rule 11-3.1   Document not legible
- ☐ Local Rule 11-3.8   Lacking name, address, phone and facsimile numbers
- ☐ Local Rule 11-4.1   No copy provided for judge
- ☐ Local Rule 19-1    Complaint/Petition includes more than ten (10) Does or fictitiously named parties
- ☐ Local Rule 15-1    Proposed amended pleading not under separate cover
- ☐ Local Rule 11-6    Memorandum/brief exceeds 25 pages
- ☐ Local Rule 11-8    Memorandum/brief exceeding 10 pages shall contain table of contents
- ☐ Local Rule 7.1-1   No Certification of Interested Parties and/or no copies
- ☐ Local Rule 6.1     Written notice of motion lacking or timeliness of notice incorrect
- ☐ Local Rule 56-1    Statement of uncontroverted facts and/or proposed judgment lacking
- ☐ Local Rule 56-2    Statement of genuine issues of material fact lacking
- ☐ Local Rule 7-19.1  Notice to other parties of ex parte application lacking
- ☐ Local Rule 16-6    Pretrial conference order not signed by all counsel
- ☐ FRCvP Rule 5(d)    No proof of service attached to document(s)
- ☑ Other: __Letter to Judge GK 03-2-11__

Note: Please refer to the court's Internet website at www.cacd.uscourts.gov for local rules and applicable forms.

## ORDER OF THE JUDGE/MAGISTRATE JUDGE

IT IS HEREBY ORDERED:

☐ The document is to be filed and processed. The filing date is ORDERED to be the date the document was stamped "received but not filed" with the Clerk. Counsel* is advised that any further failure to comply with the Local Rules may lead to penalties pursuant to Local Rule 83-7.

_____    _____
Date                U.S. District Judge / U.S. Magistrate Judge

☑ The document is **NOT** to be filed, but instead **REJECTED**, and is ORDERED returned to *counsel. *Counsel shall immediately notify, in writing, all parties previously served with the attached documents that said documents have **not** been filed with the Court.

__2/28/12__    _____
Date                U.S. District Judge / U.S. Magistrate Judge

*The term "counsel" as used herein also includes any pro se party. See Local Rule 1-3.

CV-104A (12/03)    NOTICE OF DOCUMENT DISCREPANCIES

GPO U.S. GOVERNMENT PRINTING OFFICE: 2007 672-579

**SheppardMullin**

Sheppard Mullin Richter & Hampton LLP
501 West Broadway, 19th Floor
San Diego, CA 92101-3598
619.338.6500 main
619.234.3815 main fax
www.sheppardmullin.com

February 27, 2012

The Honorable George H. King
United States District Court
Central District of California
255 East Temple Street
Los Angeles, California 90012

Re:  *United States v. Ira Isaacs*, Case No. 07-00732(A)-GHK
     Subpoena to Salon Journalist Tracy Clark-Flory

Dear Judge King:

This firm represents Tracy Clark-Flory, a journalist employed by Salon Media Group, Inc., which publishes salon.com. We submit this letter brief to bring to the Court's attention serious constitutional issues that may be raised by the government's subpoena of Ms. Clark-Flory to testify at the trial of Ira Isaacs (Defendant in the case referenced above) based on her news reporting.

Ms. Clark-Flory will appear in response to the subpoena. She will be represented by counsel. Although she has elected not to move to quash the subpoena—because the government has represented its direct examination of her will be limited to one ***published*** statement made by the Defendant to Ms. Clark-Flory (set forth below)—she respectfully requests that the Court consider whether she should be required to testify, and that if the Court determines that she must then permit her to provide a sworn affidavit in lieu of live testimony. We submit that excusing Mr. Clark-Flory from testifying or permitting her to submit an affidavit is appropriate given the marginal value of the testimony sought and the fact that the Defendant's desire to cross examination her may well extend to topics that Ms. Clark-Flory is privileged from divulging under the reporter's privilege recognized by courts under the First Amendment, the California Constitution, and federal common law.

In sum, if Ms. Clark-Flory is required to provide live testimony, it is likely her First Amendment rights will come into direct conflict with the Defendant's Sixth Amendment rights at trial. Given the extremely limited probative value of the testimony sought by the government, this significant clash of constitutional values is unnecessary, or at least requires rulings to be made in advance of any testimony by this Court.

**SheppardMullin**

The Honorable George H. King
February 27, 2012
Page 2

I. **The Testimony Sought Is Of Minimal Probative Value And Can Be Provided In An Alternative Form That Will Not Compromise First Amendment Values**

The government has represented to undersigned counsel that it seeks testimony from Ms. Clark-Flory on a single exchange between Ms. Clark-Flory and the Defendant, published on salon.com as part of a "Q&A" written by Ms. Clark-Flory. In the quote below, the bold faced text is Ms. Clark-Flory's question, and the standard font text is the Defendant's response.

> **"As far as your upcoming trial, one of your goals is to prove that your videos have artistic merit.**
>
> I have to do that to sound not guilty."

The government has further represented that it will ask Ms. Clark-Flory only to verify that she spoke with Mr. Isaacs, and that the article accurately describes his statement. A true and correct copy of Ms. Clark-Flory's complete article is attached to this letter.

It is not clear why Ms. Clark-Flory's live testimony is necessary. Under Ninth Circuit authority recognizing and applying the reporter's privilege under the First Amendment, the government is required to meet the tests set forth in *Shoen v. Shoen*, 5 F.3d 1289, 1290 (9th Cir. 1993) ("*Shoen I*") and *Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1993) ("*Shoen II*"). Under that test, the government must exhaust "all reasonable alternative sources" before testimony may be compelled in the face of an assertion of the First Amendment reporter's privilege. Moreover, the Defendant has a Sixth Amendment right of cross-examination that may extend to matters not published by Ms. Clark-Flory. If the Defendant cross-examines Ms. Clark-Flory, he will not be constrained by the government's representation that it will limit the scope of questioning. It therefore makes little sense to expose Ms. Clark-Flory to cross-examination that she may be forced to decline to answer for testimony of such limited probative value.

Ms. Clark-Flory has a strong basis in law for refusing to testify to unpublished information. That basis is provided for by both federal and California law.

II. **The First Amendment Privilege Bars Compelled Disclosure Here**

The Ninth Circuit recognizes a qualified privilege, grounded in the First Amendment, that protects journalists from compelled disclosure of unpublished information. *See Farr v. Pritchess*, 522 F.2d 464, 468-69 (9th Cir. 1975). The privilege applies to confidential information as well as non-confidential information. *Id.* (confidential information); *Shoen v. Shoen*, 5 F.3d 1289, 1290 (9th Cir. 1993) ("*Shoen I*") (non-confidential information). Even where the information sought is not confidential, the privilege is overcome only in exceptional circumstances. *See Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1993) ("*Shoen II*") ("The test we adopt must therefore ensure that compelled disclosure is the exception, not the rule"). Once the privilege is properly invoked, it is the burden of the party seeking the information to

**SheppardMullin**

The Honorable George H. King
February 27, 2012
Page 3

"demonstrate a sufficiently compelling need for the journalist's materials to overcome the privilege." *Shoen I*, 5 F.3d at 1296.

In *Shoen II*, the Ninth Circuit held that the reporter's privilege is overcome only where party seeking the information made a showing that the information is (1) unavailable despite exhaustion of all reasonable alternative sources; (2) noncumulative; and (3) clearly relevant to an important issue in the case. *Id.* at 416. *Schoen II* expressly applies this test in the context of a subpoena issued in a civil action. However, the government has no constitutional right to compel testimony in a criminal case any more than it does in a civil case. *See Miller v. Superior Court*, 21 Cal.4th 883, 895 (1999) (prosecutor's right of due process of law "specifically does not mean a right of access to evidence in contravention of previously existing evidentiary privileges and immunities which include those given to the press"); *Delaney v. Superior Court*, 50 Cal. 3d 785, 805 (Cal. 1990) (California shield law's protection may be overcome in criminal proceeding on showing that nondisclosure would deprive defendant of federal constitutional right to fair trial). Accordingly, the government here must meet the *Shoen* tests.

The government must therefore demonstrate that it has exhausted all other sources for the testimony it seeks from Ms. Clark-Flory (which could, for example, be obtained from the Defendant if he testifies at trial), that her testimony is not cumulative, and that it is directly relevant to an important issue. If it fails to make this showing, Mr. Clark-Flory should not be required to testify. If she is, then Ms. Clark-Flory's limited testimony regarding the Defendant's published statement can be provided by sworn affidavit. Should the Defendant desire to cross-examine Ms. Clark-Flory about unpublished information, the Court should rule on the issues raised in advance of the testimony, including whether Ms. Clark-Flory's testimony on direct should instead be properly excluded. Because cross-examination "is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal," *Pointer v. Texas*, 380 U.S. 400, 405 (1965), where a witness refuses to submit to cross-examination, the "conventional remedy" is to exclude the testimony on direct.

### III. California's Shield Law Applies Here Pursuant to Federal Rule of Evidence 501 and Federal Common Law

#### A. Rule 501 Requires Recognition of the Reporter's Privilege Against Compelled Testimony Under Federal Common Law

Ms. Clark-Flory has a further basis to refuse to testify, under federal common law and California's shield law, as applicable in federal court via Federal Rules of Evidence Rule 501.

Rule 501 holds that in federal question cases privileges "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." It applies with equal force in civil cases, criminal cases and grand jury proceedings. *See* Fed. R. Evid. 1101. The United States Supreme Court's guidance in *Jaffee v. Redmond*, 518 U.S. 1 (1996), compels recognition of a reporter's privilege under Federal Rule of

# SheppardMullin

The Honorable George H. King
February 27, 2012
Page 4

Evidence 501, separate from the privilege recognized under First Amendment jurisprudence. *See In re Grand Jury Subpoena to Judith Miller*, 438 F.3d 1141 at 1170-72 (D.C. Cir. 2005) (Tatel, J., concurring) (applying *Jaffee* to find the existence of a common-law reporters' privilege); *see also New York Times Co. v. Gonzales*, 459 F.3d 160, 181 (2d Cir. 2006) (Sack, J., dissenting) ("I have no doubt that there has been developed in [the last] thirty-four years federal common-law protection for journalists' sources under [Rule 501] as interpreted by *Jaffee*."). Rule 501 expressly empowers the federal courts to recognize and elucidate privileges "in the light of reason and experience." Fed. R. Evid. 501.

In *Jaffee*, in the absence of any federal legislation, the Supreme Court recognized a federal psychotherapist-patient privilege. In concluding that Rule 501 compelled recognition of such a privilege, the Court identified three factors: 1) whether important private and public interests would be served by recognition of the privilege; 2) whether the evidentiary cost of recognizing the privilege was likely to be modest; and 3) whether similar protections were afforded by the states.

Here, the first factor is plainly satisfied, for reasons well-stated by the Ninth Circuit in *Bursey v. United States*:

> The First Amendment interests in this case are not confined to the personal rights of [the journalists]. Although their rights do not rest lightly in the balance, far weightier than they are the public interests in First Amendment freedoms that stand or fall with the rights that these witnesses advance for themselves. . . The larger purpose was to protect public access to information....

*Bursey*, 466 F.2d 1059, 1083-84 (9th Cir. 1972) (citations omitted) (overruled on other grounds by *In re Grand Jury Proceedings* 863 F.2d 667, 670 (9th Cir. 1988); *see also Shoen I*, F.3d at 1292; *Riley v. City of Chester*, 612 F.2d 708, 714 (3d Cir. 1979) (recognizing reporter's privilege under Rule 501 in part because "[a] journalist's inability to protect the confidentiality of sources . . . will . . . seriously erode the essential role played by the press in the dissemination of information . . . to the public").

Thus, just as the Supreme Court concluded in *Jaffee* that the psychotherapist-patient privilege serves "[t]he mental health of our citizenry"—"a public good of transcendent importance" (518 U.S. at 11)—the reporter's privilege serves the political, economic and social health of our citizenry by allowing the public to make informed decisions.

The second factor identified in *Jaffee* is also satisfied: The important interests served by the reporter's privilege outweigh any evidentiary costs. This is true because, without a privilege,

**SheppardMullin**

The Honorable George H. King
February 27, 2012
Page 5

sources will be much less likely to provide information to the press that prosecutors and/or litigants will be interested in discovering. *Jaffee*, 518 U.S. at 11-12.

The third *Jaffee* factor looks to whether there is a consensus among the states in favor of recognizing the privilege. An overwhelming consensus exists today about the reporter's privilege. Shield laws have been adopted in 40 states, and the District of Columbia. *See* http://www.rcfp.org/browse-media-law-resources/news-media-law/news-media-law-summer-2011/number-states-shield-law-climbs.

    **B.**    **California's Reporter's Privilege Applies**

A final factor in determining whether a reporter's privilege should be recognized under Rule 501 is the treatment afforded reporters under the law of California. *See, e.g., Tennenbalm v. Deloitte & Touche*, 77 F.3d 337, 340 (9th Cir. 1996) (in determining federal law of privilege, court "may also look to state privilege law — here, California's — if it is enlightening").

California's shield law "protects a newsperson from being adjudged in contempt for refusing to disclose either: (1) unpublished information, or (2) the source of information, whether published or unpublished." *Delaney v. Superior Court*, 50 Cal. 3d 785, 805 (Cal. 1990); *Miller v. Superior Court*, 21 Cal. 4th 883 (1990); *Fost v. Superior Court*, 80 Cal.App.4th 724, 730 (2000) (citation omitted); Cal. Const. art. 1, § 2(b); *see also* Cal. Evid. Code § 1070. "The shield law is, by its own terms, absolute rather than qualified in immunizing a newsperson from contempt for revealing unpublished information obtained in the newsgathering process." *Miller v. Superior Court*, 21 Cal. 4th 883, 890 (1999) (emphasis in original).

Courts have also held that California's constitutional shield laws (the "Shield Law") "protects all unpublished information, even information that 'could or would confirm or amplify the published information or information derived therefrom." *McGarry v. University of San Diego*, 154 Cal.App.4th 97 (2007).

Moreover, courts have underscored that even published information may not be compelled from a reporter where a party will be deprived of cross-examination with respect to related, unpublished information by the California shield law. *Fost v. Superior Court*, 80 Cal.App.4th at p. 728. Where a witness refuses to submit to cross-examination, the "conventional remedy" is to exclude the testimony. *Id.* at pp. 734-737.

The only exception to the California shield law's absolute terms arises when the shield law clearly and unmistakably conflicts with a defendant's federal constitutional right to a fair trial. *Miller*, 21 Cal. 4th at 891. As it is the government, and not defendant, that subpoenaed Ms. Clark-Flory here, this issue is not relevant if Ms. Clark-Flory is not required to testify. If Ms. Clark-Flory is required to take the stand, the Defendant may assert his Sixth Amendment rights and cross examine her. However, even the Defendant's right to obtain evidence from Ms. Clark-Flory is not unlimited. Before requiring her to testify on cross, Defendant would be required to

**SheppardMullin**

The Honorable George H. King
February 27, 2012
Page 6

show "a reasonable possibility the information will *materially assist his defense.*" *Delaney*, 50 Cal. 3d at 808. The Court would be required to consider several factors in determining whether Defendant has met this "threshold requirement:"

> First, the burden is on the criminal defendant to make the required showing. Second, the defendant's showing need not be detailed or specific, but it must rest on more than mere speculation. Third, the defendant need not show a reasonable possibility the information will lead to his exoneration. He need show only a reasonable possibility the information will materially assist his defense.

*Delaney*, 50 Cal. 3d at 809. Assuming the threshold requirement is met, the Court would then be required to balance the conflicting constitutional interests of Ms. Clark-Flory and the Defendant, taking into account the following considerations: 1) Whether the unpublished information is confidential or sensitive; 2) the interests sought to be protected by the shield law; 3) the important of the information sought by the Defendants; and 4) whether there is an alternative source for unpublished information sought by the Defendant.

Thus, if Ms. Clark-Flory is required to testify, an conflict between the First and Sixth Amendments would very likely arise. Should he do so, the Court would then be required to determine, on a question-by-question basis, whether the testimony Defendant sought to elicit met the "threshold requirement" of the *Delaney* test, and whether the balance of Defendant's and Ms. Clark-Flory's respective constitutional interests justified compelled disclosure.

If the Court determined that cross-examination was not justified, it would then be required to consider whether the testimony elicited on direct examination should be stricken. As noted above, because cross-examination "is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal," *Pointer v. Texas*, 380 U.S. at 405, if a witness refuses to submit to cross-examination, the "conventional remedy" is to exclude the testimony. *Fost*, 80 Cal.4th at 735. Thus, even Ms. Clark-Flory's direct testimony may have to be excluded.

### IV.  Other Relevant Factors and Conclusion

Ms. Clark-Flory's testimony is of limited probative value at best. The constitutional rights—federal and state—implicated by compelling her to testify justify denying the government's attempt to do so. Ms. Clark-Flory respectfully requests that she not be required to testify. If any testimony is required, she requests that in lieu of live testimony the Court permit her to provide a sworn affidavit testifying to the accuracy of the Defendant's statement.

Excusing her from testifying, or permitting her to provide a sworn affidavit, would further allow Ms. Clark-Flory to engage in news reporting as opposed to be on trial call for several days, as the government has indicated she will be. Moreover, Ms. Clark-Flory's employer, Salon Media

The Honorable George H. King
February 27, 2012
Page 7

Group, would like her to report on the trial of the Defendant, which this Court may not allow if she is a witness.

Accordingly, for the reasons set forth, Ms. Clark-Flory respectfully requests she not be compelled to testify, and that if she is then in lieu of live testimony the Court permit her to provide a sworn affidavit.

Very truly yours,

Gaylyn R. Cummins
James M. Chadwick
for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

W02-WEST:5DAS1\404677672.2

cc:   Michael W. Grant, Esq.
      Roger J. Diamond, Esq.

Print: » An obscene filmmaker defends himself » Print - Salon.com          Page 1 of 3

 salon.com                                                            http://www.salon.com/2011/04/19/obscenity/singleton

TUESDAY, APR 19, 2011 9:52 PM UTC2011-04-19T21:52:00ZL, M J, Y G:| A T

# An obscene filmmaker defends himself

As senators push for more porn prosecutions, we talk to the man at the center of the next federal obscenity trial

BY TRACY CLARK-FLORY



When you call up a man facing federal obscenity charges for films featuring scatology and bestiality, you don't exactly expect to end up talking about Franz Kafka, James Joyce and Allen Ginsberg. But that's exactly what happened when I spoke with Ira Isaacs, who is scheduled for trial next month for selling films with names like "Pony Sex Game" and "Hollywood Scat Amateurs No. 7." Given that nearly half of the senate recently signed a letter demanding more obscenity prosecutions against pornography, I figured it was time to talk to the man at the center of the next trial of this sort on the federal docket.

As you have probably surmised by now, you shouldn't read on if you're opposed to hearing about some of the more stomach-turning sexual content to be committed to film. Isaacs has been indicted for making and selling coprophilic porn, a la "Two Girls One Cup" (a word of advice: if you don't know what that is, refrain from Googling — ignorance may not always be bliss, but in this case it will at least preserve your lunch). He's also charged with distributing a bestiality film made by a Dutch filmmaker.

It is repulsive material by most accounts — but Isaacs contends that it's art. Under the Miller test, which is nearly four decades old, a work is obscene only if it: 1.) "appeals to the prurient interest" based on "contemporary community standards," 2.) depicts sexual conduct in a "patently offensive way" and 3.) "lacks serious literary, artistic, political, or scientific value." This case serves as a choice example of the complicated issues that arise in federal obscenity trials — and it's especially critical to consider amid the recent high-profile push in Washington.

**What do you make of the renewed push for more obscenity prosecutions?**

I think a political year is coming up and some of these things you do just to get votes. I don't know how serious they are or not. Personally I think it's absurd that the government is wasting all this time and energy.

**As far as your upcoming trial, one of your goals is to prove that your videos have artistic merit.**

I have to do that to sound not guilty.

http://www.salon.com/2011/04/19/obscenity/print/                                                       11/23/2011

**Right. And so how are you going to go about doing that?**

Well, post-modern art, which has been around for 20 to 30 years, has celebrated disturbing images. I'm gonna show exhibits at the trial of Marcel Duchamp's "Fountain," Robert Rauschenberg's "White Paintings" to talk about how things sometimes are deeper than they look on the surface. Kiki Smith did a sculpture in the Whitney Museum a couple years ago of a woman on all fours with a ten foot turd coming out of her rear end. There are all these things that are scatological in legitimate artistic venues.

All the prosecution is saying is, "Watch these DVDs and get so emotionally charged by them that you don't think anymore and you just go by your gut reaction." I think in your gut reaction anybody who saw these and wasn't familiar with them would think they were obscene. *I* would think that. But once I start thinking about more than what's on the surface and what art tries to do in general, I would realize that they haven't proved anything. Right now we're looking at 10 hours of my work, what I call "The Isaacs Fetish Film Festival" — coming to court soon.

**What's the artistic thinking behind your films then?**

Shock art has been getting its day in the last 15 to 20 years and I wanted to do something different, something shocking. I wanted to challenge all of the taboos of the government. Except for the possible prison part, this is kind of like the Academy Award for an artist. Basically, they're saying to me that my stuff is so wild that — it's kind of like that movie "Reefer Madness" back in the 20s — they think that if people watch my stuff they're gonna go crazy and they need to throw me away to protect society. That's a big compliment for an artist. There have been other artists who were considered obscene in the past and now they're masterpieces — James Joyce's "Ulysses," for example. I'm not saying my stuff is anything like it; it's not. I'm just saying going after artists is never a good thing for a government to do.

**What's your artistic message?**

My mission is to challenge, offend and offend again. Postmodernism is based on nontraditional things. For example, John Cage has a symphony called "4'33." He's played it at [respectable] venues — only nothing is played. The conductor puts up his baton and nothing happens for four minutes and 33 seconds.

The whole idea of any piece of art is that it challenges the viewer to think about it and what it means. Even if it's Rauschenberg's painting — it makes you think, "Anybody can do this — it's just a white painting! Why is it in a museum?" It gets people to think and be challenged and to ask questions. And I think my movies did do that. If it wasn't art before, this whole trial has elevated it to the level of serious art.

**So you see yourself as standing apart from the porn industry?**

Absolutely. First of all, the porn industry doesn't like me. Believe it or not, they want to be very respectable, and I'm not respectable enough for them. They feel that my stuff is making them look bad and that they're really good guys and really, like, *Hollywood*. Second, I don't think [what I do is] porno in the strictest sense. A lot of porno people are artists. But I have to make these distinctions because I want to win this.

**You've been offered pretty handsome plea deals — why haven't you taken them?**

'Cause sometimes you gotta stand for things. I want to have my day in court. They offered me four months and I just couldn't take it. I looked in the mirror and said, "Can I live with myself after lying to the judge just to save myself a lot of inconvenience?" And I said I just can't do it, I can't live with myself as a person knowing that I'm not standing up for something. That's just not me, and maybe to my own downfall. Are you familiar with Kafka at all?

**Sure.**

Originally I had the "Two Girls One Cup" defense, but I now have the Kafka defense from his famous book, "The Trial." The character's name, by the way, is the director's credit I've used from the beginning — either it's a self-fulfilling prophecy or I predicted the future [laughs]. But, anyway, I am now like this character that finds himself arrested for this crime and no one can tell him what it is, and it's very similar in a sense.

How so?

There's no phone number I could have called to say, "Am I going over the line by doing this?" There is no hotline. If they really didn't want this stuff they could have made it clear. They could have said, "You can't do bestiality, you can't to scatology" — but what they say instead is, "You can do it if it's serious art." Why say that? Just say you can't do it!

People can film [scatology], they can engage in it, they can watch it — they just can't sell it or distribute it. It's a *legal product* that I can go to prison for. It doesn't really do any harm, otherwise they wouldn't make it legal. You're not allowed to watch child porn, you're not allowed to possess it; so there are illegal images that they made laws against, but this one it is legal.

Where should we draw the legal line?

I don't think you should use kids. You shouldn't use non-consenting people, and kids can't consent.

What about the Dutch bestiality film that you distributed?

I tell ya something, people have said to me, "Isn't that animal cruelty?" And I would say to them, "Listen, do you remember Eight Bells in the Kentucky Derby? The one who broke his leg and they came out and shot the horse right there in the head?" That's animal cruelty. Is sex more cruel to an animal than eating it? I think Kentucky Fried Chicken should go to prison before I do.

What would you say to people who are horrified and offended by the material in your —

I'm offended by Christians who keep telling me that I have to be like them! That's what I'm offended by. I'm offended that they're making people's lives miserable based on their phony beliefs and phony gods. I don't have a problem with people being religious, more power to them, but when they start coming into my life and telling me I can't be say or do this or that, it's absurd. These are modern day religious witch-hunts. If they want to protest me, picket me, write bad articles, they're welcome to — that's their right. If they want to ostracize me as a person, that's their right, I respect that. But the government should not be in this. For the government to come after me with all their force and all their money is outrageous. Offending people should be a constitutional right.

The witch-hunters are always the witch-hunters — it's just the narrative that changes. James Joyce's "Ulysses" was tried for obscenity. So was Allen Ginsberg's "Howl." I can name you ten major authors that we study in school and consider masterpieces that we used to consider obscene. Now, I'm not calling my stuff masterpieces, but we don't want artists to be afraid to do new things.

 *Tracy Clark-Flory is a staff writer at Salon. Follow @tracyclarkflory on Twitter.*

Copyright © 2011 Salon.com. All rights reserved.

```
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
   Including Professional Corporations
GUYLYN R. CUMMINS, Cal. Bar No. 122445
gcummins@sheppardmullin.com
JAMES M. CHADWICK, Cal. Bar No. 157114
jchadwick@sheppardmullin.com
501 West Broadway, 19th Floor
San Diego, California 92101-3598
Telephone:  619-338-6500
Facsimile:   619-234-3815

Attorneys for Non-Party
TRACY CLARK-FLORY
```

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>IRA ISAACS, dba Stolen Car Films, dba La Media,<br><br>　　　　　Defendants. | Case No. CR 07-732(A)-GHK<br><br>**PROOF OF SERVICE**<br><br>CRTRM:　　650<br>JUDGE:　　Hon. George H. King |

*United States of America v. Isaacs, et al.,* Case No. CR 07-732(A)-GHK
United States District Court, Central District of California

## PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF SAN DIEGO

I am employed in the County of San Diego; I am over the age of eighteen years and not a party to the within entitled action; my business address is 501 West Broadway, San Diego, California 92101.

On **February 27, 2012**, I served the following document(s) described as

**Letter Brief Dated February 27, 2012**

on the interested party(ies) in this action by placing true copies thereof enclosed in sealed envelopes and/or packages addressed as follows:

| | |
|---|---|
| Roger J. Diamond **(via fax)** <br> Roger J. Diamond Law Office <br> 2115 Main Street <br> Santa Monica, CA 90405 <br> Telephone: 310-399-3259 <br> Facsimile:  310-392-9029 <br> Attorneys for Defendant | Damon A. King **(via email)** <br> Deputy Chief-US Department of Justice <br> Child Exploitation and Obscenity Section <br> 1400 New York Avenue NW, 6th Floor <br> Washington, DC 20005 <br> Telephone:  202-353-7304 <br> Facsimile:   202514-1793 <br> damon.king@usdoj.gov <br> Attorneys for Plaintiff |

Michael W. Grant **(via email)**
US Department of Justice
Child Exploitation and Obscenity Section
1400 New York Avenue NW, 6th Fl.
Washington, DC 20005
Telephone:  202-307-1982
Facsimile:   202514-1793
Michael.grant@usdoj.gov
Attorneys for Plaintiff

☒ **BY FACSIMILE:** I served said document(s) to be transmitted by facsimile pursuant to Rule 2.306 of the California Rules of Court.  The telephone number of the sending facsimile machine was 619-234-3815.  The name(s) and facsimile machine telephone number(s) of the person(s) served are set forth in the service list.  The sending facsimile machine (or the machine used to forward the facsimile) issued a transmission report confirming that the transmission was complete and without error.  Pursuant to Rule 2.306(h)(4), a copy of that report is attached to this declaration.

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or agreement of the parties to accept service by electronic transmission, I caused the documents to be sent to the persons at the electronic notification addresses listed above.  The electronic notification address from which I served the documents(s) is gcummins@sheppardmullin.com.

-1-

*United States of America v. Isaacs, et al.*, Case No. CR 07-732(A)-GHK
United States District Court, Central District of California

1  ☒  **FEDERAL:** I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on **February 27, 2012**, at San Diego, California.

*/s/ Anjali Strauss*
Anjali Strauss

-2-

W02-WEST:8GRC1\404692055.1                                          PROOF OF SERVICE